1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Marc C. Forsythe – State Bar No. 153854
Charity J. Miller – State Bar No. 286481
GOE & FORSYTHE, LLP
18101 Von Karman Avenue, Suite 1200
Irvine, CA 92612
mforsythe@goeforlaw.com
cmiller@goeforlaw.com
Telephone:  (949) 798-2460
Facsimile:  (949) 955-9437

Attorneys for AVT, Inc., Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – RIVERSIDE DIVISION

In re:

AVT, INC.,

      Debtor and Debtor in Possession.

Case No. 6:15-bk-14464-MW

Chapter 11 Case

**NOTICE OF MOTION AND MOTION
FOR ORDER:**

**(1) APPROVING THE SALE OF THE
ESTATE'S ASSETS FREE AND
CLEAR OF LIENS AND OTHER
INTERESTS PURSUANT TO 11 U.S.C.
§363 (b) & (f);**

**(2) AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF THE
ESTATE'S INTEREST IN CERTAIN
EXECUTORY CONTRACTS
PURSUANT TO 11 U.S.C. §365;**

**(3) FINDING PURCHASER IS A GOOD
FAITH PURCHASER; AND**

**(4) WAIVING 14-DAY STAYS OF FRBP
6004(h) AND 6006(d)**

**MEMORANDUM OF POINTS AND
AUTHORITIES AND DECLARATIONS
OF WAYNE SALVINO AND SUSAN
GOODDELL GOLDMAN IN SUPPORT**

**Hearing:**
  Date:     May 10, 2016
  Time:     2:00 p.m.
  Place:    411 West Fourth Street
           Courtroom 5C
           Santa Ana, CA 92701[1]

**PLEASE TAKE NOTICE** that, pursuant to Local Bankruptcy Rule 6004-1, a hearing ("Sale Hearing") will be held at the above-referenced date, time, and location to consider this motion (the "Motion") by chapter 11 debtor and debtor in possession, AVT, Inc. ("Debtor"), for the entry of an order approving the sale ("Sale") of substantially all of the Debtor's assets that constitute property of the Debtor's bankruptcy estate pursuant to Section 541 of the Bankruptcy Code, including all of the tangible and intangible assets owned or used by Debtor, or contemplated to be used, in the operation of the Debtor's business or otherwise located at the Debtor's premises, including all inventory, accounts receivable, work in process, open purchase orders, intellectual property, the books and records of the Debtor relating to the assets (collectively, the "Property" or the "Purchased Assets"), subject to overbidding during an auction conducted in accordance with the bidding procedures ("Bid Procedures") approved by the Court in an order entered March 17, 2016 ("Bid Procedures Order"), to the highest bidder ("Purchaser") in an amount not less than $950,000.00, and for other relief.  Attached in support of the Motion is the following Memorandum of Points & Authorities and the Declarations of Wayne Salvino ("Salvino Declaration") and Susan Gooddell Goldman ("Goldman Declaration").  Also in support of the Motion is the separate and concurrently filed *Request for Judicial Notice* ("RJN") and the exhibits thereto.

As discussed below, the Debtor and Official Committee of Unsecured Creditors ("Committee") jointly retained Clear Capital Advisors ("CCA") as the estate's exclusive broker in order to market for sale, seek buyers, and effectuate a sale of the Debtor and/or the Property.  Since engaged, CCA has aggressively marketed the Debtor and the Property for sale.

Time is of the essence as Debtor's pre-petition lender and secured creditor, EWB, has indicated its opposition to the Debtor's continued use of cash collateral.  Time is also of the essence because Debtor's deadline to assume or reject its nonresidential real property lease is currently May 3, 2016, according to the *Order Approving Stipulation by and between Debtor, Prim Westgate, LLC, and the Official Committee of Unsecured Creditors to Continue Hearing on Debtor's Motion for*

---

[1] All Qualified Bidders (as defined in the Bid Procedures summary) must appear in person or through a representative at the Ronald Regan Federal Building and U.S. Courthouse, 411 West Fourth Street, Courtroom 5C, Santa Ana, CA 92701. Qualified Bidders may **not** appear at the United States Federal Courthouse, Riverside Division, 3420 Twelfth Street, Video Hearing Room 126, Riverside, CA 92501.

1

*Order Pursuant to 11 U.S.C. Section 365 Authorizing Assumption of Debtor's Nonresidential Real Property Lease* [Docket No. 342].

   **PLEASE TAKE FURTHER NOTICE** that the Debtor proposes to sell the Property according to the terms set forth in the attached Asset Purchase Agreement ("APA"), subject to overbidding during an auction to be conducted before the Court on May 10, 2016, at 2:00 p.m. ("Auction"). A true and correct copy of the APA is attached to the Salvino Declaration as **Exhibit "1"**.

   **PLEASE TAKE FURTHER NOTICE** that the Court previously approved the Bid Procedures pursuant to the Bid Procedures Order. A true and correct copy of the Bid Procedures Order is attached to the RJN as **Exhibit "4"**. The following table is a summary of the court-approved Bid Procedures, which are further discussed in the Memorandum of Points and Authorities. The terms of the APA and the Bid Procedures (as approved in the Bid Procedures Order) control in the event of any inconsistency with this summary. The Debtor intends to sell the Property to the Purchaser, for a minimum of $950,000 (the "Purchase Price" or "Opening Bid") subject to the Bid Procedures pursuant 11 U.S.C. § 363(b), (f), and (m) (the "Sale").

| | |
|---|---|
| Subsequent Overbids: | $25,000.00 increments[2]. |
| Representation & Warranties: | The Property shall be sold on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtor, except to the extent expressly set forth in the Agreement or the Marked Agreement (defined below), as the case may be. |
| Treatment of Liens | The Property shall be sold, subject to approval by order of the Bankruptcy Court entered after the Auction, free and clear of all liens, claims, and adverse claims of ownership, with any monetary liens against the Property to attach to the net proceeds of the sale with the same priority as existed with respect to the Property. |
| Qualification of Bidders: | Only Qualified Bidders ("Qualified Bidders") will be allowed to bid for the Property. In order to become a Qualified Bidder, a bidder shall meet all of the following requirements:<br><br>1. Within three (3) business days prior to the hearing on the Sale Motion, delivers to the escrow holder appointed by the Debtor ("Escrow Holder"):<br><br>  (a) a cash deposit equal to Five Percent (5%) of its |

[2] Debtor reserves the right to name a Stalking Horse Bidder prior to the hearing, in accordance with the terms set forth in the approved Bidding Procedures.

| | |
|---|---|
| | Opening Bid or the alternative bid to the Opening Bid ("the "Alternative Bid"); |
| | (b) a form of proposed purchase and sale agreement (the "APA") for the Alternative Bid, together with a redline reflecting changes from the APA ("Marked Agreement"); |
| | (c) written evidence reasonably satisfactory to the Debtor and the Committee of its financial ability to perform the obligations under such APA before, on and after the closing of the sales transaction contemplated for the sale of the Property (the "Closing"); and |
| | (d) a written statement signed by the Bidder agreeing that such Bidder, if successful at the hearing on the Sale Motion, shall be bound by the terms of the APA. No Alternative Bids that are contingent as to diligence or financing shall be considered. |
| Auction Procedures: | Debtor and the Committee will conduct an auction (the "*Auction*") for the Property at the Sale Hearing. If only one bid is received, the Auction will not be held, and the Debtor and the Committee will proceed to seek approval of the Sale pursuant to the terms of the APA or any Marked Agreement, as the Successful Bid (defined below) at the Sale Hearing. If necessary, the Auction shall be conducted in accordance with the following:

1. Only a Qualified Bidder, as determined by the Debtor and the Committee pursuant to Section III of the Bidding Procedures will be eligible to participate at the Auction.

2. Alternative Bids shall be in not less than Twenty Five Thousand and 00/100 Dollar ($25,000) increments.

3. Any sale of the Property must be on the same or better material terms and conditions as set forth in the APA and related documents, or as the Bankruptcy Court may determine are in the best interests of creditors and the Debtor's bankruptcy estate.

4. The highest and best bid submitted by a Qualified Bidder (the "Successful Bidder") as determined by the Debtor and the Committee, shall be deemed the successful did for the Property (the "Successful Bid").

5. The second highest and best bid submitted by a Qualified Bidder (the "*Backup Bidder*") that is designated by the Bankruptcy Court as a "backup" bid at the Sale Hearing (the "*Backup Bid*"), shall remain binding upon the offeror as an Alternative Bid, and in the event the Successful Bidder fails to close as required, such Backup Bid shall be deemed accepted by the Debtor and the Committee and approved by the Bankruptcy Court. In the event that the Debtor and the Committee intend to proceed with a closing with respect to the Backup Bid, the Debtor shall provide to the Backup Bidder not less than three (3) days' prior written notice of the date set for the closing with respect to such Backup Bid. |

6.     If an Alternative Bid is received, the Auction will be held at the Sale Hearing, which shall commence on May 10, 2016, at 2:00 p.m. and shall take place in Courtroom "5C" of the United States Bankruptcy Court, Central District of California, Santa Division, 411 West Fourth Street, Santa Ana, California 92701.  At the Sale Hearing, in addition to holding any necessary Auction of the Property, the Debtor and the Committee will jointly seek entry of an order authorizing and approving, among other related relief, the sale of the Property to the Successful Bidder, (the "Sale Order"). Following entry of the Sale Order, the Debtor will proceed to close the sale transaction upon the satisfaction or waiver of all applicable conditions precedent to closing.

**PLEASE TAKE FURTHER NOTICE** that the Debtor requests that the sale be made free and clear of all liens and other interests in the Property, pursuant to 11 U.S.C. §363(f)(3) and (4). Debtor's first priority lien creditor is East West Bank ("EWB"), which is perfected by the filing of a UCC-1 lien on October 1, 2012 ("Senior Lien").  Debtor submits that the Senior Lien is over secured and therefore, the Sale should be approved free and clear of the Senior Lien pursuant to Section 363(f)(3).  Debtor has also learned that Franciso Izawa, Frescos Mexican Grill, Inc., and Worth, Inc., filed UCC-1 financing statements or UCC judgment liens shortly before this case was commenced, which liens debtor disputes as preferential transfers under 11 U.S.C. Section 547.  The known liens, including the Senior Lien (collectively, the "Disputed Liens"), are all in bona fide dispute and should and the sale should therefore be approved free and clear pursuant to Section 363(f)(4).   Evidence of the filing of the Disputed Liens is attached to the Salvino Declaration as **Exhibit "2"**.

**PLEASE TAKE FURTHER NOTICE** that the Property includes various executory contracts (the "Executory Contracts") and the Debtor requests that the Court approve the assumption and assignment of all of the desired contracts set forth in the Agreement or any agreement submitted by an Alternative Bidder in accordance with the Bidding Procedures, to the eventual purchaser, whether it is the Buyer or a Successful Overbidder ("Purchaser"), upon closing of the Sale pursuant to 11 U.S.C. § 365(b), (d) & (f).  Debtor requests that the Court allow the Debtor to reject any of the Executory Contracts that are either determined to be unfavorable to the Debtor or are not desired by the Purchaser.  Debtor is a party to the following Executory Contracts: (1) Marriot International Inc., Dated March 20, 2015; (2) Nonresidential Real Property Lease ("Lease") with Prim Westgate, LLC,

4

a Delaware limited liability company ("Landlord")[3], Dated March 5, 2010, and the amendment

thereto dated April 21, 2015; (3) RSA Buying Group, Inc. Dated February 8, 2015; (4) Rug Doctor,

Inc., Dated June 11, 2011; (5) Rug Doctor, Inc., Dated January 1, 2015; (6) Chafey College Auxiliary

Services  Dated August 12, 2014; (7) City of Santa Ana Dated July 1, 2013; (8) Fitness International,

LLC  Dated June 18, 2014; (9) Marine Corps Community Services Dated April 7, 2015; (10) Sprint

Solutions, Inc. , Dated December 2, 2009; (11) Cellco Partnership dba Verizon Wireless, Dated

October 4, 2012; (12) Jofemar USA, Inc. Dated June 21, 2011; (13) Department of Rehabilitation

#28717,  Dated August 1, 2012; (14) Department of Rehabilitation #287162, Dated August 1, 2012;

(15) Worth Management, Inc., Dated May 1, 2015; (16) Worth, Inc., Dated January 1, 2013; (17)

Vending Software Design, Inc., Dated January 1, 2014.

The cure amounts for the Executory Contracts are set forth in the Salvino Declaration and

copies of the Executory Contracts are attached to the Salvino Declaration as **Exhibit "3"**.

**PLEASE TAKE FURTHER NOTICE** that the Debtor requests the Court make a

finding that the Purchaser is a good faith purchaser pursuant to 11 U.S.C. § 363(m) to the extent

Purchaser is able to satisfy the requirements for such finding.

**PLEASE TAKE FURTHER NOTICE** that the Debtor requests that the Court waive the

14-day stays as set forth in Bankruptcy Rules 6004(h) (concerning the Sale of the Property) and

6006(d) (concerning the assignment of the Executory Contracts).

**PLEASE TAKE FURTHER NOTICE** that Local Bankruptcy Rule 9013-1(f) provides

each interested party opposing or responding to the Motion must file and serve the response on the

Debtor and the Office of the United States Trustee not later than 14 days before the date designated

for hearing on the Motion.

\\\

---

[3] The assumption and assignment of the Lease is subject to the terms of the Order Approving Stipulation to Continue
Lease Assumption Motion [Dkt. # 342].

1    Dated:  April 19, 2016                    GOE & FORSYTHE, LLP

2

3                                             By:___/s/ Marc C. Forsythe_____
                                                  Marc C. Forsythe
4                                                 Charity J. Miller
                                                  Attorneys for AVT, Inc.,
5                                                 Chapter 11 Debtor and Debtor in Possession

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**MEMORANDUM OF POINTS AND AUTHORITIES**

3

I.    **INTRODUCTION**

4

By the time of the hearing on this Motion, this chapter 7 bankruptcy case will have been

5

pending for one (1) year.  Debtor has expended a great deal of time investigating exit financing in

6

hopes of being able to propose a plan of reorganization.  As of the date of this motion, no such

7

financing has been offered to Debtor on favorable terms.  EWB has expressed its intent to oppose

8

Debtor's continued use of cash collateral.  Additionally, Debtor's time to assume its real property

9

lease ("Lease") has been extended by stipulation until May 3, 2016, and Debtor's lessor has

10

indicated its intention to require Debtor to assume or reject the lease.  Debtor believes the

11

Committee may oppose Debtor's attempted assumption of the Lease due to the sizeable

12

administrative claim that could result as a consequence of assumption.  Given these facts, the sale of

13

the Property is at this juncture is necessary and in the best interests of the estate.

14

To that end, the Debtor through the estate's exclusive investment banker (CCA), has

15

marketed the Debtor and/or its assets for sale for the past five (5) months with a strategic marketing

16

campaign, which involved CCA contacting sixty-three (63) potential buyers.   Thirty (30) potential

17

buyers responded to the marketing efforts, eighteen (18) signed non-disclosure agreements, six (6)

18

performed preliminary due diligence in connection with a potential acquisition, and two (2) signed

19

letters of intent.  The Sale is subject to overbidding, as set forth in the court-approved Bid

20

Procedures, during an Auction that, by the time of the hearing, will have been extensively marketed

21

by CCA in the hopes of developing interest from prospective overbidders.  The Debtor is confident

22

that the Purchase Price and Bid Procedures will ensure that the highest value possible will be

23

received for the Property.

24

It is imperative that the Sale be approved free and clear of liens and other interests in the

25

Property, including the UCC-1 lien in favor of EWB, pursuant to 11 U.S.C. § 363(f)(3) and

26

§363(f)(4), as a bona fide dispute exists as to each of the Disputed Liens.

27

28

7

Upon approval of this motion and the closing of the Sale, the Debtor intends to assume and assign all of the estate's interest in the Executory Contracts to the Purchaser of the Property pursuant 11 U.S.C. § 365(b), (d) & (f).  As discussed below, the Debtor is in compliance with most of its contractual obligations under the Executory Contracts.  According to the terms of the APA, Buyer will cure any delinquencies existing under the Executory Contracts and to the extent necessary, provide adequate assurances of future performance under the Executory Contracts.  The Debtor submits that all Qualified Bidders shall be more than capable of performing such duties, as demonstrated by their financial capability to close the Sale, which constitutes adequate assurances of the Purchaser to perform such duties.

Finally, the Debtor may seeks a determination that the Purchaser is a good faith purchaser in accordance with 11 U.S.C. § 363(m) provided that any Qualified Bidder requests such finding. Debtor also request waivers of the 14-day stays as set forth in Bankruptcy Rules 6004(h) (concerning the Sale of the Purchaser Assets) and 6006(d) (concerning the assignment of the Executory Contracts).

## II.    STATEMENT OF FACTS

### A.    Background

On May 1, 2015 (the "Petition Date"), a chapter 11 bankruptcy petition was filed on behalf of the Debtor.  The Debtor is operating its business and managing its affairs as a debtor-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.  No trustee or examiner has been appointed in this case.  See Salvino Declaration ¶2. The Committee was appointed by the United States Trustee on June 8, 2016 [Docket No. 55].  Debtor is a publicly traded company and has been in business for more than 40 years. Debtor is headquartered in Corona, California.  See Salvino Declaration ¶3.  Debtor owns no real property.  Debtor's main sources of income are the design and manufacture of custom vending kiosks, income from the sale of goods through vending routes, and sale of technologies including broadband for computerized kiosk.  Id.

1.    The Court Approved the Employment of Debtor's Professionals.

The Court has entered orders approving the Debtor's applications to employ (i) Goe & Forsythe, LLP as general bankruptcy counsel [Docket No. 60[4]]; (ii) Pritchett Siler Hardy P.C. as Debtor's independent auditors [Docket No. 177]; (iii) One Blue Mountain as outside accountants [Docket No. 179]; (iv) Armory Consulting as financial advisor to the Committee [Docket No. 222]; and (v) Clear Capital Advisors as the estate's exclusive investment banker [Docket No. 287][5].

2.    The Disputed Liens in Favor of Secured Creditors

East West Bank ("EWB") holds two liens against Debtor secured by a majority of Debtor's assets, with total outstanding indebtedness to EWB in the approximate amount of $664,490.00.   In 2012, Debtor borrowed $1,000,000 from EWB to purchase equipment and materials and also received a $1,000,000 line of credit from EWB to provide it with working capital.   In consideration for these loans, Debtor provided EWB a security interest in a majority of its assets, as evidenced by a UCC-1 filing.  None of Debtor's other creditors hold an interest in cash collateral. See Salvino Declaration ¶4.

Debtor recently discovered three of the Disputed Liens, which include UCC judgment liens were recorded by Francisco Izawa, Frescos Mexican Grill, Inc., and April 28, 2015, (Filing Numbers 157462271277 and 157462274442).  Debtor also recently discovered an insider of Debtor, Worth, Inc., filed a UCC lien on April 10, 2015.  Given the timing of the perfection of these liens, among other facts, Debtor disputes these liens and intends to file preference actions under Section 547 of the Bankruptcy Code.  See Salvino Declaration ¶5.

A copy of the search results from the UCC-1 lien search that reflects the filing of the Disputed Liens is attached to the Salvino Declaration as **Exhibit "2"**.

---

[4] The terms of employment approved in this Order were subsequently amended on request of the Debtor by Docket No. 209.
[5] True and correct copies of the Orders employing the professionals in this case are attached to the concurrently filed RJN as exhibits 6-11.

**B.** **The Proposed Sale of the Property**

    1.   The Debtor's Assets and the Property to be Sold

Debtor seeks an order approving the sale of substantially all of the Debtor's assets including the tangible and intangible assets owned or used by the Debtor, or contemplated to be used in the operation of Debtor's business or otherwise located at Debtor's premises (in the past, currently, or contemplated in the future), specifically including, again without limitation, all inventory and tangible assets, accounts receivable, work in process, open purchase orders, intellectual property, cash deposits of any kind provided by Debtor in the ordinary course of its business as it relates to the Property, equity interests of any subsidiaries of Debtor, and the books and records of Debtor relating to the Property.   A more complete description of the Property and the exclusions therefrom are in the APA attached as **Exhibit "1"** to the Salvino Declaration.

Debtor is a party to the Executory Contracts with the following parties/entities which Debtor, upon the request of a Qualified Bidder, shall seek approval for the assumption and assignment of said contracts, based on the following estimation of default cures required pursuant to Section 365.

| | **Executory Contract** | **Existing Defaults Under Contract** |
|---|---|---|
| 1. | Marriot International Inc., Dated March 20, 2015 | No known defaults exist under this agreement. |
| 2. | Nonresidential Real Property Lease ("Lease") with Prim Westgate, LLC, a Delaware limited liability company ("Landlord"), Dated March 5, 2010, and the amendment thereto dated April 21, 2015 | No known defaults exist under this agreement. |
| 3. | RSA Buying Group, Inc. Dated February 8, 2015 | No known defaults exist under this agreement. |
| 4. | Rug Doctor, Inc., Dated June 11, 2011 | No known defaults exist under this agreement. |
| 5. | Rug Doctor, Inc., Dated January 1, 2015 | No known defaults exist under this agreement. |
| 6. | Chafey College Auxiliary Services  Dated August 12, 2014 | Debtor believes a monetary default in the amount of $10,000.00 exists under this agreement. |

| 7.  | City of Santa Ana Dated July 1, 2013 | No known defaults exist under this agreement. |
| 8.  | Fitness International, LLC  Dated June 18, 2014 | No known defaults exist under this agreement. |
| 9.  | Marine Corps Community Services, Dated April 7, 2015 | No known defaults exist under this agreement. |
| 10. | Sprint Solutions, Inc.  Dated December 2, 2009 | No known defaults exist under this agreement. |
| 11. | Cellco Partnership dba Verizon Wireless  Dated October 4, 2012 | No known defaults exist under this agreement. |
| 12. | Jofemar USA, Inc. Dated June 21, 2011 | Debtor believes a monetary default exists under this agreement in the amount of $49,208 and that mutual non-moentary defaults exist. |
| 13. | Department of Rehabilitation #28717  Dated  August 1, 2012 | No known defaults exist under this agreement. |
| 14. | Department of Rehabilitation #287162 Dated August 1, 2012 | No known defaults exist under this agreement. |
| 16. | Worth Management, Inc., Dated May 1, 2015 | No known defaults exist under this agreement. |
| 17. | Worth, Inc., Dated January 1, 2013 | No known defaults exist under this agreement. |
| 18. | Vending Software Design, Inc., Dated January 1, 2014 | No known defaults exist under this agreement. |

True and correct copies of the Executory Contracts are attached to the Salvino Declaration as **Exhibit "3"**.

Debtor filed a motion requesting an extension of the time to assume or reject its Lease pursuant to Section 365(B)(i), which was granted.  [*See* Docket No. 182].  Thereafter, Landlord consented to an additional extension of time for Debtor to file a motion to assume or reject the Lease through January 25, 2016.  Debtor previously filed a motion to assume the Lease [Docket No. 331], which was continued to May 3, 2016, pursuant to the stipulation between Landlord, the Committee and the Debtor [Docket No. 341], which was approved by Order of the Court on March 1, 2016 ("Lease Assumption Order") [Docket No. 342, attached as **Exhibit "12"** to the RJN].  Pursuant to the Lease Assumption Order, Debtor's ability to assume and assign the Lease is subject to the Landlord's approval.

Debtor also owns the following valuable intellectual property: (1) Touch Screen Vending Software (2) Patent #63635-237144 Multimedia System (Patent Pending); (3) Patent US 8,191,799 B2 Wireless Management of Remote Vending Machines; and (4) Patent US 8,998,082 B2 Multimedia System & Method for Controlling Machines.  See Salvino Declaration ¶ 11.

### 2. Efforts to Market and Sell the Debtor's Assets

Since becoming an employed as the estate's exclusive investment banker, CCA has aggressively marketed the Debtor and its assets for the past five (5) months with a strategic marketing campaign, which involved CCA contacting sixty-three (63) potential buyers.   Thirty (30) potential buyers responded to the marketing efforts, eighteen (18) signed non-disclosure agreements, six (6) performed preliminary due diligence in connection with a potential acquisition, and two (2) signed letters of intent were signed.  Unless the Debtor designates a stalking horse bidder, the Sale will proceed as an open auction.  Based on its efforts, CCA believes there are more than ten (10) interested parties which may bid at the auction.  Debtor has dual tracked these efforts by also attempting to find potential purchasers.  See Goldmand Declaration.

The Sale is subject to overbidding, as set forth in the court-approved Bid Procedures, during an Auction that, by the time of the hearing, will have been extensively marketed by CCA in the hopes of developing existing and potential interest from prospective overbidders.  See RJN, **Exhibit "4"** (copy of Bid Procedures Order).

### 3. The APA and Court-Approved Bid Procedures

The Auction will be conducted before the Court on May 10, 2016, at 2:00 p.m. pursuant to the Bid Procedures previously approved by the Court and the terms of the APA.  See Salvino Declaration, **Exhibit "1"** (copy of the APA).  The court-approved Bid Procedures are summarized in the following table, with the exception of the opening bid, which has been set by Debtor at $950,000.00 ("Opening Bid").  The court-approved terms of the Bid Procedures control in the event of any inconsistency with this summary.

| Subsequent Overbids: | $25,000.00 increments[6]. |
| --- | --- |

---

[6] Debtor reserves the right to name a Stalking Horse Bidder prior to the hearing, in accordance with the terms set forth in the approved Bidding Procedures.

| Representation & Warranties: | The Property shall be sold on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtor, except to the extent expressly set forth in the Agreement or the Marked Agreement (defined below), as the case may be. |
|---|---|
| Treatment of Liens | The Property shall be sold, subject to approval by order of the Bankruptcy Court entered after the Auction, free and clear of all liens, claims, and adverse claims of ownership, with any monetary liens against the Property to attach to the net proceeds of the sale with the same priority as existed with respect to the Property. |
| Qualification of Bidders: | Only Qualified Bidders ("Qualified Bidders") will be allowed to bid for the Property.  In order to become a Qualified Bidder, a bidder shall meet all of the following requirements:<br><br>2.    Within three (3) business days prior to the hearing on the Sale Motion, delivers to the escrow holder appointed by the Debtor ("Escrow Holder"):<br><br>    (a) a cash deposit equal to Five Percent (5%) of its Opening Bid or the alternative bid to the Opening Bid ("the "Alternative Bid");<br><br>    (b) a form of proposed purchase and sale agreement (the "APA") for the Alternative Bid, together with a redline reflecting changes from the APA ("Marked Agreement");<br><br>    (c) written evidence reasonably satisfactory to the Debtor and the Committee of its financial ability to perform the obligations under such APA before, on and after the closing of the sales transaction contemplated for the sale of the Purchased Assets (the "Closing"); and<br><br>    (d) a written statement signed by the Bidder agreeing that such Bidder, if successful at the hearing on the Sale Motion, shall be bound by the terms of the APA.  No Alternative Bids that are contingent as to diligence or financing shall be considered. |
| Auction Procedures: | Debtor and the Committee will conduct an auction (the "**Auction**") for the Purchased Assets at the Sale Hearing. If only one bid is received, the Auction will not be held, and the Debtor and the Committee will proceed to seek approval of the Sale pursuant to the terms of the APA or any Marked Agreement, as the Successful Bid (defined below) at the Sale Hearing. If necessary, the Auction shall be conducted in accordance with the following:<br><br>7.    Only a Qualified Bidder, as determined by the Debtor and the Committee pursuant to Section III of the Bidding Procedures will be eligible to participate at the Auction.<br><br>8.    Alternative Bids shall be in not less than Twenty Five Thousand and 00/100 Dollar ($25,000) increments.<br><br>9.    Any sale of the Purchased Assets must be on the same or better material terms and conditions as set forth in the APA and related documents, or as the Bankruptcy Court may determine are in |

the best interests of creditors and the Debtor's bankruptcy estate.

10.    The highest and best bid submitted by a Qualified Bidder (the "Successful Bidder") as determined by the Debtor and the Committee, shall be deemed the successful did for the Purchased Assets (the "Successful Bid").

11.    The second highest and best bid submitted by a Qualified Bidder (the "***Backup Bidder***") that is designated by the Bankruptcy Court as a "backup" bid at the Sale Hearing (the "***Backup Bid***"), shall remain binding upon the offeror as an Alternative Bid, and in the event the Successful Bidder fails to close as required, such Backup Bid shall be deemed accepted by the Debtor and the Committee and approved by the Bankruptcy Court. In the event that the Debtor and the Committee intend to proceed with a closing with respect to the Backup Bid, the Debtor shall provide to the Backup Bidder not less than three (3) days' prior written notice of the date set for the closing with respect to such Backup Bid.

12.    If an Alternative Bid is received, the Auction will be held at the Sale Hearing, which shall commence on May 10, 2016, at 2:00 p.m. and shall take place in Courtroom "5C" of the United States Bankruptcy Court, Central District of California, Santa Division, 411 West Fourth Street, Santa Ana, California 92701.  At the Sale Hearing, in addition to holding any necessary Auction of the Purchased Assets, the Debtor and the Committee will jointly seek entry of an order authorizing and approving, among other related relief, the sale of the Purchased Assets to the Successful Bidder, (the "Sale Order").  Following entry of the Sale Order, the Debtor will proceed to close the sale transaction upon the satisfaction or waiver of all applicable conditions precedent to closing.

The Debtor is confident that the Purchase Price and Bid Procedures will ensure that the highest value possible will be received for the Property.

4.    <u>Tax Consequences of the Sale</u>

Debtor believes that the tangible personal property to be sold is subject to the assessment of sales and/or use taxes by the State of California and potentially, the County of Riverside.  Debtor's intangible personal property is exempt from sales tax pursuant to Revenue Code Sections 6011 and 6012.  Pursuant to the terms of the APA, Purchaser shall bear the expense of taxes incurred as a result of the Sale.

### III.    ARGUMENT

By way of this Motion, the Debtor requests the entry of an order (1) authorizing the Debtor

to sell the Property, subject to overbidding as set forth in the Bid Procedures, pursuant to 11 U.S.C.

§ 363(b), (f), and (m); (ii) authorizing the sale of the Property free and clear of liens and other

interests pursuant to 11 U.S.C. § 363(f); (iii) authorizing the assumption and assignment of the

estate's interest in the Executory Contracts to the Purchaser upon closing pursuant to 11 U.S.C. §

365(b), (d) &(f), (iv) finding the Purchaser to be a good faith purchaser as described in 11 U.S.C. §

363(m) if Purchaser requests such a finding, and (vi) waiving the 14-day stays set forth in

Bankruptcy Rules 6004(h) and 6006(d).

### A.    The Property May Be Sold Pursuant to 11 U.S.C. § 363(b)

Section 363(b) of the Bankruptcy Code provides that after a notice and a hearing, a trustee or

debtor in possession may sell property of the estate outside the ordinary course of business.  11

U.S.C. §§ 363(b); 11 U.S.C. §1107(a).  "The court's obligation in § 363(b) sales is to assure that

optimal value is realized by the estate under the circumstances. The requirement of a notice and

hearing operates to provide both a means of objecting and a method for attracting interest by

potential purchasers." Simantob v. Claims Prosecutor, L.L.C. (In re Lahijani), 325 B.R. 282, 288-

289 (B.A.P. 9th Cir. 2005).  To this end, courts have long recognized the benefits of competitive

bidding at hearings on private sales.  "Competitive bidding yields higher offers and thus benefits the

estate.  Therefore, the objective is 'to maximize bidding, not restrict it.'"  See In re Atlanta

Packaging Products, Inc., 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988).

In determining whether to approve a proposed sale under section 363, courts generally apply

standards that, although stated various ways, represent essentially a business judgment test.

3-363 Collier on Bankruptcy ¶ 363.02[4].  "Ordinarily, the position of the trustee is afforded

deference, particularly where business judgment is entailed in the analysis or where there is no

objection." In re Lahijani, 325 B.R. at 289.  The bankruptcy court reviews the trustee's business

judgment only "to determine independently whether the judgment is a reasonable one.  The court

should not substitute its judgment for the trustee's but should determine only whether the trustee's

judgment was reasonable and whether a sound business justification exists supporting the sale and its terms." 3-363 <u>Collier on Bankruptcy</u> ¶ 363.02[4].

The Court has previously approved the Bid Procedures after the Debtor and Committee demonstrated that the Bid Procedures will set a benchmark price for the Property, make the sale process more efficient, and ensure that the highest possible price is obtained for the Property.

As discussed above, the Debtor's investment banker, CCA, has aggressively and exhaustively marketed the Debtor and its assets. Debtor has dual tracked these efforts by also attempting to find potential purchasers.

The Debtor submits that the extensive marketing and the opportunity for competitive bidding will yield the highest price for the Property as possible. The Debtor and CCA have reason to believe that Qualified Bidders will attend the Auction and that the Property will ultimately sell for an amount equal or greater to the Opening Bid.

Based upon the foregoing, the Debtor submits that its business judgment to proceed with the Sale is reasonable and based upon a sound business justification. Accordingly, the Debtor's business judgment should be afforded deference and the Sale should be approved pursuant to 11 U.S.C. § 363(b).

**B.    The Sale May Be Free and Clear of Liens Pursuant to 11 U.S.C. § 363(f)(3)**

Section 363(f)(3) provides that the trustee may sell property of the estate free and clear of any lien on such property if the price at which such property is to be sold is greater than the aggregate value of all liens on such property. 11 U.S.C. § 363(f)(3).

The Trustee intends to sell the Property free and clear of EWB's Senior Lien, pursuant to subsection (f)(3), as the sale price will be greater than the aggregate value of EWB's lien against the Property. EWB's lien is approximately $664,490.00 and the Opening Bid is set at $950,000.00.

**C.    The Sale May Be Free and Clear of the Disputed Liens Pursuant to 11 U.S.C. § 363(f)(4)**

Section 363(f)(4) provides that the trustee may sell property of the estate free and clear of any interest if such interest in in "bona fide dispute." A bona fide dispute exists where there is an objective basis for either a factual or legal dispute as to the validity of the interest. In ruling on a

motion to sell estate property free and clear under § 363(f)(4), "a court need not determine the probable outcome of the dispute, but merely whether one exists." In re Octagon Roofing, 123 B.R. 583, 590 (Bankr. N.D. Ill. 1991). A substantial history of litigation over the validity of an interest is sufficient to establish that a bona fide dispute exists over such interest. See In re Daufuskie Island Props., LLC, 431 B.R. 626 (Bankr. D.S.C. 2010); In re Kellogg-Taxe, 2014 Bankr. LEXIS 1033, 23 (Bankr. C.D. Cal. Mar. 17, 2014).

The Debtor intends to sell the Property free and clear of the Disputed Liens pursuant to subsection (f)(4), as the amount by which EWB is secured is subject to a bona fide dispute. Debtor is informed and believes that EWB seeks recovery of fees and costs in addition to any outstanding principal or interest owed. EWB's additionally does not attach to certain assets of the Debtor, including the intellectual property owned by Debtor.

The Worth UCC-1 lien is subject to bona fide dispute as it was recorded on the eve of Debtor's bankruptcy, less than one month prior to the Petition Date, and therefore, is an avoidable preference under Section 547. Similarly, the judgment liens of Frescos Mexican Grill, Inc., and Franciso Izawa are subject to bona fide disputes as they were filed within the same week as the Petition Date and are therefore, avoidable preferences.

Accordingly, Disputed Liens are therefore subject to bona fide dispute and the Purchased Assets may be sold free and clear of the Disputed Liens pursuant to 11 U.S.C. § 363(f)(4).

**D.    The Executory Contracts May Be Assumed Pursuant to 11 U.S.C. § 365(b) & (d) and the Estate's Interests therein May Be Assigned Pursuant to 11 U.S.C. § 365(f)**

Section 365(b) of the Bankruptcy Code provides that the trustee may assume an executory contract or unexpired lease of the debtor, if at the time of assumption, the trustee:

> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. §365(b).

11 U.S.C. Section 365(d)(4) provides:

(A) Subject to subparagraph (B), an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of—
    (i) the date that is 120 days after the date of the order for relief; or
    (ii) the date of the entry of an order confirming a plan.
(B)
    (i) The court may extend the period determined under subparagraph (A), prior to the expiration of the 120-day period, for 90 days on the motion of the trustee or lessor for cause.
    (ii) If the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior written consent of the lessor in each instance.

Section 365(f)(2) of the Bankruptcy Code provides that the trustee may assign an executory contract or unexpired lease of the debtor only if (A) the trustee assumes the lease or executory contract in accordance with section 365, and (B) provides adequate assurance of future performance by the assignee of such contract or lease.

Debtor filed a motion requesting an extension of the time to assume or reject its Lease pursuant to Section 365(B)(i), which was granted. [*See* Docket No. 182]. Thereafter, Landlord consented to an additional extension of time for Debtor to file a motion to assume or reject the Lease through January 25, 2016. Debtor previously filed a motion to assume the Lease [Docket No. 331], which was continued to May 3, 2016, pursuant to the stipulation between Landlord, the Committee and the Debtor [Docket No. 341], which was approved by Order of the Court on March 1, 2016 ("Lease Assumption Order") [Docket No. 342]. Pursuant to the Debtor's assumption and assignment of the Lease Assumption Order, Debtor's ability to assume and assign the Lease is subject to the Landlord's approval.

The Debtor seeks an Order allowing it to assume and assign any of the Executory Contracts, subject to the aforementioned conditions with respect to its Lease, that are desired by any Qualified

1  Bidder that becomes the Successful Bidder or Backup Bidder. Therefore, Debtor requests that this

2  Court enter an Order approving the assumption of the list of contracts set forth in the APA or any

3  Marked Agreement submitted for approval. Pursuant to the terms of the APA, the Purchaser shall

4  cure any existing monetary defaults and provide adequate assurances of future performance.

5      **E.    The Court Should Find The Purchaser a Good Faith Buyer Pursuant to 11 U.S.C.**

6          **§ 363(m)**

7      Section 363(m) provides that a purchaser of property of the estate is protected from the

8  effects of a reversal or modification on appeal of the authorization to sell as long as the purchaser

9  acted in good faith and the appellant failed to obtain a stay of the sale. The Code does not defined

10 "good faith." Courts have adopted various definitions. A good faith purchaser is "one who buys

11 property . . . for value, without knowledge or adverse claims." In re Mark Bell Furniture

12 Warehouse, Inc., 992 F.2d 7, 8 (1st Cir. 1993). "Typically, lack of good faith is shown by fraud,

13 collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair

14 advantage of other bidders." In re Ewell, 958 F.2d 276, 279 (9th Cir. 1992).

15     Here, the Sale is subject to overbidding pursuant to court-approved Bid Procedures at an

16 Auction that has been aggressively marketed. Absent any allegations against the Purchaser of fraud,

17 collusion, or any attempt to take grossly unfair advantage of other bidders, or adverse claims to the

18 Debtor, the Court should find that the Buyer is a good faith purchaser pursuant to 11 U.S.C. §

19 363(m).

20     **F.    The Court Should Waive the 14-Day Stays Set Forth in Bankruptcy Rules 6004(h)**

21          **and 6006(d)**

22     Bankruptcy Rule 6004(h) provides that an order authorizing the sale of property is stayed

23 until the expiration of 14 days after entry of the order, unless the court orders otherwise. Likewise,

24 Bankruptcy Rule 6006(d) provides that an order authorizing the assignment of an unexpired lease

25 under § 365(f) is stayed until the expiration of 14 days after entry of the order, unless the court

26 orders otherwise. Absent any objection to the Motion, the Trustee requests that the 14-day stays set

27 forth in Bankruptcy Rules 6004(h) and 6006(d) be waived to allow the Sale to close quickly.

28

## IV.    **CONCLUSION**

**WHEREFORE,** the Debtor respectfully requests that the Court enter an order:

1.    Granting the Motion in its entirety;

2.    Authorizing the Debtor to sell the Property to the Successful Bidder or Backup Bidder, subject to overbidding as set forth in the Bid Procedures, pursuant to 11 U.S.C. § 363(b);

3.    Authorizing the sale of the Property to be free and clear of EWB's Senior Lien pursuant to 11 U.S.C. § 363(f)(3) & (4);

4.    Authorizing the sale of the Property to be free and clear of the Disputed Liens pursuant to 11 U.S.C. § 363(f)(4);

5.    Authorizing the Debtor to assume and assign all of the estate's interest in the Executory Contracts, upon closing of the Sale, to the Purchaser pursuant to 11 U.S.C. § 365(f);

6.    Finding that the Purchaser is a good faith purchaser pursuant to 11 U.S.C. § 363(m);

7.    Waiving the 14-day stays set forth in Bankruptcy Rules 6004(h) and 6006(d), and

8.    Affording such other and further relief as is appropriate under the circumstances.

Dated:  April 19, 2016                    GOE & FORSYTHE, LLP


                                          By: */s/ Marc C. Forsythe*
                                          Marc C. Forsythe
                                          Charity J. Miller
                                          GOE & FORSYTHE, LLP
                                          Attorneys for AVT, Inc.
                                          Debtor and Debtor in Possession

## DECLARATION OF WAYNE SALVINO

I, Waynbe Salvino, declare and state:

1.    I am the President of AVT, Inc., debtor and debtor in possession ("Debtor") in the case entitled *In re AVT, Inc.*, Case No. 6:15-bk-14464 MW.   I make this declaration in support of Debtor's *Motion for Order: (1) Approving the Sale of the Estate's Assets Free and Clear of Liens and Other Interests Pursuant to 11 U.S.C. § 363 (b) & (f); (2) Authorizing the Assumption and Assignment of the Estate's Interest in Certain Executory Contracts Pursuant to 11 U.S.C. § 365; (4) Finding Purchaser is a Good Faith Purchaser; and (4) Waiving 14-Days Stays of FRBP 6004(h) and 6006(d)* (the "Motion").   The following facts are within my own personal knowledge and if called to testify, I could and would testify competently to the following facts.

2.    On May 1, 2015 (the "Petition Date"), a chapter 11 bankruptcy petition was filed on behalf of the Debtor.   The Debtor is operating its business and managing its affairs as a debtor-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.   No trustee or examiner has been appointed in this case.

3.    Debtor is a publicly traded company and has been in business for more than 40 years. Debtor is headquartered in Corona, California and owns no real property.   Debtor's main sources of income are the design and manufacture of custom vending kiosks, income from the sale of goods through vending routes, and sale of technologies including broadband for computerized kiosks.

4.    Debtor's only creditor with an interest in cash collateral, East West Bank ("EWB"), holds two liens against Debtor secured by a majority of Debtor's assets, with total outstanding indebtedness to EWB in the approximate amount of $664,490.00.   In 2012, Debtor borrowed $1,000,000 from EWB to purchase equipment and materials and also received a $1,000,000 line of credit from EWB to provide it with working capital.   In consideration for these loans, Debtor provided EWB with a security interest in a majority of its assets, as evidenced by a UCC-1 filing.

5.    Debtor recently discovered three of the Disputed Liens[7], which include UCC judgment liens which were recorded by Francisco Izawa and Frescos Mexican Grill, Inc., on April 28, 2015, (Filing Numbers 157462271277 and 157462274442).   Debtor also recently discovered an insider of

---

[7] All defined terms have the same meaning as set forth in the motion, unless otherwise defined in this Declaration.

Debtor, Worth, Inc., filed a UCC-1 lien on April 10, 2015.  Given the timing of the perfection of these liens, among other facts, Debtor disputes these liens and intends to file preference actions under Section 547 of the Bankruptcy Code.  A copy of the search results from the UCC-1 lien search that reflects the filing of the Disputed Liens is attached hereto as **Exhibit "2"** and incorporated herein.

6.      By the time of the hearing on this Motion, this chapter 7 bankruptcy case will have been pending for one (1) year.  Debtor has expended a great deal of time investigating exit financing in hopes of being able to propose a plan of reorganization.  As of the date of this motion, no such financing has been offered to Debtor on favorable terms.  EWB has expressed its intent to oppose Debtor's continued use of cash collateral.  Additionally, Debtor's time to assume its real property lease ("Lease") has been extended by stipulation until May 3, 2016, and Debtor's Landlord has indicated its intention to require Debtor to assume or reject the lease.  Debtor believes the Committee may oppose Debtor's attempted assumption of the Lease due to the sizeable administrative claim that could result as a consequence of assumption.  Given these facts, the sale of the Property at this juncture is necessary and in the best interests of the estate.

7.      By the Motion, Debtor seeks an order approving the sale of substantially all of the Debtor's assets including the tangible and intangible assets owned or used by the Debtor, or contemplated to be used in the operation of Debtor's business or otherwise located at Debtor's premises (in the past, currently, or contemplated in the future), specifically including, again without limitation, all inventory and tangible assets, accounts receivable, work in process, open purchase orders, intellectual property, cash deposits of any kind provided by Debtor in the ordinary course of its business as it relates to the Property, equity interests of any subsidiaries of Debtor, and the books and records of Debtor relating to the Property.   A more complete description of the Property and the exclusions therefrom are set forth in the proposed Asset Purchase Agreement ("APA"), to be executed by any Successful Bidder on the same or better terms, a true an correct copy of which is attached hereto as **Exhibit "1"** and incorporated herein.

8.      The Sale is subject to overbidding, as set forth in the court-approved Bid Procedures, during an Auction that, by the time of the hearing, will have been extensively marketed by CCA in

the hopes of developing interest from prospective overbidders. The Debtor is confident that the Opening Bid and Bid Procedures will ensure that the highest value possible will be received for the Property.

9. Debtor is a party to the Executory Contracts set forth I the following chart, as identified by the name of the other parties to said Executory Contracts. To the best of my knowledge, any defaults existing under the Executory Contracts are as set forth in the following chart:

| | **Executory Contract** | **Existing Defaults Under Contract** |
|---|---|---|
| 1. | Marriot International Inc., Dated March 20, 2015 | No known defaults exist under this agreement. |
| 2. | Nonresidential Real Property Lease ("Lease") with Prim Westgate, LLC, a Delaware limited liability company ("Landlord"), Dated March 5, 2010, and the amendment thereto dated April 21, 2015 | No known defaults exist under this agreement. |
| 3. | RSA Buying Group, Inc. Dated February 8, 2015 | No known defaults exist under this agreement. |
| 4. | Rug Doctor, Inc., Dated June 11, 2011 | No known defaults exist under this agreement. |
| 5. | Rug Doctor, Inc., Dated January 1, 2015 | No known defaults exist under this agreement. |
| 6. | Chafey College Auxiliary Services  Dated August 12, 2014 | Debtor believes a monetary default in the amount of $10,000.00 exists under this agreement. |
| 7. | City of Santa Ana Dated July 1, | No known defaults exist under this agreement. |

| | | |
|---|---|---|
| | 2013 | |
| 8. | Fitness International, LLC  Dated June 18, 2014 | No known defaults exist under this agreement. |
| 9. | Marine Corps Community Services, Dated April 7, 2015 | No known defaults exist under this agreement. |
| 10. | Sprint Solutions, Inc.  Dated December 2, 2009 | No known defaults exist under this agreement. |
| 11. | Cellco Partnership dba Verizon Wireless  Dated October 4, 2012 | No known defaults exist under this agreement. |
| 12. | Jofemar USA, Inc. Dated June 21, 2011 | Debtor believes a monetary default exists under this agreement in the amount of $49,208 and that mutual non-moentary defaults exist. |
| 13. | Department of Rehabilitation #28717  Dated  August 1, 2012 | No known defaults exist under this agreement. |
| 14. | Department of Rehabilitation #287162 Dated August 1, 2012 | No known defaults exist under this agreement. |
| 16. | Worth Management, Inc., Dated May 1, 2015 | No known defaults exist under this agreement. |
| 17. | Worth, Inc., Dated January 1, 2013 | No known defaults exist under this agreement. |
| 18. | Vending Software Design, Inc., Dated January 1, 2014 | No known defaults exist under this agreement. |

10.    True and correct copies of the Executory Contracts are attached hereto as **Exhibit "3"** and incorporated herein.

11. Debtor also owns the following valuable intellectual property: (1) Touch Screen Vending Software (2) Patent #63635-237144 Multimedia System (Patent Pending); (3) Patent US 8,191,799 B2 Wireless Management of Remote Vending Machines; and (4) Patent US 8,998,082 B2 Multimedia System & Method for Controlling Machines.

12. Debtor believes that the tangible personal property to be sold is subject to the assessment of sales and/or use taxes by the State of California and potentially, the County of Riverside. Pursuant to the terms of the APA, Purchaser shall bear the expense related to taxes incurred as a result of the Sale.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19th day of April 2016, at Irvine, California.

Wayne Salvino

1

## DECLARATION OF SUSAN GOODELL GOLDMAN

2

I, Susan Goodell Goldman, declare and state as follows,

3      1.      I am a Director of Clear Capital Advisors, LLC ("CCA"), the exclusive investment

4   banking firm pursuant to debtor and debtor-in-possession AVT, Inc.'s ("AVT" and/or "Debtor")

5   joint employment application ("Application") with the Official Committee of Unsecured Creditors

6   ("Committee"), which was approved by Court Order entered December 17, 2015 [Docket No.

7   287].  I make this declaration in support of the Debtor's Chapter 11 Status Report.  The matters

8   stated herein are within my own personal knowledge and if called, I could and would competently

9   testify to the following facts.

10      2.      CCA prepared marketing summary materials for AVT and contacted 63 potential

11   strategic and financial buyers for AVT's business and assets.  Approximately 30 potential buyers

12   responded to CCA, of which 18 signed non-disclosure agreements.  Seven potential buyers have

13   performed preliminary due diligence in connection with a potential acquisition of AVT, including

14   review of financial documentation regarding AVT and conference calls with management.  Six of

15   these parties have had meetings with AVT representatives and have visited the facilities.

16      3.      CCA received three letters of intent for the purchase of the AVT business and

17   assets, which have due diligence conditions (among others) and worked with them with the hopes

18   of one becoming the stalking horse buyer.

19      4.      On March 28, 2016, AVT signed a letter of intent with The Anderson Group which

20   has conducted substantial due diligence and remains interested in purchasing Debtor's assets.  The

21   Anderson Group intends to continue its due diligence with the hopes of being in a position to

22   participate in the upcoming auction.

23   \\\

24

25

26

27

28

1

2

3        5.    CCA continues to market the assets and Debtor for sale and will do so through the

4    auction date, including by contacting potential buyers who previously showed an interest in

5    purchasing AVT.

6        I declare under penalty of perjury under the laws of the United States of America that the

7    foregoing is true and correct to the best of my knowledge. Executed this 19th day of April, 2016, at

8    Sherman Oaks, California.

9

10    _____
    Susan Goodell Goldman

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

# EXHIBIT 1

Draft 23/~~1731~~/2016

ASSET PURCHASE AGREEMENT


between


AVT, INC.

DEBTOR AND DEBTOR IN POSSESSION

and

[INSERT]


DATED AS OF _____, 2016

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of _____, 2016 by and between AVT, Inc., a Nevada corporation, as debtor and debtor in possession ("Seller"), in Case No. 6:15-bk-14464-MW (the "Bankruptcy Case") in the United States Bankruptcy Court for the Central District of California, Riverside Division, Honorable Mark Wallace, United States Bankruptcy Judge presiding (the "Bankruptcy Court"), and _____("Purchaser").

## R E C I T A L S

WHEREAS, on May 1, 2015, the Seller commenced the Bankruptcy Case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (as defined in Article 1 hereof) with the Bankruptcy Court; and

WHEREAS, Seller is continuing to manage its affairs as a debtor and debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code; and

WHEREAS, the Seller wishes to sell, transfer, convey, assign and deliver to Purchaser, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code, all of the Purchased Assets (as hereinafter defined), together with the Assumed Liabilities (as hereinafter defined), of the Seller upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, Purchaser wishes to purchase and take delivery of the Purchased Assets and assume certain of such Assumed Liabilities upon such terms and subject to such conditions;

WHEREAS, the Purchased Assets will be sold pursuant to a Sale Order (as hereinafter defined) of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code and such Sale Order will include the assumption and assignment of certain Executory Contracts, unexpired leases and liabilities thereunder under Section 365 of the Bankruptcy Code and the terms and conditions of this Agreement; and

WHEREAS, all of the obligations of the Seller under this Agreement are conditioned upon the approval of the Bankruptcy Court in accordance with the terms hereof.

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements herein set forth and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE 1
DEFINITIONS

Section 1.1.      Definitions.  For purposes of this Agreement and any schedules hereto or other Transaction Documents, the following terms shall have the following meanings:

"Affiliate" means any Person, which, directly or indirectly, is in control of, is controlled by, or is under common control with, another Person.  For purposes of this definition, a Person shall be deemed to be "controlled by" another Person if such latter Person possesses, directly or indirectly, power either to direct or cause the direction of the management and policies of such controlled Person whether by contract or otherwise.

"Assumed Contract Rights" means those rights, powers, privileges, defenses (including setoff and/or recoupment rights), and remedies that may exist with respect to any Assumed Contract, other than Avoidance Claims (except to the extent any such defense would constitute an Avoidance Claim hereunder), setoff and/or recoupment rights).

"Assumed Contracts" has the meaning ascribed to that term in Section 6.1.

"Assumed Liabilities" means those Liabilities assumed by Purchaser pursuant to Section 3.2.

"Avoidance Claims" means any and all claims of Seller arising under Chapter 5 of the Bankruptcy Code, but excluding rights of setoff and recoupment to the extent related to an Assumed Contract.

"Bankruptcy Code" means 11 U.S.C. Section 101, et. seq., and any amendments thereof operative at the time of the Bankruptcy Case.

"Closing" has the meaning ascribed in Section 8.1.

"Contract" or "Contracts" means any written or oral contract, agreement, lease, license, instrument, or other document or commitment, arrangement, undertaking, practice or authorization that is binding on any Person or its property under any applicable Law.

"Deposit" has the meaning ascribed in Section 4.2.

"Deposit Account" means the client-trust account established by the Escrow Holder for the purpose of holding the Deposit, subject to the terms and conditions of this Agreement.

"Documentation" means properties, titles, contracts, books, records, files and documents, whether stored in physical or electronic format.

"Due Diligence Materials" means all documents and information relating to the Purchased Assets that would be necessary for a prospective purchaser to review in the course of performing due diligence in advance of an acquisition of the Purchased Assets.

"Escrow Holder" means Goe & Forsythe, LLP.

"Excluded Assets" means, collectively, the following assets of the Seller:

(a)      All losses, loss carry forwards and rights to receive refunds or credits from any Governmental Authority with respect to any taxes of the Seller incurred prior to the Closing;

(b)      Any employee benefit plans or obligations of the Seller;

(c)      Cash, other than as expressly set forth herein;

(d)      Except to the extent included in Assumed Contract Rights, all claims, rights of offset or causes of action against third parties  arising under and relating to Chapter 5 of the Bankruptcy Code, other than Assumed Contract Rights;

(e)      All Excluded Contracts;

(f)      All personnel records and other records that Seller is required by law to retain in its possession and any retained copies of any record or document included in the Purchased Assets;

(g)      All insurance proceeds, claims and/or causes of action solely with respect to or arising in connection with (i) any Excluded Contract, or (ii) any item of tangible or intangible property not acquired by Purchaser at the Closing; and

(h)      Causes of action, including avoidance actions or actions against insiders of AVT.

"Excluded Contracts" means any Contracts that are not Assumed Contracts.

"Executory Contract" means any Contract that constitutes an executory Contract subject to the provisions of Section 365 of the Bankruptcy Code.

"Final Order" means an order or judgment, entered by a court of competent jurisdiction, that remains in full force and effect and has not been reversed, or amended or modified in a manner that is materially inconsistent with the terms and conditions set forth in this Agreement, and as to which (i) the time to seek rehearing, file a notice of appeal or seek other review has expired and (ii) no stay is in effect.

"Good Funds" means immediately available, good funds of the United States of America.

"Governmental Authority" means any federal, state, provincial, municipal and foreign governmental entity, authority, or agency, or any other political subdivision, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"Intellectual Property" means the property set forth on Schedule 1, together with, *inter alia*, (a) all copyrights and trademarks, rights in, under or related to copyrights or trademarks,

interests in copyrights and trademarks and renewals and extension of copyrights and trademarks, domestic and foreign, heretofore or hereafter in, or obtained by, the Debtor in or in connection with any of the Purchased Assets and the rights (but not any obligation) to make any publication thereof for copyright, trademark and other purposes, to register claims under copyright and trademark, to renew and extend such registrations; (b) all inventions, processes, formulae, licenses, patent applications, patents, patent rights, trademark applications, service marks and corporate, company and trade name, logo and other business identifiers (for use in and in connection with the Purchased Assets and the exploitation of any other rights acquired hereunder); (c) any and all renewals and extensions of any property listed in (a) and (b), above, domestic and foreign; (d) the rights (but not the obligation) to register, renew and extend trademarks and service marks for use in and in connection with the Purchased Assets and the exploitation of any other rights acquired hereunder; and (e) the rights (but not any obligation) to sue in the name of the Debtor for past, present or future infringement of any of the foregoing.

"<u>Law</u>" means any federal, state, provincial, local or foreign statute, law, ordinance, regulation, rule, code, order, case law decision or other requirement or rule of law.

"<u>Liability</u>" or "<u>Liabilities</u>" means any liability, indebtedness, obligation, expense, claim, loss, cost, damage, obligation, responsibility, guaranty or endorsement of or by any Person, absolute or contingent, accrued or unaccrued, known or unknown, due or to become due, liquidated or unliquidated, secured or unsecured, pre-petition or administrative.

"<u>Lien</u>" or "<u>Liens</u>" means any security interests, mortgages, interests, liens, pledges, charges, encumbrances and other rights or claims of third parties.

"<u>Non-Assumed Liabilities</u>" means any and all Liabilities of the Seller that are not Assumed Liabilities.

"<u>Ordinary Course of Business</u>" means the current course of business conducted by the Seller in the Bankruptcy Case consistent with past custom and practice (including with respect to quantity and frequency).

"<u>Party</u>" means any signatory to this Agreement.

"<u>Person</u>" means any corporation, partnership, limited liability company, joint venture, business association, entity or individual.

"<u>Procedures Motion</u>" means a motion filed with the Bankruptcy Court seeking entry of an order approving the procedures for a sale to Purchaser or an alternative bidder.

"<u>Purchase Price</u>" has the meaning ascribed to that term in Article 4.

"<u>Purchased Assets</u>" means all of the assets of Seller (other than the Excluded Assets) that constitute property of Seller's bankruptcy estates pursuant to Section 541 of the Bankruptcy Code.  For purposes of clarity, but in no way limiting the definition of Purchased Assets, Purchased Assets comprise all of the tangible and intangible assets owned or used by Seller, or contemplated to be used, in the operation of Seller's business or otherwise located at Seller's

premises (in the past, currently, or contemplated in the future), specifically including, again without limitation, all inventory, accounts receivable, work in process, open purchase orders, Intellectual Property, cash deposits of any kind provided by Seller in the ordinary course of its business as it relates to the Purchased Assets, equity interests of any subsidiaries of Seller, and the books and records of Seller relating to the Purchased Assets.

"Qualified Bidder" has the meaning ascribed to that term in Section 5.2.

"Sale Motion" means the motion filed requesting entry of a Sale Order seeking, inter alia, authority for the Seller to sell and assign, among other things, the Purchased Assets to Purchaser.

"Sale Order" means an order granting the Sale Motion in a form reasonably acceptable to Purchaser and the Seller, which order shall authorize the Seller to sell and assign the Purchased Assets to Purchaser in accordance with the terms and conditions of this Agreement.

"Sale Procedures Order" means an order entered by the Bankruptcy Court granting the Procedures Motion and approving the bid procedures set forth therein.

"Tax" or "Taxes" means any taxes, charges, duties, assessments, fees, levies, imposts, or similar governmental assessments, together with any interest, penalties, and additions to tax, imposed by any taxing authority, wherever located (i.e., whether federal, state, local, municipal, or foreign), including all net income, gross income, gross receipts, net receipts, sales, use, goods and services, transfer, franchise, privilege, profits, social security, disability, withholding, payroll, telecommunications, utility user, unemployment, employment, employer health, excise, capital, capital gains, severance, property, windfall profits, value added, ad valorem, or occupation tax, or any other similar governmental charge or imposition, and any other taxes, customs duties, stamp duties, fees, assessments, or similar charges in the nature of a tax together with any interest, fines, and penalties imposed by any Governmental Authority, whether disputed or not.

"Transaction Documents" means this Agreement, and all other agreements, documents and instruments executed in connection herewith or required to be executed or delivered by the Parties or any one or more of them in accordance with the provisions of this Agreement, which Transaction Documents shall be prepared by Purchaser.

Section 1.2.    Other Defined Terms.    For purposes of this Agreement and any schedules hereto or other Transaction Documents, other capitalized terms used in this Agreement have the meanings ascribed to them elsewhere in this Agreement.

Section 1.3.    Other Meanings.  Unless the context of this Agreement clearly requires otherwise, (a) "or" has the inclusive meaning frequently identified with the phrase "and/or," (b) "including" has the inclusive meaning frequently identified with the phrase "including, but not limited to," (c) references to "hereof," "hereunder" or "herein" or words of similar import relate to this Agreement, and (d) any reference to the singular shall include the plural.

## ARTICLE 2
### PURCHASE AND SALE

Section 2.1.     Except as otherwise provided and subject to the terms and conditions set forth in this Agreement, the Seller agrees to sell, convey, assign, transfer and deliver to Purchaser, and Purchaser agrees to purchase from the Seller at the Closing (as defined in Article 8 hereof), all of the Seller's respective right, title and interest in and to the Purchased Assets, free and clear of all Liens other than the Liens securing Assumed Liabilities of Purchaser.

## ARTICLE 3
### DESCRIPTION OF PURCHASED ASSETS

Section 3.1.     <u>Purchased Assets</u>.  On and subject to the terms and conditions of this Agreement, Purchaser agrees to purchase from the Seller, and the Seller agree to sell to Purchaser, all of the Purchased Assets for the Purchase Price.  At the Closing, the Purchased Assets shall be sold, transferred and conveyed to Purchaser, free and clear of all Liens, and Purchaser will purchase, acquire and accept for the Purchase Price, the Purchased Assets, free and clear of all Liens.

Section 3.2.     <u>Assumed Liabilities</u>.

(a)     At the Closing, Purchaser shall assume and agree to perform and discharge, or take subject to, the following Liabilities of the Seller to the extent not previously performed or discharged, and no others: (i) all Liabilities of the Seller with respect to the Purchased Assets which accrue and are to be performed from and after the Closing under the Assumed Contracts which relate to time periods or goods or services provided to or by Purchaser after the Closing; (ii) Liabilities and obligations relating to and arising from Purchaser's use of the Purchased Assets after the Closing; (iii) all Liabilities of the Seller with respect to any payments to be made with respect to Assumed Contracts, including cure amounts and (iv) certain employee-related and other business related accruals to be identified by Purchaser, (including accrued wages and paid time off for Seller employees to be offered employment by Purchaser)**.**

(b)     Purchaser shall not assume or be bound by or be obligated or responsible for any of the Non-Assumed Liabilities.

## ARTICLE 4
### PURCHASE PRICE

Section 4.1.     <u>Purchase Price</u>.  The purchase price for the Purchased Assets shall be an amount equal Nine Hundred and Fifty Thousand Dollars ($950,000) in Good Funds (the "<u>Purchase Price</u>") paid to the Seller at the Closing.

Section 4.2.     <u>Deposit; Payment of Purchase Price</u>.

(a)     Prior to the execution of this Agreement, Purchaser has deposited into the Deposit Account, Good Funds in the amount of  five (5%) of Purchase Price ($47,500.00) (the

"Deposit").  Except as otherwise provided herein, the Deposit shall be applied to the obligations of Purchaser hereunder.

(b)    Except as provided in Section 4.4, below (including Section 16.2), the Deposit shall become non-refundable upon execution of this Agreement.

(c)    At the Closing, subject to Article 5 hereof, the Deposit, together with all interest accrued thereon, shall be credited and applied toward payment of the Purchase Price, and the Escrow Holder shall deliver the Deposit to the Seller.

(d)    The cash balance of the Purchase Price shall be payable at Closing by wire transfer of Good Funds to one or more bank accounts specified by the Seller in wire transfer instructions to be delivered to Purchaser at least two (2) business days prior to the Closing Date.

Section 4.3.    Allocation of Purchase Price.  The Purchase Price shall be allocated between and among the Purchased Assets, if at all, in a manner agreed to by the Seller and Purchaser prior to the Closing.

Section 4.4.    Application or Return of Deposit.    The Deposit, together with all interest accrued thereon, shall either be applied to the payment of the Purchase Price hereunder or returned to the Purchaser upon the occurrence of any of the following:  (i) an order approving the sale of the Purchased Assets has not been entered prior to [June 15, 2016], (ii) the Closing Date does not occur on or before forty-five (45) days after the slae hearing and Purchaser elects not to proceed with the purchase of the Purchased Assets, and (iii) the Agreement is the subject of a successful overbid from a third party pursuant to the Sale Procedures Order and such sale to the third party closes, as set forth in Section 16.2.   If, notwithstanding that all conditions precedent in Articles 13 and 14 have been met and an order approving the sale to Purchaser has been entered, Purchaser is unwilling or unable to consummate the sale and perform the obligations required upon closing, all of the Deposit, together with all interest accrued thereon, shall be non-refundable and shall immediately be released and paid by the Escrow Holder to the Seller.

## ARTICLE 5
PROCEDURES AND APPROVALS

Section 5.1.    Due Diligence Materials.  The Seller shall make the Due Diligence Materials available to Purchaser and may prepare summaries, compilations and other reports on the contents of the Due Diligence Materials for distribution to Purchaser.

Section 5.2.        Bankruptcy Court Proceedings.

(a)        The Seller obtained the Sale Procedures Order from the Bankruptcy court approving the sale procedures described herein.

(b)        Any sale of the Purchased Assets must be on the same or, as set forth in this Article 5, better material terms and conditions then as set forth in this Agreement and the Transaction Documents, or as the Bankruptcy Court may determine are in the best interests of creditors and the Seller's bankruptcy estate;

(i)        Only Qualified Bidders may tender an alternative bid ("Alternative Bid").  For purposes of this provision a Qualified Bidder shall be any party that, within three (3) business days prior to the hearing on the Sale Motion, delivers to the Escrow Holder (w) a Good Funds deposit in an amount equal to Five Percent (5%) of the Alternative Bid; (x) written evidence from a third party reasonably satisfactory to the Seller of its financial ability to perform the obligations under this Agreement before, on and after the Closing; (y) a form of a proposed purchase and sale agreement for the Alternative Bid, together with a redline reflecting changes from this Agreement; and (z) a written statement signed by the Alternate Bidder agreeing that such Alternate Bidder, if successful at the hearing on the Sale Motion, shall be bound by the terms of this Agreement.   No Alternative Bids that are contingent as to financing shall be considered;

(ii)        Alternative Bids shall be in not less than Twenty-Five Thousand Dollar ($25,000.00) increments;

(iii)        Unless an alternate date is agreed to by the Parties, the Closing shall occur no later than forty-five (45) days after the sale hearing is concluded; and

(iv)        With respect to any Assumed Contract any disputes with respect to any alleged default or the amount of a cure payment or other obligation under such Assumed Contract shall be determined at the hearing on the Sale Motion.

(c)        The Seller shall promptly provide notice of any hearing on the Sale Motion, or any other matter before the Bankruptcy Court relating to this Agreement, in each case as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules of the Central District of California or as otherwise ordered by the Bankruptcy Court.

Section 5.3.        Certain Bankruptcy Undertakings by the Seller.

(a)        Purchaser and Seller will use their commercially reasonable efforts to take all actions and do all things necessary or appropriate to comply with and satisfy the terms and conditions of this Agreement and consummate the transactions contemplated by this Agreement. With the cooperation of the Seller, Purchaser will bear the burden of providing the evidence to establish that Purchaser is a good faith purchaser under Section 363(m) of the Bankruptcy Code,

and cooperate with the Seller to comply with the terms and conditions of and consummate the transactions contemplated by this Agreement, and Purchaser will not interfere, directly or indirectly, with such efforts by the Seller.

(b)     From and after the date hereof, except as ordered by the Bankruptcy Court, the Parties agree to use their commercially reasonable efforts to neither take any action, nor fail to take any action, which action or failure to act would reasonably be expected to (i) prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms and conditions of this Agreement and the proposed Sale Order; or (ii) with respect to the Sale Order, result in (A) the reversal, avoidance, revocation, vacating or modification (in any manner that would reasonably be expected to materially and adversely affect Purchaser's or Seller's rights hereunder), or (B) the entry of a stay pending appeal.

(c)     If the Sale Procedures Order, the Sale Order or any other order of the Bankruptcy Court relating to this Agreement shall be appealed (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), and, as a result thereof, Purchaser elects not to proceed with a Closing and Purchaser provides written notice to the Seller within two (2) business days following the filing of such appeal, petition for certiorari or motion for rehearing or reargument if (i) Purchaser elects not to proceed with a Closing under the circumstances, and (ii) Purchaser desires for the Seller to contest any such appeal, petition for certiorari or motion for rehearing or reargument, the Seller shall, contingent upon the cooperation and financial support of Purchaser, which cooperation and financial support shall include, without limitation, payment of all reasonable attorneys' fees and expenses incurred by the Seller in opposing any such appeal, petition for certiorari, motion for rehearing or reargument or any motion for a stay or in providing any bond or similar assurance with respect thereto, take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion, and shall endeavor to obtain an expedited resolution thereof.

## ARTICLE 6
ASSUMPTION OF CONTRACTS

Section 6.1.     <u>Assumed Contracts</u>.  Attached hereto as <u>Schedule 6.1(a)</u> is a list of Executory Contracts, including leases, to which the Seller represents that Seller is a party and as to which Purchaser has advised the Seller of its desire for Seller to assume and assign such Contracts to Purchaser at the Closing in accordance with Section 365 of the Bankruptcy Code, subject to the provisions of Section 6.2 (each an "<u>Assumed Contract</u>," and, collectively, the "<u>Assumed Contracts</u>").  All Contracts which are not expressly identified as Assumed Contracts shall not be assumed by, nor shall they be the responsibility of, Purchaser.  Schedule 6.1(a) may be modified by Purchaser at any time up to two (2) business days prior to the sale hearing.

Section 6.2.     <u>Requirements to Assume and Assign Assumed Contracts</u>.  To the extent Purchaser has identified an Executory Contract as an Assumed Contract under this Agreement, Purchaser shall be responsible, separate and apart from the payment of the Purchase Price, to (a) perform and discharge any and all Liabilities (including cure or other payments) which may be required pursuant to the Bankruptcy Code as a precondition to allow the Seller to assume and assign such Assumed Contract to Purchaser in accordance with the terms of this Agreement; and

(b) provide adequate assurance of future performance and otherwise satisfy the obligations under Section 365(b)(1) of the Bankruptcy Code.  Seller is required to obtain any necessary consents to assume and assign such specified Assumed Contracts to Purchaser pursuant to Section 365 of the Bankruptcy Code (which consents shall not, in any event, include any consent the need for which is obviated by the Sale Order or otherwise by the provisions of the Bankruptcy Code)**.** In the event Seller is unable to obtain any such necessary consent, such Executory Contract or Executory Contracts shall not be assumed and assigned to Purchaser.

## ARTICLE 7
### INSTRUMENTS OF TRANSFER AND ASSUMPTION

Section 7.1.        <u>Transaction Documents</u>.  Upon satisfaction or waiver of all conditions to the parties' obligation to close, set forth in Articles 13 and 14, and Seller's receipt of the payment of the Purchase Price at the Closing, title to and possession of the Purchased Assets shall immediately pass to Purchaser, and, within five (5) business days following the conclusion of the hearing on the Sale Motion, the Purchaser shall deliver to Seller (a) a bill of sale prepared by Purchaser with respect to the Purchased Assets; and (b) all such other good and sufficient instruments of sale, transfer and conveyance  prepared by Purchaser consistent with the terms and provisions of this Agreement, including assignments of Assumed Contracts and assignments of Intellectual Property, as shall be reasonably necessary to vest in Purchaser, all of the Seller's right and title to, and interest in, the applicable Purchased Assets.

## ARTICLE 8
### CLOSING

Section 8.1.        <u>Closing Date</u>.  Subject to the terms and conditions hereof, the closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place at the offices of GOE & FORSYTHE, LLP, 18101 Von Karman Ave., Ste. 1200, Irvine, California 92612, on the date (the "<u>Closing Date</u>") which is the later of:  (i) the first (1st) business day following the date on which all conditions to Closing set forth in Articles 13 and 14 hereof have been satisfied or waived, or (ii) the second (2nd) business day after expiration of the 14-day appeal period following entry of the Sale Order.  In any event, the Closing shall occur by no later than forty-five (45) days after the sale hearing unless Purchaser and the Seller agree in writing to a later date.

## ARTICLE 9
### SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants (and, as necessary, acknowledges) to Purchaser that the statements contained in this Article 9 are true, correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement in this Section).  Any and all representations and warranties made by Seller herein, or otherwise in connection with the transactions contemplated herein, will lapse and terminate and be of no further force or effect as of the Closing.

Section 9.1.    <u>Organization, Qualification and Corporate Power</u>.    Seller is duly organized and validly existing under the Laws of the state of Nevada, and Seller has all necessary power and authority to own and operate its properties and to carry on its business as it is now being conducted, and, subject to obtaining Bankruptcy Court approval as contemplated herein, to carry out the transactions contemplated by this Agreement.    Seller has the power and authority to execute and deliver and, subject to entry of the Sale Order, perform its obligations under this Agreement, and to undertake the transactions contemplated hereby.

Section 9.2.    <u>Authorization, Execution and Delivery of Agreement and Transaction Documents</u>.    Subject to obtaining the Sale Order and pursuant thereto, the execution, delivery and performance of this Agreement and the other Transaction Documents by Seller in accordance with their terms, and the sale or assignment of the Purchased Assets to Purchaser in accordance therewith, have been duly and validly authorized and approved by all necessary action of on the part of Seller.    Subject to obtaining the Sale Order and pursuant thereto, Seller will have full power, right and authority to sell and convey to Purchaser the Purchased Assets. This Agreement is, and as of the Closing Date, the other Transaction Documents will be, the legal, valid and binding obligations of Seller, enforceable in accordance with their respective terms.

Section 9.3.    <u>Title to and Condition of Assets</u>.    All of the Purchased Assets constitute property of Seller's bankruptcy estate as provided in Section 541 of the Bankruptcy Code, and, subject to the entry of the Sale Order, Seller has the valid and enforceable right to transfer, sell and assign to Purchaser the Purchased Assets, free and clear of all Liens except for Liens and Assumed Liabilities set forth herein.

Section 9.4.    <u>No Violation of Laws or Agreements</u>.    Assuming that the Bankruptcy Court enters the Sale Order, the execution and delivery by Seller of this Agreement and other documents contemplated hereby to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated herein will not violate in any material respect, any statute or Law or any judgment, decree, order, regulation or rule of any court or governmental authority to which Seller is subject or any contract, instrument or other agreement to which Seller is a party.

Section 9.5.    <u>Brokers</u>.    Seller has not engaged any agent, broker or other Person acting pursuant to the express or implied authority of Seller which is or may be entitled to a commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Purchased Assets other than Clear Capital Advisors.    Seller shall have the sole and exclusive liability for payment of any fees or costs of Clear Capital Advisors.

Section 9.6.    <u>No Undisclosed Liabilities</u>.    To the best of Seller's knowledge, there are currently no existing or threatened Liens, litigation, claims, circumstances or conditions that have not been disclosed in writing to Purchaser and that would impose any Liability upon Purchaser notwithstanding the entry of the Sale Order or would otherwise limit the use and exploitation of the Purchased Assets in a material way.

Section 9.7.    <u>Governmental Approvals</u>.  Other than entry of the Sale Order, there are no governmental approvals required as a precondition to Seller's consummation of the transactions contemplated by this Agreement.

# ARTICLE 10
## PURCHASER'S REPRESENTATIONS AND WARRANTIES

Purchaser represents and warrants (and, as necessary, acknowledges) to the Seller that the statements contained in this Article 10 are true, correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article 10).

Section 10.1.    <u>Organization; Qualification and Power</u>.    Purchaser is a _____company duly organized, validly existing and in good standing under the Laws of the State of _____.  Purchaser has all necessary power and authority to (a) own and operate its properties, (b) carry on its business as it is now being conducted, (c) undertake and carry out the transactions contemplated by this Agreement; (d) perform its obligations under this Agreement, the other Transaction Documents, the Sale Order (and any other Final Order of the Bankruptcy Court relating to the transactions contemplated by this Agreement), and (e) own and operate the Purchased Assets.

Section 10.2.    <u>Governmental Approvals</u>.  Other than entry of the Sale Order, there are no governmental approvals required as a precondition to Purchaser's consummation of the transactions contemplated by this Agreement.

Section 10.3.    <u>Authorization, Execution and Delivery of Agreement and Transaction Documents</u>.  All corporate or other legal consents and approvals necessary to authorize its execution and delivery of this Agreement and the Transaction Documents and its performance hereunder have been obtained by Purchaser.  The execution, delivery and performance of this Agreement and the other Transaction Documents in accordance with their terms by it has been duly and validly authorized and approved by all necessary limited liability company action of Purchaser.  It has full power, right and authority to acquire the Purchased Assets to be acquired by it.  This Agreement is, and each of the other Transaction Documents when so executed and delivered will be, its valid and binding obligation, enforceable against it in accordance with its terms.  The representatives of Purchaser that execute this Agreement on its behalf are duly-authorized and empowered to bind Purchaser to the terms and conditions of this Agreement.

Section 10.4.    <u>Brokers</u>.  If Purchaser has engaged any agent, broker or other Person acting pursuant to the express or implied authority of Purchaser as a broker which is or may be entitled to a commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Purchased Assets, Purchaser is responsible for paying such broker.

Section 10.5.    <u>Funding</u>.  At Closing, Purchaser shall have available to it all of the required cash or financing to pay the Purchase Price and to perform all of its obligations required

to be performed by it at the Closing pursuant to this Agreement, the other Transaction Documents, or applicable orders of the Bankruptcy Court.  Purchaser's ability to consummate the transactions contemplated by this Agreement is not subject to any financing contingency.

## ARTICLE 11
## DISCLAIMER OF WARRANTIES

Section 11.1.    <u>Disclaimer of Warranties</u>.  Purchaser hereby acknowledges and agrees that, except for the representations and warranties of the Seller expressly set forth in Article 10 of this Agreement, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets (including income to be derived or expenses to be incurred in connection with the Purchased Assets, the physical condition of any personal property comprising a part of the Purchased Assets or which is the subject of any Assumed Contract, the value of the Purchased Assets (or any portion thereof), the transferability of the Purchased Assets, the terms, amount, validity, collectability or enforceability of any accounts receivable or any Assumed Liabilities or Assumed Contracts, the title of the Purchased Assets (or any portion thereof), the merchantability or fitness of the personal property comprising a portion of the Purchased Assets or any other portion of the Purchased Assets for any particular purpose, or any other matter or thing relating to the Purchased Assets (or any portion thereof).  Without in any way limiting the foregoing, except as otherwise expressly set forth in Article 9 above, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose of the Purchased Assets or any portion of the Purchased Assets.  Purchaser further acknowledges that (a) Purchaser has conducted such independent inspections and investigations as Purchaser deemed necessary or appropriate of the physical condition of all of the Purchased Assets and any and all other matters relating to or affecting the Purchased Assets or the Assumed Liabilities, and that (b) in proceeding with the consummation of the transactions contemplated by this Agreement, including its acquisition of the Purchased Assets and assumption of the Assumed Liabilities and any and all other obligations contemplated hereby, Purchaser is doing so based solely upon such independent inspections and investigations (except for the representations and warranties expressly set forth in Article 9, above).  Accordingly, and in light of the fact that any and all representations and warranties made by Seller will lapse and terminate and be of no further force or effect following the Closing, Purchaser accepts the Purchased Assets at the Closing "AS IS," "WHERE IS," and "WITH ALL FAULTS."

## ARTICLE 12
## SELLER'S AND PURCHASER'S COVENANTS

Section 12.1.    <u>Conduct of Business</u>.  Unless otherwise ordered by the Bankruptcy Court, Seller will, without the express written consent of Purchaser, refrain from doing or failing to do anything that would: (i) dispose of, or transfer, any Purchased Asset, (ii) transfer any tangible Purchased Asset to any location other than its location as of the date of this Agreement, (iii) terminate, amend or modify the terms of any of the Assumed Contracts, or (iv) consent to or otherwise acquiesce in or stipulate to the rejection of any Executory Contract (v) hire or terminate any employees except that the Seller may terminate Shannon Illingworth and Phillip Koehne, (vi) pay, declare or accrue any bonuses, increases in salary or compensation to its

employees, (vii) loan any funds, extend any credit or grant any discounts, (viii) engage in any transactions with related or affiliated parties, or (ix) grant any interest (whether ownership, security, participation or otherwise) in or to any of the Purchased Assets or permit or authorize any third party to grant any interest (whether ownership, security, participation or otherwise) in or to any of the Purchased Assets; provided, however, that nothing herein shall prevent or otherwise limit Seller from continuing to operate in the Ordinary Course of Business.

Section 12.2.    Mutual Covenants.  The Parties hereto mutually covenant (and subject to the other terms of this Agreement):

after the Closing Date, each of the Parties hereto will give, or cause to be given, to the other and/or the other's representatives, during normal business hours: (i) reasonable access, to the extent permitted by applicable law, to its personnel, properties, titles, contracts, books, records, files, electronic files, and documents associated with the Purchased Assets (collectively, the "Documentation"); provided, however, that (ii) Seller shall only be entitled to such reasonable access from Purchaser as is otherwise necessary or appropriate in connection with Seller's ongoing administration pertaining to any litigation involving Seller, the preparation of any Tax Return or any other document relating to Taxes applicable to the Seller, and/or closing of its Bankruptcy Case and as needed for the Seller or any bankruptcy trustee or other successor to the Seller in connection with the investigation and prosecution of any estate causes of action, including avoidance actions, and claims against insiders of the Seller; and (iii) Purchaser shall not be required to maintain any computer servers or other data storage systems used by Seller at the time of the Closing for a period exceeding forty five (45) days, and may store any physical books and records at a place of its choosing.  In the event Purchaser chooses to no longer maintain any computer servers or other data storage systems used by Seller at the time of the Closing, Purchaser shall provide access to Seller, at Seller's sole and exclusive expense, to allow Seller to generate reports necessary for the ongoing administration pertaining to any litigation involving Seller, the preparation of any Tax Return or any other document relating to Taxes applicable to the Seller and as needed for the Seller or any bankruptcy trustee or other successor to the Seller in connection with the investigation and prosecution of any estate causes of action, including avoidance actions, and claims against insiders of the Seller, and/or closing of its Bankruptcy Case; and (i) at the requesting Party's expense, copies of such Documentation, as necessary to allow the requesting party to obtain information in connection with any claims, demands, other audits, suits, actions or proceedings by or against such requesting party as the owner and operator of the Purchased Assets or otherwise in furtherance of the purposes described in clause (ii) above, including, without limitation, in connection with the Seller's bankruptcy proceedings.  In connection with access to the records of a Party's accountants, the requesting Party shall execute and deliver such "hold harmless" agreements as the other Party's accountants may reasonably request; and

(c)    from the date of this Agreement to the Closing Date, the Parties shall cooperate with each other in determining whether filings are required to be made or consents required to be obtained in any jurisdiction in connection with the consummation of the transactions contemplated by this Agreement and in making or causing to be made any such filings promptly and in seeking to obtain timely any such consents (each Party shall furnish to the other and to the other's counsel all such information as may be reasonably required in order

to effectuate the foregoing action), which consents shall not, in any event, include any consent the need for which is obviated by the Sale Order or otherwise by the provisions of the Bankruptcy Code; and

(d)      from the date of this Agreement to the Closing Date, to advise the other Party promptly if such Party determines that any condition precedent to its obligations hereunder will not be satisfied in a timely manner.

Section 12.3.    <u>Filings and Authorizations</u>.  The Parties hereto shall, as promptly as practicable, cause to be made all such filings and submissions as may be required to consummate the terms of this Agreement.  Seller and Purchaser shall keep each other apprised of the status of any communications with, and inquiries or requests for additional information from, any Governmental Authority, and shall comply promptly with any such inquiry or request.  Seller shall not make any filings or submissions without the prior approval of Purchaser, which approval shall not be unreasonably withheld.

Section 12.4.    <u>Access and Information</u>.  Upon execution of this Agreement and through the Closing Date, Seller will give, or cause to be given, to Purchaser or its representatives designated in writing: (i) reasonable access, to the extent permitted by applicable law, during normal business hours to their personnel, properties, titles, contracts, books, records, files and documents that pertain to the Purchased Assets; (ii) at the requesting Party's expense, copies of such Documentation as necessary to allow such Party to obtain information in connection with any claims, demands, audits, suits, actions or proceedings by or against such requesting Party as the owner and operator of the Purchased Assets or otherwise in furtherance of the purposes described in clause (i) above; and (iii) any and all such information as such Party reasonably may request pertaining to the Purchased Assets, as promptly as practicable.  In connection with access to the records of the Seller's accountants, such Party shall execute and deliver such "hold harmless" agreements as Seller's accountants may reasonably request.

Section 12.5.    <u>Public Announcement</u>.  Subject to the provisions of the Bankruptcy Code and Seller's right to make such filings and disclosures as it in good faith deems necessary or appropriate in connection with the Bankruptcy Case, no Party hereto, nor their respective affiliates, agents and representatives, shall make or issue, or cause to be made or issued, any public announcement or written statement concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other Party hereto (which will not be unreasonably withheld or delayed), unless counsel to such Party advises that such announcement or statement is required by law (in which case the Parties hereto shall make reasonable efforts to consult with each other prior to such required announcement).   The restrictions imposed hereunder shall not apply to communications between Purchaser and Seller.  Notwithstanding anything herein to the contrary, following the filing of the Sale Motion, Purchaser may, but is not obligated to, make a public announcement of its intent to proceed under this Agreement and following the consummation of the transaction, Purchaser (or its affiliates) may issue a press release, email or other announcement of the acquisition.

Section 12.6.    Taxes

(a)    Seller shall be responsible for all taxes, charges, fees, levies, penalties or other assessments imposed by any federal, state, territorial, local or foreign taxing authority, including income, gross receipts, excise, property, sales, transfer, franchise, payroll, withholding, social security and other taxes, and shall include any interest, penalties or additions attributable thereto ("Taxes") in connection with, relating to or arising out of the ownership of the Purchased Assets, or the Assumed Liabilities attributable to taxable periods, or portions thereof, ending on or before the Closing, which Taxes shall be a Non-Assumed Liability.  Purchaser shall be responsible for all Taxes that are Liabilities under its respective Assumed Contracts, and all applicable Taxes in connection with, relating to or arising out of the Purchased Assets attributable to taxable periods, or portions thereof, from and after the Closing.  All state and local sales and use Taxes, to the extent attributable to periods prior to the Closing, shall be paid or otherwise discharged by Seller.

(b)    All transfer and documentary Taxes and recording fees and Taxes applicable to the transactions contemplated hereby (collectively, the "Transfer Taxes") shall be borne and paid by Purchaser.

(c)    Seller and Purchaser shall (i) provide the other with such assistance as may reasonably be requested by either of them in connection with the preparation of any return, report, information return or other document (including any related or supporting information) ("Tax Return"), any audit or other examination by any taxing authority or any judicial or administrative proceeding with respect to Taxes, (ii) retain for a period of not less than seven (7) years, and provide the other with, any records or other information which may be relevant to such return, audit, examination or proceeding, limited solely to prior years' Tax Returns and any workpapers related thereto, and (iii) provide the other with any final determination of any such audit or examination proceeding or determination that affects any amount required to be shown on any Tax Return of the other for any period (which shall be maintained confidentially).

Section 12.7.    Consents.  Each Party hereto will use its good faith efforts and will cooperate with the other party hereto to obtain all consents required from third persons, whose consent or approval is required pursuant to any Assumed Contract, or otherwise, in order to consummate the transaction contemplated hereby; provided, however, that Seller shall not be required to obtain any consent the need for which is obviated by the entry of the Sale Order or otherwise by any provision of the Bankruptcy Code.

Section 12.8.    Good Faith Efforts.  Without limiting the specific obligations of any Party hereto under any covenant or agreement hereunder, each Party hereto shall use its good faith efforts to take all action and do all things necessary to consummate the transactions contemplated in this Agreement.

Section 12.9.    Further Assurances.  From time to time after the Closing and without further consideration, Purchaser or Seller, at the request of the other, will execute and deliver such other instruments of conveyance and transfer or other instruments or documents, and take or arrange for such other actions, as may reasonably be required to effect any of the transactions

contemplated by this Agreement, or to provide any Party hereto with the benefits intended to be conferred and conveyed by this Agreement.  Upon the execution of this agreement by the parties, Seller grants to Purchaser a power of attorney, which power of attorney is irrevocable and coupled with an interest, to execute, deliver and/or file on behalf of Seller any documents or instruments required to be executed, delivered or filed by or on behalf of Seller after the Closing pursuant to this Section 12.9.  Notwithstanding anything to the contrary in this Section 12.9 or any other provision of this Agreement, neither Purchaser nor Seller shall be required to execute any document or take any action that would (i) materially increase the liability or obligation of the Party of whom such document or action is requested beyond that such Party would have pursuant to the other provisions of this Agreement, (ii) require or cause the Party of whom such action or document is requested to initiate, join in or otherwise become a Party to any litigation, action or other proceeding, or (iii) cause such Party to incur any material cost or expense that is not already imposed upon it by another provision of this Agreement.

Section 12.10.   No Survival of Representations and Warranties.   None of the representations and warranties contained in this Agreement or made in any other documents or instruments delivered pursuant to this Agreement shall survive the Closing hereunder.

Section 12.11.   Non-Assignment by Seller.  Seller may not assign any of its rights under this Agreement prior to the Closing without the prior written consent of Purchaser, which may be withheld in its sole discretion.

Section 12.12.   Litigation.  Purchaser and its successors, assigns, designees, transferees and affiliates agree to cooperate with and reasonably assist the Seller with respect to litigation matters related to the Purchased Assets after the Closing; provided, however, such assistance shall not require Purchaser or any of its successors, assigns, designees, transferees or affiliates to (a) initiate, join in or otherwise become a party to any litigation, action or other proceeding; or (b) assume responsibility for any costs, including legal fees, relating to such litigation.

# ARTICLE 13
## CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATION TO CLOSE

The obligations of Purchaser under this Agreement with respect to the purchase and sale of the Purchased Assets shall be subject to the fulfillment on or prior to the Closing of the conditions of Sections 13.1 through 13.9, any of which may be waived in writing by Purchaser. Seller shall use its best efforts to satisfy these conditions so that the Closing can occur on the later of (i) the first (1st) business day following the date on which all conditions to Closing set forth in Articles 13 and 14 hereof have been satisfied or waived, or (ii) the second (2nd) business day after expiration of the 14-day appeal period following entry of the Sale Order.

Section 13.1.    Accuracy of Representations and Warranties; Performance of this Agreement.  To the best of Seller's knowledge, each of the representations and warranties made by Seller shall be true and correct in all material respects on and as of the date hereof and at and as of the Closing Date (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date). Seller shall have complied with and performed in all material respects all of the agreements and

covenants required by this Agreement, each other Transaction Document, the Sale Procedures Order or the Sale Order (or any other Final Order of the Bankruptcy Court relating to the transactions contemplated by this Agreement) to be performed or complied with by it prior to the Closing and shall be able to perform in all material respects all of the agreements and covenants required by this Agreement, each other Transaction Document, the Sale Procedures Order or the Sale Order (or any other Final Order of the Bankruptcy Court relating to the transactions contemplated by this Agreement) to be performed or complied with at Closing.

Section 13.2.    <u>Bankruptcy Matters</u>.  The Sale Order in form and substance reasonably acceptable to Purchaser shall have been entered and the hearing on the Sale Motion shall have been held by the Hearing Deadline.  The Sale Order must be in effect, and must be a Final Order.

Section 13.3.    <u>Consents</u>.  Purchaser shall have received duly authorized, executed and delivered consents to the transactions contemplated hereby and waivers of rights to terminate or modify any material rights or obligations of the Seller from any Person from whom such consent or waiver is required under or in connection with any Assumed Contracts or instruments who, as a result of the transactions contemplated hereby, would have such rights to terminate or modify such Assumed Contracts or instruments, either by the terms thereof or as a matter of law; provided that, the consents required under this Section 13.3 shall not, in any event, include any consent the need for which is obviated by the Sale Order or otherwise by the provisions of the Bankruptcy Code.

Section 13.4.    <u>No Material Adverse Change or Destruction of Property</u>.  Between the date hereof and the Closing and except as otherwise provided in this Agreement, (i) there shall have been no material adverse change with respect to the Purchased Assets which would affect the Purchased Assets following the Closing, or which would otherwise continue to impact, following the Closing, the benefits and obligations of the transaction with respect to Purchaser contemplated under this Agreement, and (ii) there shall have been no adverse federal, state or local legislative change, or injunction affecting in any material respect any of the Purchased Assets, which would affect the Purchased Assets following the Closing, or which would otherwise impact, following the Closing, the benefits and obligations of the transaction with respect to Purchaser contemplated under this Agreement.

Section 13.5.    <u>Outside Closing Date</u>.  The Closing shall have occurred as provided in Article 8, above.

Section 13.6.    Due Diligence.  Purchaser shall be satisfied in its sole discretion with the results of its due diligence investigation, provided, that if the Purchaser does not terminate this Agreement pursuant to Section 16.2(f) hereof, this condition shall be deemed satisfied and expire as of expiration of the Due Diligence Period.

Section 13.7.    <u>Good Faith Purchaser</u>.  Purchaser shall have been found by the Bankruptcy Court at the hearing on the Sale Motion to be a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code.

Section 13.8.   <u>Delivery of Transaction Documents</u>.   Seller shall have delivered to Purchaser all of the Transaction Documents (other than this Agreement) which shall have been fully and duly executed by Seller to the extent required.

## ARTICLE 14
### CONDITIONS PRECEDENT TO THE SELLER' OBLIGATION TO CLOSE

The obligations of Seller under this Agreement with respect to the purchase and sale of the Purchased Assets shall be subject to the fulfillment on or prior to the Closing of each of the following conditions, any of which may be waived in writing by Seller.   Purchaser shall use its best efforts to satisfy these conditions so that the Closing can occur on the later of (i) the first (1st) business day following the date on which all conditions to Closing set forth in Articles 13 and 14 hereof have been satisfied or waived, or (ii) the second (2nd) business day after expiration of the 14-day appeal period following entry of the Sale Order.

Section 14.1.   <u>Accuracy of Representations and Warranties; Performance of this Agreement</u>.   Each of the representations and warranties made by Purchaser shall be true and correct in all material respects on and as of the date hereof and at and as of the Closing Date (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date).   Purchaser shall have complied with and performed in all material respects all of the agreements and covenants required by this Agreement, each other Transaction Document, the Procedures Order or the Sale Order (or any other Final Order of the Bankruptcy Court with respect to the transactions contemplated by this Agreement) to be performed or complied with by them prior to the Closing, and shall be able to perform in all material respects all of the agreements and covenants required by this Agreement, each other Transaction Document, the Procedures Order or the Sale Order (or any other Final Order of the Bankruptcy Court with respect to the transactions contemplated by this Agreement) to be performed or complied with at Closing.

Section 14.2.   <u>Authorizing Resolutions</u>.   Purchaser shall have delivered to the Seller copies of the authorizing resolutions of its board of directors or managing member(s), as applicable, authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and all instruments and documents to be delivered in connection herewith and the transactions contemplated hereby or thereby, duly certified by an authorized signatory of Purchaser.

Section 14.3.   <u>Good Faith Purchaser</u>.   Purchaser shall have been found by the Bankruptcy Court at the hearing on the Sale Motion to be a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code.

Section 14.4.   <u>Satisfaction of All Cure Payments</u>.   With respect to all Assumed Contracts to be assumed and assigned to Purchaser in accordance with the terms of this Agreement, Purchaser shall have performed and discharged any and all of its applicable Liabilities (including cure or other payments) and satisfied all other requirements imposed by the provisions of Section 365 of the Bankruptcy Code to allow Seller to assume and assign such

Assumed Contracts, if such Contracts are assumable and assignable under applicable Law, to Purchaser at the Closing.

Section 14.5.  <u>Bankruptcy Matters</u>.  The Sale Order must be in effect, and must be a Final Order.

Section 14.6.  <u>Outside Closing Date</u>.  The Closing shall have occurred no later than forty-five (45) days after the sale hearing is concluded.

Section 14.7.  <u>Delivery of Transaction Documents</u>.  Purchaser shall have prepared and delivered to the Seller all of the Transaction Documents (other than this Agreement), which shall have been fully and duly executed by Purchaser to the extent required.

# ARTICLE 15
## INDEMNIFICATION

Section 15.1.  <u>Indemnification by Purchaser</u>.  Subject to the provisions of this Article 15 and if (but only if) the Closing is consummated, Purchaser agrees to indemnify, defend  and hold Seller, and each of its respective subsidiaries, officers, directors, advisors, employees, representatives, successors and assigns (collectively, the "<u>Seller Indemnified Parties</u>") harmless of, from and against the aggregate of all losses, costs, damages, claims, demands, obligations, liabilities, actions, causes of action, fine, liens, charges, penalties, costs and expenses (including, without limitation, all court costs and attorneys' fees) (collectively, "<u>Indemnification Costs</u>") incurred or suffered by such Seller Indemnified Party, resulting from failure of Purchaser to satisfy its Assumed Liabilities with respect to the Purchased Assets after the Closing Date.

Section 15.2.  <u>Determination of Damages and Related Matters</u>.  In calculating any amounts payable pursuant to Section 15.1 hereof, Purchaser shall receive credit for any insurance recoveries by any Seller Indemnified Parties with respect to the Purchased Assets as to which any Indemnification Costs arose.

Section 15.3.  <u>Notice of Indemnification</u>.  In the event any legal proceeding shall be instituted or any claim or demand shall be asserted by any Seller Indemnified Party entitled to indemnification in respect of which payment may be sought under the provisions of this Article 15, any Seller Indemnified Party entitled to indemnification seeking indemnification (the "<u>Indemnitee</u>") shall promptly cause written notice of the assertion of any such claim of which it has knowledge which it reasonably believes to be covered by this indemnity to be forwarded to Purchaser.  Subject to the foregoing, any notice of a claim shall state specifically the facts giving rise to an alleged basis for the claim and the amount of the liability asserted against Purchaser by reason of the claim.  Any claim for indemnification by Seller against Purchaser shall be settled exclusively and finally by the Bankruptcy Court.  For the avoidance of doubt, no party hereto may seek indemnification under the provisions of this Article 15 unless a legal proceeding shall have been instituted or a claim or demand shall have been asserted.

Section 15.4.  <u>Indemnification Procedure for Third Party Claims</u>.  Except as otherwise provided herein, in the event of the initiation of any legal proceeding against an Indemnitee by a third party, Purchaser shall have the right after the receipt of notice, at its option and at its own

expense, to be represented by counsel (which counsel shall be reasonably satisfactory to the Indemnitee) and to defend against, negotiate, settle or otherwise deal with any proceeding, claim, or demand which relates to any damage claim subject to Indemnification, provided, however, that (i) Purchaser exercises such option in writing within 30 days of receipt of notice; and (ii) the Indemnitee may participate in any such proceeding with counsel of its choice and at Purchaser's reasonable expense. The Parties hereto agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such legal proceeding, claim or demand.  To the extent Purchaser elects not to defend such proceeding, claim or demand, and the Indemnitee defends against or otherwise deals with any such proceeding, claim or demand, the Indemnitee may retain counsel (reasonably satisfactory to Purchaser) at the reasonable expense of Purchaser and control the defense of and settlement of such proceeding; provided, that Purchaser shall nevertheless indemnify the Indemnitee for the full amount of the damages relating to such proceeding, claim or demand and provided, further, that the Indemnitee shall give Purchaser twenty (20) days' written notice prior to entering into any such settlement and shall not settle any such claim without the consent of Purchaser, which consent shall not be unreasonably withheld and which consent shall be deemed to have been granted if Purchaser fails to respond to the Indemnitee's properly noticed request for such consent.  If the Indemnitee shall settle any such proceeding without the consent or deemed consent of Purchaser, the Indemnitee shall thereafter have no claim, except for reasonable attorneys fees and costs, against Purchaser under this Article 15 with respect to any damages occasioned by such settlement, unless it is found or otherwise determined that Purchaser unreasonably withheld its consent to such settlement.

## ARTICLE 16
### TERMINATION

Section 16.1.    Breaches and Defaults; Opportunity to Cure.  Prior to the exercise by a Party of any termination rights afforded under Section 16.2 of this Agreement, if the Seller or Purchaser (the "Non-Breaching Party") believes that either Seller or Purchaser, as applicable (the "Breaching Party") is in breach hereunder, the Non-Breaching Party shall provide the Breaching Party with written notice (a "Default Notice") specifying in reasonable detail the nature of such breach, whereupon if such breach is curable the Breaching Party shall have five (5) calendar days from the receipt of such Default Notice to cure such breach to the reasonable satisfaction of the Non-Breaching Party; provided, however, that the cure period for a breach shall in no event extend, or cause the Closing Date to extend, beyond forty-five (45) days following the conclusion of the sale hearing.  The parties hereby agree that disputes concerning the validity or adequacy of any Default Notice shall be resolved by the Bankruptcy Court, and each party hereto specifically consents to the jurisdiction of the Bankruptcy Court to resolve any such disputes.  If the breach is not cured within the cure period described above and if there has been no challenge to the sufficiency of any Default Notice, or, to the extent of any such challenge, the Default Notice has been upheld by the Bankruptcy Court as proper under the circumstances, then the Non-Breaching Party shall be entitled to terminate this Agreement.

Section 16.2.    Termination.  This Agreement may be terminated and the transactions contemplated herein may be abandoned, by written notice given to the other party hereto in accordance with Section 16.1, at any time prior to the Closing:

(a)      by mutual written consent of the Seller and Purchaser;

(b)      by the Seller or Purchaser if the Sale Order is for any reason (other than a material breach or material default hereunder by the party seeking to terminate) not entered on or before June 15, 2016;

(c)      subject to the right to cure set forth in Section 16.1 at any time prior to the Closing Date by Purchaser if Seller (i) alters, amends or breaches any of the material covenants of this Agreement, or (ii) is in breach of any material covenant, representation, undertaking or warranty, or if it appears that a condition set forth in Article 13 is impossible (other than through the failure of Purchaser to comply with its obligations under this Agreement) to satisfy and Purchaser has not waived such condition in writing on or before the Closing Date;

(d)      subject to the right to cure set forth in Section 16.1, at any time prior to the Closing Date by Seller if Purchaser is in breach of any material covenant, representation or warranty, or if a condition set forth in Article 12 is impossible (other than through the failure of the Seller to comply with its obligations under this Agreement) to satisfy and Seller has not waived such condition in writing on or before the Closing Date;

(e)      by Purchaser if, notwithstanding the entry of a Final Order approving the sale, the Seller refuses to close for any reason whatsoever, other than a breach or default by Purchaser of Purchaser's obligations at Closing;

(f)      by Purchaser if the Closing shall not have occurred on or before forty-five (45) after the sale hearing, unless the failure to have the Closing shall be due to the failure of the Party seeking to terminate this Agreement to perform in any material respect its obligations under this Agreement required to be performed by it at or prior to the Closing; or

(g)      by Purchaser if Seller enters into an agreement for the sale of any of the Purchased Assets with any party other than Purchaser.

## ARTICLE 17
### MISCELLANEOUS

Section 17.1.    <u>Additional Instruments of Transfer</u>.    From time to time after the Closing, each party shall, if requested by another party, make, execute and deliver such additional assignments, bills of sale, deeds and other instruments and documents, as may be reasonably necessary or proper to carry out the specific provisions of this Agreement, including, without limitation, transfer to Purchaser of all of the Seller' right, title and interest in and to the applicable Purchased Assets.    Upon execution of this Agreement, Seller hereby grants to Purchaser a power of attorney, which power of attorney is irrevocable and coupled with an interest, to execute and deliver on behalf of Seller any documents or instruments required to be executed or delivered by or on behalf of Seller after the Closing pursuant to this Section 17.1.

Section 17.2.    <u>Notices</u>.  All notices and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered

personally, sent by telecopier, recognized overnight delivery service or registered or certified mail, return receipt requested, postage prepaid, to the following addresses:

If to Purchaser:

[INSERT]

If to Seller:

AVT, Inc.
341 Bonnie Circle, Ste. 102
Corona, California 92880
Attention:  Wayne Salvino
Facsimile:  951-737-7646
Email:  waynes@avtinconline.com

with a required copy to:

Marc C. Forsythe, Esq.
Charity J. Miller, Esq.
Goe & Forsythe LLP
18101 Von Karman Ave., Suite 1200
Irvine, CA 92612
Facsimile:  (949) 798-2460
Email:  mforsythe@goeforlaw.com
Email:  cmiller@goeforlaw.com

With copies to Counsel for the Official Unsecured
Creditors Committee:

Gary E. Klausner, Esq.
Eve H. Karasik, Esq.
Levene, Neale, Bender, Yoo & Brill LLP
10250 Constellation Avenue, Suite 1700
Los Angeles, CA 90067
Facsimile: (310) 229-1244
Email:  gek@lnbyb.com
Email:  ehk@lnbyb.com

Notices delivered personally or by electronic mail shall be effective upon receipt. Notices transmitted by telecopy shall be effective when received, provided that the burden of proving receipt when notice is transmitted by telecopy shall be the responsibility of the Party providing such notice.  Notices delivered by overnight mail shall be effective when received.

Notices delivered by registered or certified mail shall be effective on the date set forth on the receipt of registered or certified mail, or 72 hours after mailing, whichever is earlier.

Section 17.3.    Expenses.  Except as expressly provided herein, each Party shall bear its own expenses and costs, including the fees of any attorney retained by it, incurred in connection with the preparation of this Agreement and the consummation of the transactions contemplated hereby.  In the event either Party shall bring any action or proceeding in connection with the performance, breach or interpretation of this Agreement or any Transaction Document, the prevailing Party in such action or proceeding shall be entitled to recover from the losing Party all reasonable costs and expenses of such action, including, without limitation, reasonable attorneys' fees.

Section 17.4.    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of California (without application of principles of conflicts of law).  In connection with any controversy arising out of or related to this Agreement, Seller and Purchaser hereby irrevocably consent to the exclusive jurisdiction of the Bankruptcy Court, or if, and only if, the Bankruptcy Case has been closed, any federal court located in the Central District of California (Riverside Division) or any courts of the State of California located in Riverside County.  Seller and Purchaser each irrevocably consents to service of process out of the aforementioned courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in the aforementioned courts.

Section 17.5.    Assignment.  This Agreement binds and benefits the Parties and their respective successors and assignees.  Purchaser shall have the right to freely assign any of its rights under this Agreement to any other entity (i) the majority of which is owned or controlled by Purchaser, or (ii) that is an Affiliate of Purchaser.  No Party may delegate any performance of its obligations under this Agreement, except that Purchaser may at any time delegate the performance of its obligations to any Affiliate of Purchaser so long as Purchaser remains fully responsible for the performance of the delegated obligation.

Section 17.6.    Successors and Assigns.  All agreements made and entered into in connection with this transaction shall be binding upon and inure to the benefit of the Parties hereto, their successors and permitted assigns.

Section 17.7.    Amendments; Waivers.  No alteration, modification or change of this Agreement shall be valid except by an agreement in writing executed by the Parties hereto. Except as otherwise expressly set forth herein, no failure or delay by any Party hereto in exercising any right, power or privilege hereunder (and no course of dealing between or among any of the parties) shall operate as a waiver of any such right, power or privilege.  No waiver of any default on any one occasion shall constitute a waiver of any subsequent or other default.  No single or partial exercise of any such right, power or privilege shall preclude the further or full exercise thereof.

Section 17.8.    Entire Agreement.  This Agreement, together with the other Transaction Documents, merges all previous negotiations and agreements between the Parties hereto, either

verbal or written, and constitutes the entire agreement and understanding between the Parties with respect to the subject matter of this Agreement.

Section 17.9.    Counterparts.    This Agreement may be executed in one or more counterparts, each of which when so executed shall be an original, but all of which together shall constitute one agreement.  Facsimile signatures shall be deemed original signatures.

Section 17.10.    Severability.   If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law, but only as long as the continued validity, legality and enforceability of such provision or application does not materially (a) alter the terms of this Agreement, (b) diminish the benefits of this Agreement or (c) increase the burdens of this Agreement, for any person.

Section 17.11.    Section Headings.   The section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties and shall not in any way affect the meaning or interpretation of this Agreement.

Section 17.12.    Interpretation.   This Agreement has been negotiated at arms' length between persons knowledgeable in the matters dealt with herein.  In addition, each Party has been represented by experienced and knowledgeable legal counsel.  Accordingly, the parties hereto agree that any rule of law, including, but not limited to, California Civil Code Section 1654, or any other statutes, legal decisions, or common law principles of similar effect, that would require interpretation of any ambiguities in this Agreement against the party that has drafted this Agreement, is of no application and is hereby expressly waived.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intentions of the parties hereto.

Section 17.13.    Reasonable Access to Records and Certain Personnel.   For a period of two (2) years following the Closing (or until the closing of the Bankruptcy Case, if the Bankruptcy Case is closed sooner), Purchaser shall provide to Seller's counsel and other professionals or any successor to the Seller (collectively, "Permitted Access Parties") (a) reasonable access to the financial and other books and records relating to the Purchased Assets through and including the Closing Date, which access shall include the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may request, and Purchaser's copying and delivering to the relevant Permitted Access Parties such documents or records as they may request, but only to the extent such Permitted Access Parties furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses Purchaser for the reasonable costs and expenses thereof, and (b) at no cost to the Permitted Access Parties, reasonable access during regular business hours to assist Seller and the other Permitted Access Parties in their post-Closing activities; provided, however, that any access provided under this paragraph shall (i) not require Purchaser to produce information relating to transactions involving the Purchased Assets first entered into following the Closing Date, (ii) not materially interfere with Purchaser's business operations, (iii) not require access to Purchaser documents which are covered by a duty

of confidentiality or impact protection of such documents under attorney-client privilege, (iv) not require Purchaser's violation of any applicable Law, (v) be limited to matters pertaining to litigation involving Seller, the preparation of any Tax Return or any other document relating to Taxes applicable to Seller, and/or the closing of Seller's Bankruptcy Case, and as needed for the Seller or any bankruptcy trustee or other successor to the Seller in connection with the investigation and prosecution of any estate causes of action, including avoidance actions, and claims against insiders of the Seller; and (vi) be subject to the execution of such agreements as may be necessary to preserve any confidential, privileged, proprietary or secret information.  At the expiration of the two (2) year period provided for above, in the event a Party requires access to documents relating to the Purchased Assets under Section 12.2 hereof or otherwise, the Party requiring such access may elect to pay the other Party the costs of that Party's continued storage of the documents, or may, at its own expense, arrange for the transfer of the documents from the other Party, with such documents thereafter to be stored by the Party requiring such documents at its sole expense.

Section 17.14.    Third Parties.  Nothing herein, expressed or implied, is intended to or shall confer on any Person other than the Parties hereto any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 17.15.    Escrow Holder Matters.  Escrow Holder shall hold all of the funds in the Deposit Account pursuant to the terms of this Agreement.  Escrow Holder shall only disburse the contents of the Deposit Account at the times and pursuant to the terms and conditions set forth in this Agreement; provided, however, that if there are any disputes and/or conflicting instructions from and/or among the Seller, Purchaser and/or any other relevant party in interest regarding the disbursement of the funds in the Deposit Account, the Escrow Holder shall either (a) not release any funds in the Deposit Account until such dispute is resolved by the entry of an order of the Bankruptcy Court or otherwise by agreement of the Parties, or (b) deposit any funds in the Deposit Account into the registry of the Bankruptcy Court and commence an interpleader action so that the Bankruptcy Court may determine the Parties' respective rights, if any, with respect to such funds.  Escrow Holder shall not be deemed to have assumed any fiduciary duty to the Parties hereto, shall have no liability to any Party for actions taken in substantial compliance with the terms of this Agreement and/or controlling court order, and shall not charge any of the Parties a fee for serving as Escrow Holder hereunder.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative as of the day and year first above written.

AVT, INC.
"Seller"

By:_____
        Wayne Salvino
        Its: President


[INSERT]
"Purchaser"


By:_____
        Its:_____


**SOLELY WITH RESPECT TO SECTION 17.15
OF THE FOREGOING AGREEMENT**

GOE & FORSTYHE, LLP


By:_____

## Schedule 1

Intellectual Property

Touch Screen Vending Software

Patent #63635-237144 Multimedia System (Patent Pending)

Patent US 8,191,799 B2 Wireless Management of Remote Vending Machines

Patent US 8,998,082 B2 Multimedia System & Method for Controlling Machines

## **Schedule 1.1**

## **Excluded Assets**

See Exlcuded Assets set forth and defined in the Agreement.

Remaining assets to be excluded - TBD

## Schedule 6.1(a)

Assumed Contracts

TBD

# EXHIBIT 2

# EXHIBIT 2



**Search:** Public Records : Uniform Commercial Code Filings
**Terms:** company(AVT, Inc.)

| No. | Debtor | Filing | Secured Party |
|-----|--------|--------|---------------|
| 1 | **AVT INC.**<br>**3351 KELLER ST**<br>**SANTA CLARA, CA 95054-2601** | FINANCING STATEMENT<br>NUMBER: 157464484285<br>DATE: 05/13/2015<br>JURISDICTION: CA | BANK OF AMERICA, N.A.<br>1 INDEPENDENCE CTR<br>CHARLOTTE, NC 28255-0001 |
| 2 | **AVT, INC.**<br>**341 BONNIE CIR STE 102**<br>**CORONA, CA 92880-2895** | JUDGMENT LIEN<br>NUMBER: 157462271277<br>DATE: 04/28/2015<br>JURISDICTION: CA | MR FRANCISCO IZAWA<br>420 EXCHANGE STE 270<br>IRVINE, CA 92602-1316<br>FRESCOS MEXICAN GRILL<br>420 EXCHANGE STE 270<br>IRVINE, CA 92602-1316 |
| 3 | **AVT, INC.**<br>**341 BONNIE CIR STE 102**<br>**CORONA, CA 92880-2895**<br>AC MEXICAN FOOD, INC.<br>341 BONNIE CIR STE 102<br>CORONA, CA 92880-2895<br>RUSSELL, NATALIE<br>1245 DUXBURY CIR<br>CORONA, CA 92882-8392<br>ILLINGWORTH, SHANNON<br>1245 CLEVELAND WAY<br>CORONA, CA 92881-5907 | JUDGMENT LIEN<br>NUMBER: 157462274442<br>DATE: 04/28/2015<br>JURISDICTION: CA | MR FRANCISCO IZAWA<br>420 EXCHANGE STE 270<br>IRVINE, CA 92602-1316<br>FRESCOS MEXICAN GRILL<br>420 EXCHANGE STE 270<br>IRVINE, CA 92602-1316 |
| 4 | **AVT, INC.**<br>**341 BONNIE CIR STE 102**<br>**CORONA, CA 92880-2895** | INITIAL FILING<br>DATE: 04/10/2015<br>NUMBER: 2015009308-4<br>JURISDICTION: NV | WORTH, INC.<br>2320 WHITEOAK LN<br>CORONA, CA 92882-3796 |
| 5 | **AVT ENTERPRISES LLC**<br>**21 RIVERS POINT ROW APT 17F**<br>**CHARLESTON, SC 29412-3606**<br>TOULOUPOV, ANDREI<br>21 RIVERS POINT ROW APT 17F<br>CHARLESTON, SC 29412-3606 | INITIAL FILING<br>DATE: 06/13/2013<br>NUMBER: 130613-1421256<br>JURISDICTION: SC | INTERSTATE CAPITAL CORPORATION<br>PO BOX 1229<br>SANTA TERESA, NM 88008-1229 |
| 6 | **AVT ENTERPRISES LLC**<br>**21 RIVERS POINT ROW APT 17F**<br>**CHARLESTON, SC 29412-3606**<br>TOULOUPOV, ANDREI<br>21 RIVERS POINT ROW APT 17F<br>CHARLESTON, SC 29412-3606 | INITIAL FILING<br>DATE: 06/13/2013<br>NUMBER: 20130057442K<br>JURISDICTION: NC | INTERSTATE CAPITAL CORPORATION<br>PO BOX 1229<br>SANTA TERESA, NM 88008-1229 |
| 7 | **AVT ENTERPRISES LLC**<br>**21 RIVERS POINT ROW APT 17F**<br>**CHARLESTON, SC 29412-3606**<br>TOULOUPOV, ANDREI<br>21 RIVERS POINT ROW APT 17F<br>CHARLESTON, SC 29412-3606 | INITIAL FILING<br>DATE: 06/13/2013<br>NUMBER: 2013 2271618<br>JURISDICTION: DE | INTERSTATE CAPITAL CORPORATION<br>PO BOX 1229<br>SANTA TERESA, NM 88008-1229 |

| No. | Debtor | Filing | Secured Party |
|-----|--------|--------|---------------|
| 8 | AVT, INC.<br>2016 E BROAD ST<br>SAVANNAH, GA 31401-8661 | INITIAL FILING<br>DATE: 03/19/2013<br>NUMBER: 02513000955<br>JURISDICTION: GA | QUEENSBOROUGH NATIONAL BANK<br>AND TRUST COMPANY<br>216 US HIGHWAY 80 W<br>SAVANNAH, GA 31408-3114 |
| 9 | AVT, INC.<br>341 BONNIE CIR STE 102<br>CORONA, CA 92880-2895 | INITIAL FILING<br>DATE: 10/01/2012<br>NUMBER: 2012026065-3<br>JURISDICTION: NV | EAST WEST BANK<br>9300 FLAIR DR FL 6TH<br>EL MONTE, CA 91731-2851 |
| 10 | AVT, INC.<br>341 BONNIE CIR STE 102<br>CORONA, CA 92880-2895<br>AVT VENDING, INC.<br>341 BONNIE CIR STE 102<br>CORONA, CA 92880-2895 | FINANCING STATEMENT<br>NUMBER: 127328421555<br>DATE: 09/05/2012<br>JURISDICTION: CA | CRANE MERCHANDISING SYSTEMS,<br>INC.<br>12955 ENTERPRISE WAY<br>BRIDGETON, MO 63044-1206 |
| 11 | AVT, INC.<br>2016 E BROAD ST<br>SAVANNAH, GA 31401-8661 | INITIAL FILING<br>DATE: 07/27/2012<br>NUMBER: 00712019333<br>JURISDICTION: GA | MARLIN BUSINESS BANK<br>2795 E COTTONWOOD PKWY<br>SALT LAKE CITY, UT 84121-7032 |
| 12 | AVT, INC.<br>341 BONNIE CIR STE 102<br>CORONA, CA 92880-2895 | INITIAL FILING<br>DATE: 06/15/2012<br>NUMBER: 2012016564-9<br>JURISDICTION: NV<br>TERMINATION<br>DATE: 10/15/2012<br>NUMBER: 2012027361-2 | WELLS FARGO BANK, N.A.<br>PO BOX 8203<br>BOISE, ID 83707-2203 |
| 13 | A.V.T., LLC<br>9420 E GOLF LINKS RD<br>TUCSON, AZ 85730-1355<br>MCCOY, WAYNE<br>10197 E CARDIFF PL<br>TUCSON, AZ 85748-6781<br>OLIVER-MCCOY, TAMMY<br>10197 E CARDIFF PL<br>TUCSON, AZ 85748-6781 | INITIAL FILING<br>DATE: 06/11/2012<br>NUMBER: 201216975246<br>JURISDICTION: AZ | THE BUSINESS BACKER, LLC<br>10101 ALLIANCE RD STE 140<br>BLUE ASH, OH 45242-4715 |
| 14 | AVT, INC.<br>341 BONNIE CIR STE 102<br>CORONA, CA 92880-2895 | FINANCING STATEMENT<br>NUMBER: 117295144327<br>DATE: 12/22/2011<br>JURISDICTION: CA | VEND LEASE COMPANY INC<br>8100 SANDPIPER CIR STE 300<br>BALTIMORE, MD 21236-4992 |
| 15 | AVT, INC.<br>2016 E BROAD ST<br>SAVANNAH, GA 31401-8661 | INITIAL FILING<br>DATE: 11/15/2011<br>NUMBER: 02511003819<br>JURISDICTION: GA | QUEENSBOROUGH NATIONAL BANK<br>AND TRUST COMPANY<br>216 W HIGHWAY 80<br>SAVANNAH, GA 31408 |
| 16 | AVT, INC.<br>341 BONNIE CIR STE 102<br>CORONA, CA 92880-2895 | INITIAL FILING<br>DATE: 05/11/2011<br>NUMBER: 2011012120-3<br>JURISDICTION: NV | FIRESTONE FINANCIAL CORP.<br>27 CHRISTINA ST<br>NEWTON, MA 02461-1955 |

| No. | Debtor | Filing | Secured Party |
|-----|--------|--------|---------------|
| 17 | **AVT INC**<br>**1598 TIFFANY DR**<br>**PITTSBURGH, PA 15241-3232** | INITIAL FILING<br>DATE: 01/19/2011<br>NUMBER: 2011011905626<br>JURISDICTION: PA<br>CONTINUATION<br>DATE: 12/11/2015<br>NUMBER: 2015121100994 | FIRST NATIONAL BANK OF PENNSYL-<br>VANIA<br>1 FNB BLVD<br>HERMITAGE, PA 16148-3347 |
| 18 | **AVT, INC.**<br>**341 BONNIE CIR STE 102**<br>**CORONA, CA 92880-2895** | FINANCING STATEMENT<br>NUMBER: 107248884365<br>DATE: 10/19/2010<br>JURISDICTION: CA | PM FACTORS, INC. DBA 1ST PMF<br>BANCORP ("PMF")<br>9701 W PICO BLVD FL 1ST<br>LOS ANGELES, CA 90035-4744 |
| 19 | **AVT, INC.**<br>**341 BONNIE CIR STE 102**<br>**CORONA, CA 92880-2895** | INITIAL FILING<br>DATE: 10/18/2010<br>NUMBER: 2010026445-5<br>JURISDICTION: NV | PM FACTORS, INC. DBA 1ST PMF<br>BANCORP ("PMF")<br>9701 W PICO BLVD FL 1ST<br>LOS ANGELES, CA 90035-4744 |
| 20 | **AVT, INC.**<br>**341 BONNIE CIR STE 102**<br>**CORONA, CA 92880-2895** | INITIAL FILING<br>DATE: 04/09/2009<br>NUMBER: 2009009034-0<br>JURISDICTION: NV | FIRESTONE FINANCIAL CORP.<br>27 CHRISTINA ST<br>NEWTON, MA 02461-1955 |
| 21 | **AVT, INC.**<br>**341 BONNIE CIR STE 102**<br>**CORONA, CA 92880-2895** | INITIAL FILING<br>DATE: 04/09/2009<br>NUMBER: 2009009035-2<br>JURISDICTION: NV<br>CONTINUATION<br>DATE: 03/17/2014<br>NUMBER: 2014006547-5<br>AMENDMENT<br>DATE: 11/16/2015<br>NUMBER: 2015031446-4 | FIRESTONE FINANCIAL CORP.<br>27 CHRISTINA ST<br>NEWTON, MA 02461-1955<br>FIRESTONE FINANCIAL, LLC<br>117 KENDRICK ST STE 200<br>NEEDHAM, MA 02494-2728 |
| 22 | **AVT, INC.**<br>**341 BONNIE CIR STE 102**<br>**CORONA, CA 92880-2895** | FINANCING STATEMENT<br>NUMBER: 097186129255<br>DATE: 01/29/2009<br>JURISDICTION: CA | FIRESTONE FINANCIAL CORP.<br>27 CHRISTINA ST<br>NEWTON, MA 02461-1955 |
| 23 | **AVT INC**<br>**341 BONNIE CIR STE 102**<br>**CORONA, CA 92880-2895** | FINANCING STATEMENT<br>NUMBER: 097185775493<br>DATE: 01/27/2009<br>JURISDICTION: CA | FALCON LEASING, LLC<br>183 CEDAR DR<br>FOLEY, MN 56329-4401 |
| 24 | **AVT, INC.**<br>**341 BONNIE CIR STE 102**<br>**CORONA, CA 92880-2895** | FINANCING STATEMENT<br>NUMBER: 087177694544<br>DATE: 11/06/2008<br>JURISDICTION: CA<br>UCC3 AMENDMENT DATE:<br>04/16/2010 NUMBER:<br>1072290183 | FIRESTONE FINANCIAL CORP.<br>27 CHRISTINA ST<br>NEWTON, MA 02461-1955 |

| No. | Debtor | Filing | Secured Party |
|-----|--------|--------|---------------|
| | | AMENDMENT DATE: 04/16/2010 NUMBER: 1072290183 | |
| 25 | **AVT, INC 341 BONNIE CIR STE 102 CORONA, CA 92880-2895** | FINANCING STATEMENT NUMBER: 087168888478 DATE: 08/15/2008 JURISDICTION: CA | FALCON LEASING, LLC 183 CEDAR DR FOLEY, MN 56329-4401 |
| 26 | **AVT, INC. 2016 E BROAD ST SAVANNAH, GA 31401-8661** | INITIAL FILING DATE: 08/12/2008 NUMBER: 02508002474 JURISDICTION: GA | PUGET SOUND LEASING CO., INC. PO BOX 1295 ISSAQUAH, WA 98027-0050 |
| 27 | **AVT, INC. 341 BONNIE CIR STE 102 CORONA, CA 92880-2895** | FINANCING STATEMENT NUMBER: 087167355032 DATE: 08/01/2008 JURISDICTION: CA | FALCON LEASING, LLC 183 CEDAR DR FOLEY, MN 56329-4401 |
| 28 | **AVT, INC. 2103 9TH AVE CAMANCHE, IA 52730-9600** | INITIAL FILING DATE: 06/25/2008 NUMBER: P569579-9 JURISDICTION: IA TERMINATION DATE: 08/02/2011 NUMBER: E11048074-7 | OLYMPIC CREDIT FUND, INC. 1800 COOPER POINT RD SW STE 5 OLYMPIA, WA 98502-1179 |
| 29 | **AVT, INC 2016 E BROAD ST SAVANNAH, GA 31401-8661** | INITIAL FILING DATE: 01/22/2008 NUMBER: 02508000226 JURISDICTION: GA | 20 QUEENSBOROUGH NATIONAL BANK AND TRUST COMPANY 6605 ABERCORN ST STE 112 SAVANNAH, GA 31405-5890 |
| 30 | **AVT HOLDINGS LLC PO BOX 2568 HICKORY, NC 28603-2568** | INITIAL FILING DATE: 09/10/2007 NUMBER: 20070086641F JURISDICTION: NC TERMINATION DATE: 08/06/2012 NUMBER: 20120073354J | CAROLINA TRUST BANK 901 E MAIN ST LINCOLNTON, NC 28092-3448 |
| 31 | **A.V.T., LLC 9402 E PLACITA CASCADA TUCSON, AZ 85715-5718** | INITIAL FILING DATE: 03/19/2007 NUMBER: 200714708599 JURISDICTION: AZ | NATIONAL BANK OF ARIZONA, A NATIONAL BANKING ASSOC 335 N WILMOT RD STE 100 TUCSON, AZ 85711-2658 |
| 32 | **A.V.T., LLC 4400 E BROADWAY BLVD TUCSON, AZ 85711-3517** | INITIAL FILING DATE: 11/09/2006 NUMBER: 200614510975 JURISDICTION: AZ | BANK OF TUCSON 4400 E BROADWAY BLVD STE 112 TUCSON, AZ 85711-3552 |
| 33 | **AVT, INC. 2616 E BROAD ST SAVANNAH, GA 31401** | INITIAL FILING DATE: 04/03/2006 NUMBER: 02506001125 JURISDICTION: GA | PILCHER/CARL G 2542 GORDON HWY AUGUSTA, GA 30909-9794 |

| No. | Debtor | Filing | Secured Party |
|---|---|---|---|
| 34 | **AVT, INC.**<br>**2616 E BROAD ST**<br>**SAVANNAH, GA 31401** | INITIAL FILING<br>DATE: 04/03/2006<br>NUMBER: 02506001126<br>JURISDICTION: GA | PILCHER/SHERRY A<br>142 STEEPLECHASE RD<br>SAVANNAH, GA 31405-1049 |
| 35 | **AVT, INC.**<br>**1031 MCLAUGHLIN RUN RD**<br>**BRIDGEVILLE, PA 15017-2530** | INITIAL FILING<br>DATE: 09/13/2004<br>NUMBER: 20040968995<br>JURISDICTION: PA<br>CONTINUATION<br>DATE: 03/24/2009<br>NUMBER: 2009032403672<br>AMENDMENT<br>DATE: 03/24/2009<br>NUMBER: 2009032403658<br>ASSIGNMENT<br>DATE: 09/30/2009<br>NUMBER: 2009100507827<br>TERMINATION<br>DATE: 01/14/2011<br>NUMBER: 2011011401628 | FIRST NIAGARA FUNDING, INC.<br>6950 S TRANSIT RD<br>LOCKPORT, NY 14094-6333<br>NATIONAL CITY BANK<br>20 STANWIX ST<br>PITTSBURGH, PA 15222-4802<br>NATIONAL CITY BANK OF PENNSYLVA-<br>NIA<br>20 STANWIX ST<br>PITTSBURGH, PA 15222-4802 |
| 36 | **AVT INC.**<br>**1731 ADRIAN RD STE 3**<br>**BURLINGAME, CA 94010-2108**<br>AVT INC.<br>3351 KELLER ST<br>SANTA CLARA, CA 95054-2601<br>LHEUREUX, RICHARD R<br>4137 MYSTIC VIEW CT<br>HAYWARD, CA 94542-2167<br>LHEUREUX, JEAN S<br>4137 MYSTIC VIEW CT<br>HAYWARD, CA 94542-2167 | FINANCING STATEMENT<br>NUMBER: 0312960016<br>DATE: 05/07/2003<br>JURISDICTION: CA<br>UCC3 CONTINUATION<br>DATE: 12/05/2007 NUM-<br>BER: 0771390835<br>CONTINUATION DATE:<br>12/05/2007 NUMBER:<br>0771390835<br>UCC3 AMENDMENT DATE:<br>12/05/2008 NUMBER:<br>0871809709<br>AMENDMENT DATE:<br>12/05/2008 NUMBER:<br>0871809709<br>UCC3 AMENDMENT DATE:<br>02/01/2011 NUMBER:<br>1172593352<br>AMENDMENT DATE:<br>02/01/2011 NUMBER:<br>1172593352<br>UCC3 AMENDMENT DATE:<br>02/01/2011 NUMBER:<br>1172593351<br>AMENDMENT DATE:<br>02/01/2011 NUMBER:<br>1172593351 | BRIDGE BANK, NA<br>2120 EL CAMINO REAL<br>SANTA CLARA, CA 95050-4052 |

| <u>No.</u> | **Debtor** | **Filing** | **Secured Party** |
|------|-----------|-----------|----------------|
|  |  | AMENDMENT DATE: 04/05/2012 NUMBER: 1273075917 CONTINUATION DATE: 11/13/2012 NUMBER: 1273367712 TERMINATION DATE: 06/16/2015 NUMBER: 1574700938 |  |
| 37 | **AVT INC 3075 WASHINGTON PIKE BRIDGEVILLE, PA 15017-1417** AVT, INC. | INITIAL FILING DATE: 01/13/2003 NUMBER: 36981316 JURISDICTION: PA TERMINATION DATE: 09/16/2004 NUMBER: 20040980085 | MERRILL LYNCH BUSINESS FINAN-CIAL SERVICES INC 222 N LA SALLE ST CHICAGO, IL 60601-1003 MERRILL LYNCH BUSINESS FINAN-CIAL SERVICES INC. |
| 38 | **AVT INC 1765 W CORTLAND CT ADDISON, IL 60101-4237** | UCC-1 FINANCING STATEMENT NUMBER: 004446808 DATE: 10/09/2001 JURISDICTION: IL | MBS BUSINESS SYSTEMS PO BOX 728 PARK RIDGE, NJ 07656 |
| 39 | **AVT INC 400 E MINERAL AVE LITTLETON, CO 80122-2604** | INITIAL FILING DATE: 09/26/2000 NUMBER: 20002085295 JURISDICTION: CO TERMINATION DATE: 12/09/2002 NUMBER: 2002F128525 | HEPP, JAMES A. PO BOX 342 HYGIENE, CO 80533-0342 COMAX CAPITAL MANAGEMENT LLC RD HYGIENE, CO 80533 |
| 40 | **AVT, INC. 552 GRAND AVE RIDGEFIELD, NJ 07657-1609** | INITIAL FILING DATE: 09/15/2000 NUMBER: 1997344 JURISDICTION: NJ | RAINBOW DANCE SPORTS, INC. 233 12TH ST APT 5F PALISADES PARK, NJ 07650-2070 |
| 41 | COMMWORLD WILSHIRE CENTER INC. 458 MANDEVILLE DR WALNUT, CA 91789-4718 | JUDGEMENT LIEN NUMBER: 0024260898 DATE: 08/22/2000 JURISDICTION: CA | **AVT CORPORATION 4676 LAKEVIEW AVE STE 103 YORBA LINDA, CA 92886-2466** |
| 42 | **AVT 995 5TH AVE NEW YORK, NY 10028-0125** AVT. THE STANHOPE PARK HYATT HOTEL 995 5TH AVE NEW YORK, NY 10028-0125 AUDIOVISUAL TECHNIQUES 995 5TH AVE NEW YORK, NY 10028-0125 AUDIOVISUAL TECHNIQUES | INITIAL FILING DATE: 07/13/2000 NUMBER: 00136870 JURISDICTION: NY CONTINUATION DATE: 07/13/2005 NUMBER: 200507130789154 TERMINATION DATE: 02/09/2009 | AMERICAN CHARTERED BANK 1199 E HIGGINS RD SCHAUMBURG, IL 60173-4711 AMERICAN CHARTERED BANK |

| No. | Debtor | Filing | Secured Party |
|-----|--------|--------|---------------|
| | HOSPITALITY PARTNERS, L.L.C.<br>995 5TH AVE<br>NEW YORK, NY 10028-0125<br>HOSPITALITY PARTNERS, L.L.C. D/B/A<br>AUDIOVISUAL TECHNIQUES DBA AVT<br>995 5TH AVE<br>NEW YORK, NY 10028-0125<br>THE STANHOPE PARK HYATT HOTEL<br>995 5TH AVE<br>NEW YORK, NY 10028-0125 | NUMBER:<br>200902098048430<br>TERMINATION<br>DATE: 03/06/2009<br>NUMBER:<br>200903060132108 | |
| 43 | **AVT**<br>**GRENELEFE RESORT**<br>**HAINES CITY, FL 33844**<br>AUDIOVISUAL TECHNIQUES<br>GRENELEFE RESORT<br>HAINES CITY, FL 33844<br>HOSPITALITY PARTNERS LLC<br>GRENELEFE RESORT<br>HAINES CITY, FL 33844 | INITIAL FILING<br>DATE: 07/13/2000<br>NUMBER: 200000161344<br>JURISDICTION: FL | AMERICAN CHARTERED BANK<br>1199 E HIGGINS RD<br>SCHAUMBURG, IL 60173-4711 |
| 44 | **AVT, INC.**<br>**2616 E BROAD ST**<br>**SAVANNAH, GA 31401** | INITIAL FILING<br>DATE: 07/06/2000<br>NUMBER: 02500003992<br>JURISDICTION: GA | PILCHER, CARL G.<br>2542 GORDON HWY<br>AUGUSTA, GA 30909-9794 |
| 45 | **AVT INC**<br>**400 E MINERAL AVE**<br>**LITTLETON, CO 80122-2604** | INITIAL FILING<br>DATE: 03/23/2000<br>NUMBER: 20002026689<br>JURISDICTION: CO<br>TERMINATION<br>DATE: 12/09/2002<br>NUMBER: 2002F128533<br>TERMINATION<br>DATE: 12/09/2002<br>NUMBER: 2002F128528 | HEPP, JAMES A.<br>PO BOX 342<br>HYGIENE, CO 80533-0342<br>COMAX CAPITAL MANAGEMENT LLC<br>PO BOX 342<br>HYGIENE, CO 80533-0342 |
| 46 | **AVT**<br>**1540 E DUNDEE RD STE 102**<br>**PALATINE, IL 60074-8316**<br>AUDIOVISUAL TECHNOLGIES<br>1540 E DUNDEE RD STE 102<br>PALATINE, IL 60074-8316<br>HOSPITALITY PARTNERS LLC<br>1540 E DUNDEE RD STE 102<br>PALATINE, IL 60074-8316 | UCC-1 FINANCING<br>STATEMENT<br>NUMBER: 004163828<br>DATE: 02/08/2000<br>JURISDICTION: IL<br>AMENDMENT TO A<br>SECURED PARTY DATE:<br>05/15/2000 NUMBER:<br>004213651<br>CONTINUATION DATE:<br>02/03/2005 NUMBER:<br>008747643<br>TERMINATION DATE:<br>02/09/2009 NUMBER:<br>001687142 | AMERICAN CHARTERED BANK<br>1199 E HIGGINS RD<br>SCHAUMBURG, IL 60173-4711 |

| No. | Debtor | Filing | Secured Party |
|-----|--------|--------|---------------|
| | | TERMINATION DATE: 03/20/2009 NUMBER: 001692067 | |
| 47 | **A.V.T., INC.** **340 MILLBURN AVE3RD FLR** **MILLBURN, NJ 07041** A. V. T. INC. | INITIAL FILING DATE: 06/30/1998 NUMBER: 1846774 JURISDICTION: NJ ASSIGNMENT DATE: 04/30/2003 NUMBER: 1846774 CONTINUATION DATE: 05/01/2003 NUMBER: 1846774 | FLEET NATIONAL BANK SUMMIT BANK 210 MAIN ST HACKENSACK, NJ 07601-7311 SUMMIT BANK |
| 48 | **AVT, INC.** **1731 ADRIAN RD STE 3** **BURLINGAME, CA 94010-2108** | FINANCING STATEMENT NUMBER: 9714060554 DATE: 05/19/1997 JURISDICTION: CA UCC3 CONTINUATION DATE: 12/24/2001 NUMBER: 01361C0334 UCC3 TERMINATION DATE: 10/01/2004 NUMBER: 0470011113 | SAN JOSE NATIONAL BANK PO BOX 1957 SAN JOSE, CA 95109-1957 |
| 49 | **AVT, INC** **PO BOX 9712** **SAVANNAH, GA 31412-9712** AVT, INC. PO BOX 9712 SAVANNAH, GA 31412-9712 | INITIAL FILING DATE: 12/29/1995 NUMBER: 02595007152 JURISDICTION: GA TERMINATION DATE: 08/02/1999 NUMBER: 02599004814 | FIRST LIBERTY BANK 18 W BRYAN ST SAVANNAH, GA 31401-2604 |
| 50 | **AVT, INC.** **2016 EAST RD** **SAVANNAH, GA 31401** | INITIAL FILING DATE: 12/07/1995 NUMBER: 02595006531 JURISDICTION: GA | AVCO LEASING SERVICES, INC. 18022 COWAN STE 101 IRVINE, CA 92614-6806 |
| 51 | **AVT, INC.** **2179 3400 AVE** **JUNCTION CITY, KS 66441-8722** AVERY, GAILEN JAMES, JEFF VEACH, JOHN | NUMBER: 2117396 DATE: 03/15/1995 JURISDICTION: KS CONTINUATION DATE: 03/07/2000 NUMBER: 3367539 | FARMERS & MERCHANTS STATE BANK PO BOX 278 WAKEFIELD, KS 67487-0278 |
| 52 | **AVT INC** **8100 SOUTHPARK WAY STE A9** **LITTLETON, CO 80120-4525** ELECTRITEK-AVT, INC. | INITIAL FILING DATE: 05/09/1994 NUMBER: 19942034548 JURISDICTION: CO TERMINATION DATE: 12/20/2006 NUMBER: 2006F122768 | ELECTRITEK-AVT, INC. UMB COLUMBINE NATIONAL BANK 6900 E HAMPDEN AVE DENVER, CO 80224-3010 |

| No. | Debtor | Filing | Secured Party |
|---|---|---|---|
| | | TERMINATION<br>DATE: 12/20/2006<br>NUMBER: 2006F122750 | |
| 53 | **AVT INC**<br>**8100 SOUTHPARK WAY STE A9**<br>**LITTLETON, CO 80120-4525**<br>AVT, INC.<br>8100 SOUTHPARK WAY STE A9<br>LITTLETON, CO 80120-4525 | INITIAL FILING<br>DATE: 05/09/1994<br>NUMBER: 942034548<br>JURISDICTION: CO<br>CONTINUATION<br>DATE: 07/11/1997<br>NUMBER: 15040 | UMB BANK COLORADO<br>1670 BROADWAY<br>DENVER, CO 80202-4801 |
| 54 | **A.V.T.**<br>**1421 LATTA ST**<br>**CHATTANOOGA, TN 37406-3864** | NUMBER: 257830<br>DATE: 12/02/1993<br>JURISDICTION: TN<br>TERMINATION<br>DATE: 12/17/1999<br>NUMBER: 992-057231 | CORNERSTONE COM. BANK (FORM-<br>ERSLY THE BANK OF EAST RIDGE)<br>6401 LEE HWY STE B<br>CHATTANOOGA, TN 37421-2406 |
| 55 | **AVT, INC.**<br>**PO BOX 9712**<br>**SAVANNAH, GA 31412-9712** | NUMBER: 02593265331<br>DATE: 07/01/1993<br>JURISDICTION: GA<br>TERMINATION<br>DATE: 08/27/1997<br>NUMBER: 02597006247 | FIRST LIBERTY BANK<br>PO BOX 9712<br>SAVANNAH, GA 31412-9712 |
| 56 | **AVT INC**<br>**PO BOX 9712**<br>**SAVANNAH, GA 31412-9712** | INITIAL FILING<br>DATE: 07/01/1993<br>NUMBER: 265331<br>JURISDICTION: GA | FIRST LIBERTY BANK<br>PO BOX 9712<br>SAVANNAH, GA 31412-9712 |
| 57 | **AVT INC**<br>**2016 E BROAD ST**<br>**SAVANNAH, GA 31401-8661** | INITIAL FILING<br>DATE: 03/24/1993<br>NUMBER: 264060<br>JURISDICTION: GA | HARBEN INC<br>PO BOX 830107<br>CUMMING, GA 30130 |
| 58 | **AVT INC**<br>**8100 SOUTHPARK WAY STE A9**<br>**LITTLETON, CO 80120-4525**<br>AVT INC<br>8100 SOUTHPARK WAY STE A9<br>LITTLETON, CO 80120-4525<br>VISX INC<br>5166 E ATLANTIC PL<br>DENVER, CO 80222-4708 | INITIAL FILING<br>DATE: 06/18/1992<br>NUMBER: 922044111<br>JURISDICTION: CO<br>TERMINATION<br>DATE: 02/11/1993<br>NUMBER: 932011392 | VISX INC<br>5166 E ATLANTIC PL<br>DENVER, CO 80222-4708<br>JOHN S BENNETT<br>5166 E ATLANTIC PL<br>DENVER, CO 80222-4708<br>SCOTT A HABERT<br>2744 S READING CT<br>DENVER, CO 80231-6018<br>OMNIBANK ARAPAHOE<br>PO BOX 370013<br>DENVER, CO 80237-0013 |
| 59 | **AVT INC**<br>**8100 SOUTHPARK WAY STE A9**<br>**LITTLETON, CO 80120-4525**<br>AVT INC<br>7108 S ALTON WAY | INITIAL FILING<br>DATE: 07/13/1989<br>NUMBER: 892058245<br>JURISDICTION: CO | FIRST CO BANK & TRUST NA<br>2696 S COLORADO BLVD<br>DENVER, CO 80222-5945 |

| No. | Debtor | Filing | Secured Party |
|---|---|---|---|
| | CENTENNIAL, CO 80112-2106 | AMENDMENT<br>DATE: 11/08/1990<br>NUMBER: 902086247<br>TERMINATION<br>DATE: 05/18/1994<br>NUMBER: 942037499 | |
| 60 | **AVT INC**<br>**7108 S ALTON WAY**<br>**CENTENNIAL, CO 80112-2106**<br>AVT INC<br>7108 S ALTON WAY STE E2<br>CENTENNIAL, CO 80112-2112 | INITIAL FILING<br>DATE: 07/13/1989<br>NUMBER: 892058246<br>JURISDICTION: CO<br>AMENDMENT<br>DATE: 11/08/1990<br>NUMBER: 902086246<br>TERMINATION<br>DATE: 05/18/1994<br>NUMBER: 942037500 | FIRST CO BANK & TRUST NA<br>2696 S COLORADO BLVD<br>DENVER, CO 80222-5945 |
| 61 | **AVT INC**<br>**8100 SOUTHPARK WAY STE A9**<br>**LITTLETON, CO 80120-4525**<br>AVT INC<br>7108 S ALTON WAY<br>CENTENNIAL, CO 80112-2106 | INITIAL FILING<br>DATE: 07/13/1989<br>NUMBER: 892058247<br>JURISDICTION: CO<br>AMENDMENT<br>DATE: 11/08/1990<br>NUMBER: 902086245<br>TERMINATION<br>DATE: 05/18/1994<br>NUMBER: 942037501 | FIRST CO BANK & TRUST NA<br>2696 S COLORADO BLVD<br>DENVER, CO 80222-5945 |
| 62 | **AVT INCORPORATED**<br>**411 W MARTINDALE RD**<br>**SEGUIN, TX 78155-1642**<br>WASHTUB NO 2<br>411 W MARTINDALE RD<br>SEGUIN, TX 78155-1642 | ORIGINAL FILING<br>NUMBER: 8800113958<br>DATE: 05/11/1988<br>JURISDICTION: TX<br>UCC STANDARD DATE:<br>05/11/1988 NUMBER:<br>8800113958 | I R S<br>AUSTIN, TX |
| 63 | **AVT INC**<br>**2016 E BROAD ST**<br>**SAVANNAH, GA 31401-8661** | INITIAL FILING<br>DATE: 11/20/1987<br>NUMBER: 233422<br>JURISDICTION: GA | LIBERTY SAVINGS BANK<br>SAVANNAH, GA |
| 64 | **AVTIN CORPORATION, INC.** | UCC-1 ORIGINAL<br>NUMBER: 90928713<br>DATE: 01/02/1990<br>JURISDICTION: MA<br>NUMBER: 90928713 | CENTURY NORTH SHORE BANK |
| 65 | **AVTIN CORPORATION, INC.**<br>**00000** | UCC-1 ORIGINAL<br>NUMBER: 90928714<br>DATE: 01/02/1990<br>JURISDICTION: MA<br>NUMBER: 90928714 | CENTURY NORTH SHORE BANK |

| No. | Debtor | Filing | Secured Party |
|-----|--------|--------|---------------|
| 66 | **AVT PAINTS LLC**<br>**4644 RICHARD AVE**<br>**ALEXANDRIA, LA 71302-2922** | INITIAL FILING<br>DATE: 11/03/2015<br>NUMBER: 2015 5095855<br>JURISDICTION: DE | CROWN CREDIT COMPANY<br>40 S WASHINGTON ST<br>NEW BREMEN, OH 45869-1247 |
| 67 | **AVT RANCH, INC.**<br>**6702 BROKEN ARROW TRL S**<br>**LAKELAND, FL 33813-4862**<br>LEWIS, CAROLYN THOMAS<br>6702 BROKEN ARROW TRL S<br>LAKELAND, FL 33813-4862 | INITIAL FILING<br>DATE: 03/13/2015<br>NUMBER: 201503259410<br>JURISDICTION: FL | KUBOTA CREDIT CORPORATION,<br>U.S.A.<br>4400 AMON CARTER BLVD STE 100<br>FORT WORTH, TX 76155-2695 |
| 68 | **AVT PRO, INC.**<br>**1610 WESTWOOD DR STE 6**<br>**SAN JOSE, CA 95125-5110** | STATE TAX LIEN<br>NUMBER: 117272318082<br>DATE: 06/02/2011<br>JURISDICTION: CA | EMPLOYMENT DEVELOPMENT<br>DEPARTMENT<br>PO BOX 826880<br>SACRAMENTO, CA 94280-0001 |
| 69 | **AVT TITLE SERVICES LLC**<br>**14180 DALLAS PKWY STE 600**<br>**DALLAS, TX 75254-4373** | ORIGINAL FILING<br>NUMBER: 100029513516<br>DATE: 10/12/2010<br>JURISDICTION: TX<br>UCC STANDARD DATE:<br>10/12/2010 NUMBER:<br>100029513516 | SUMNER GROUP INC<br>2121 HAMPTON AVE<br>SAINT LOUIS, MO 63139-2904 |
| 70 | **AVT VENDING, INC.**<br>**341 BONNIE CIR STE 102**<br>**CORONA, CA 92880-2895** | FINANCING STATEMENT<br>NUMBER: 087161034535<br>DATE: 06/11/2008<br>JURISDICTION: CA | VEND LEASE COMPANY, INC.<br>6424 FRANKFORD AVE<br>BALTIMORE, MD 21206-4905 |
| 71 | **AVT GROCERY, INC.**<br>**8304 ESTERS BLVD STE 860**<br>**IRVING, TX 75063-2234**<br>MINYARD FOOD STORES, INC.<br>777 FREEPORT PKWY<br>COPPELL, TX 75019-4449 | ORIGINAL FILING<br>NUMBER: 70006409329<br>DATE: 02/26/2007<br>JURISDICTION: TX<br>UCC STANDARD DATE:<br>02/26/2007 NUMBER:<br>70006409329<br>AMENDMENT, MASTER<br>AMENDMENT DATE:<br>06/21/2011 NUMBER:<br>1100182113<br>CONTINUATION DATE:<br>08/29/2011 NUMBER:<br>1100253295 | ASSOCIATED WHOLESALE GRO-<br>CERS, INC.<br>PO BOX 2932<br>KANSAS CITY, KS 66110-2932 |
| 72 | **AVT TITLE SERVICES LLC**<br>**14180 DALLAS PKWY STE 660**<br>**DALLAS, TX 75254-7308** | ORIGINAL FILING<br>NUMBER: 60036523398<br>DATE: 11/06/2006<br>JURISDICTION: TX<br>UCC STANDARD DATE:<br>11/06/2006 NUMBER:<br>60036523398 | SUMNER GROUP INC<br>2121 HAMPTON AVE<br>SAINT LOUIS, MO 63139-2904 |

| No. | Debtor | Filing | Secured Party |
|---|---|---|---|
| 73 | **AVT TITLE SERVICES LLC 1505 ELM ST APT 1204 DALLAS, TX 75201-3529** MACKIE, WOLF & ZIENTZ, P.C. 1505 ELM ST APT 1204 DALLAS, TX 75201-3529 | ORIGINAL FILING NUMBER: 60032169118 DATE: 09/27/2006 JURISDICTION: TX UCC STANDARD DATE: 09/27/2006 NUMBER: 60032169118 AMENDMENT, MASTER AMENDMENT DATE: 10/24/2006 NUMBER: 600350981 AMENDMENT, MASTER AMENDMENT DATE: 10/24/2006 NUMBER: 600350978 | SOUTHSIDE BANK PO BOX 1079 TYLER, TX 75710-1079 |
| 74 | **AVT SALES 832 W KIVA AVE MESA, AZ 85210-6747** TROTTI, ANDREW V 832 W KIVA AVE MESA, AZ 85210-6747 | INITIAL FILING DATE: 09/07/2006 NUMBER: 200614420170 JURISDICTION: AZ CONTINUATION DATE: 04/13/2011 NUMBER: 200614420170 | JPMORGAN CHASE BANK, NA PO BOX 4660 HOUSTON, TX 77210-4660 |
| 75 | 901 CB BOULEVARD CORP. 901 BEACH CHANNEL DR BROAD CHANNEL, NY 11693 901 CB BOULEVARD CORP. 901 BEACH CHANNEL DR BROAD CHANNEL, NY 11693 | INITIAL FILING DATE: 06/29/1998 NUMBER: 98139009 JURISDICTION: NY TERMINATION DATE: 10/12/1999 NUMBER: 99203920 | **AVT VENDING INC. 72-33 ORITTO AVE MASPETH, NY 11378** A.N.T. WARDING 7233 GRAND AVE MASPETH, NY 11378-1532 |
| 76 | **AVT TITLE SERVICES LLC 14160 DALLAS PKWY STE 900 DALLAS, TX 75254-4314** | ORIGINAL FILING NUMBER: 120035533527 JURISDICTION: TX MASTER RECORD (ORIGINAL FILING UCC-1) DATE: 11/12/2012 NUMBER: 120035533527 | SUMNER GROUP 2121 HAMPTON AVE SAINT LOUIS, MO 63139-2904 |
| 77 | **AVT TITLE SERVICES LLC 124 W CAPITOL AVE LITTLE ROCK, AR 72201-3704** | ORIGINAL FILING NUMBER: 120039893176 JURISDICTION: TX MASTER RECORD (ORIGINAL FILING UCC-1) DATE: 12/27/2012 NUMBER: 120039893176 | SUMNER GROUP 2121 HAMPTON AVE SAINT LOUIS, MO 63139-2904 |
| 78 | **AVT TITLE SERVICES LLC 14160 DALLAS PKWY STE 900 DALLAS, TX 75254-4314** | ORIGINAL FILING NUMBER: 140010962659 JURISDICTION: TX MASTER RECORD (ORIGINAL FILING UCC-1) | DATAMAX INC 2121 HAMPTON AVE SAINT LOUIS, MO 63139-2904 |

| No. | Debtor | Filing | Secured Party |
|---|---|---|---|
| | | DATE: 04/08/2014 NUMBER: 140010962659 | |
| 79 | A.V.T. REALTY CO., LLC<br>522 ARMSTRONG AVE<br>STATEN ISLAND, NY 10308-1937 | INITIAL FILING<br>DATE: 10/20/2014<br>NUMBER:<br>201410200586814<br>JURISDICTION: NY | BCB COMMUNITY BANK<br>595 AVENUE C<br>BAYONNE, NJ 07002-3813 |
| 80 | AVT PROPERTIES, LLC<br>111 WINDSOR RIDGE DR<br>WHITINSVILLE, MA 01588-2049 | UCC-1 ORIGINAL<br>NUMBER: 201410871640<br>DATE: 03/28/2014<br>JURISDICTION: MA<br>NUMBER: 201410871640 | SPENCER SAVINGS BANK<br>176 MAIN ST<br>SPENCER, MA 01562-2179 |
| 81 | AVT SERVICE TECHNOLOGIES, L.L.C.<br>800 BUSSE RD<br>ELK GROVE VLG, IL 60007-2429 | UCC-1 FINANCING<br>STATEMENT<br>NUMBER: 017284452<br>DATE: 05/14/2012<br>JURISDICTION: IL | AMERICAN CHARTERED BANK<br>1199 E HIGGINS RD<br>SCHAUMBURG, IL 60173-4711 |
| 82 | AVT TRANSPORTATION, INC.<br>16342 SUN SUMMIT DR<br>RIVERSIDE, CA 92503-0508 | FINANCING STATEMENT<br>NUMBER: 107244673337<br>DATE: 09/13/2010<br>JURISDICTION: CA<br>CONTINUATION DATE:<br>07/16/2015 NUMBER:<br>1574751558 | APEX CAPITAL LP<br>6000 WESTERN PL STE 1000<br>FORT WORTH, TX 76107-4664 |
| 83 | AVT SERVICE TECHNOLOGIES, L.L.C.<br>4 CARLISLE DR<br>OAK BROOK, IL 60523-1709 | UCC-1 FINANCING<br>STATEMENT<br>NUMBER: 015442476<br>DATE: 07/19/2010<br>JURISDICTION: IL<br>CONTINUATION DATE:<br>03/12/2015 NUMBER:<br>009347145 | AMERICAN CHARTERED BANK<br>1199 E HIGGINS RD<br>SCHAUMBURG, IL 60173-4711 |
| 84 | AVT EQUIPMENT, LLC<br>5115 JOANNE KEARNEY BLVD<br>TAMPA, FL 33619-8602<br>K & S EQUIPMENT COMPANY, INC.<br>5115 JOANNE KEARNEY BLVD<br>TAMPA, FL 33619-8602<br>KEARNEY CONSTRUCTION COMPANY, INC.<br>5115 JOANNE KEARNEY BLVD<br>TAMPA, FL 33619-8602<br>KEARNEY DEVELOPMENT COMPANY, INC.<br>5115 JOANNE KEARNEY BLVD<br>TAMPA, FL 33619-8602<br>FLORIDA SOLL CEMENT, LLC | INITIAL FILING<br>DATE: 06/30/2009<br>NUMBER: 200900792742<br>JURISDICTION: FL<br>TERMINATION<br>DATE: 11/16/2011<br>NUMBER: 20110566899X | TRAVELERS CASUALTY AND SURETY<br>COMPANY OF AMERICA<br>1 TOWER SQ<br>HARTFORD, CT 06183-0001 |

| No. | Debtor | Filing | Secured Party |
|-----|--------|--------|---------------|
| | 5115 JOANNE KEARNEY BLVD<br>TAMPA, FL 33619-8602<br>KEARNEY, BING CHARLES W<br>5115 JOANNE KEARNEY BLVD<br>TAMPA, FL 33619-8602<br>PAYNE, ALAN G<br>5115 JOANNE KEARNEY BLVD<br>TAMPA, FL 33619-8602<br>SEEGER, BRIAN W JR.<br>5115 JOANNE KEARNEY BLVD<br>TAMPA, FL 33619-8602<br>FLORIDA FUEL TRANSPORTERS, LLC<br>5115 JOANNE KEARNEY BLVD<br>TAMPA, FL 33619-8602<br>KEARNEY CONSTRUCTION CO., LLC<br>5115 JOANNE KEARNEY BLVD<br>TAMPA, FL 33619-8602 | | |
| 85 | **AVT EQUIPMENT, LLC**<br>**5115 JOANNE KEARNEY BLVD**<br>**TAMPA, FL 33619-8602** | INITIAL FILING<br>DATE: 01/05/2009<br>NUMBER: 200909800136<br>JURISDICTION: FL | CATERPILLAR FINANCIAL SERVICES<br>CORPORATION<br>2120 WEST END AVE<br>NASHVILLE, TN 37203-5251 |
| 86 | **AVT EQUIPMENT, LLC**<br>**5115 JOANNE KEARNEY BLVD**<br>**TAMPA, FL 33619-8602** | INITIAL FILING<br>DATE: 01/05/2009<br>NUMBER: 200909800144<br>JURISDICTION: FL | CATERPILLAR FINANCIAL SERVICES<br>CORPORATION<br>2120 WEST END AVE<br>NASHVILLE, TN 37203-5251 |
| 87 | **AVT EQUIPMENT, LLC**<br>**5115 JOANNE KEARNEY BLVD**<br>**TAMPA, FL 33619-8602** | INITIAL FILING<br>DATE: 01/05/2009<br>NUMBER: 200909800152<br>JURISDICTION: FL | CATERPILLAR FINANCIAL SERVICES<br>CORPORATION<br>2120 WEST END AVE<br>NASHVILLE, TN 37203-5251 |
| 88 | **AVT EQUIPMENT, LLC**<br>**5115 JOANNE KEARNEY BLVD**<br>**TAMPA, FL 33619-8602** | INITIAL FILING<br>DATE: 01/05/2009<br>NUMBER: 200909800780<br>JURISDICTION: FL | CATERPILLAR FINANCIAL SERVICES<br>CORPORATION<br>2120 WEST END AVE<br>NASHVILLE, TN 37203-5251 |
| 89 | **AVT EQUIPMENT, LLC**<br>**5115 JOANNE KEARNEY BLVD**<br>**TAMPA, FL 33619-8602** | INITIAL FILING<br>DATE: 01/05/2009<br>NUMBER: 200909800799<br>JURISDICTION: FL | CATERPILLAR FINANCIAL SERVICES<br>CORPORATION<br>2120 WEST END AVE<br>NASHVILLE, TN 37203-5251 |
| 90 | **AVT EQUIPMENT, LLC**<br>**5115 JOANNE KEARNEY BLVD**<br>**TAMPA, FL 33619-8602** | INITIAL FILING<br>DATE: 09/10/2008<br>NUMBER: 200809122683<br>JURISDICTION: FL | CATERPILLAR FINANCIAL SERVICES<br>CORPORATION<br>2120 WEST END AVE<br>NASHVILLE, TN 37203-5251 |
| 91 | **AVT EQUIPMENT, LLC**<br>**9625 WES KEARNEY WAY**<br>**RIVERVIEW, FL 33578-0506** | INITIAL FILING<br>DATE: 07/28/2008<br>NUMBER: 200808825095<br>JURISDICTION: FL<br>TERMINATION<br>DATE: 10/06/2008 | FCC EQUIPMENT FINANCING, INC.<br>PO BOX 56347<br>JACKSONVILLE, FL 32241-6347 |

| No. | Debtor | Filing | Secured Party |
|-----|--------|--------|---------------|
| | | NUMBER: 200809296924 | |
| 92 | **AVT EQUIPMENT, LLC**<br>**5115 JOANNE KEARNEY BLVD**<br>**TAMPA, FL 33619-8602** | INITIAL FILING<br>DATE: 07/28/2008<br>NUMBER: 200808826776<br>JURISDICTION: FL | CATERPILLAR FINANCIAL SERVICES<br>CORPORATION<br>2120 WEST END AVE<br>NASHVILLE, TN 37203-5251 |
| 93 | **AVT EQUIPMENT, LLC**<br>**5155 JOANNE KEARNEY BLVD**<br>**TAMPA, FL 33619-8602** | INITIAL FILING<br>DATE: 07/21/2008<br>NUMBER: 200808783015<br>JURISDICTION: FL<br>CONTINUATION<br>DATE: 05/23/2013<br>NUMBER: 201309097907 | FCC EQUIPMENT FINANCING, INC. |
| 94 | **AVT EQUIPMENT, LLC**<br>**5115 JOANNE KEARNEY BLVD**<br>**TAMPA, FL 33619-8602** | INITIAL FILING<br>DATE: 05/29/2008<br>NUMBER: 200808414435<br>JURISDICTION: FL | CATERPILLAR FINANCIAL SERVICES<br>CORPORATION<br>2120 WEST END AVE<br>NASHVILLE, TN 37203-5251 |
| 95 | **AVT EQUIPMENT, LLC**<br>**5115 JOANNE KEARNEY BLVD**<br>**TAMPA, FL 33619-8602** | INITIAL FILING<br>DATE: 05/29/2008<br>NUMBER: 200808414443<br>JURISDICTION: FL | CATERPILLAR FINANCIAL SERVICES<br>CORPORATION<br>2120 WEST END AVE<br>NASHVILLE, TN 37203-5251 |
| 96 | **AVT EQUIPMENT, LLC**<br>**5115 JOANNE KEARNEY BLVD**<br>**TAMPA, FL 33619-8602** | INITIAL FILING<br>DATE: 05/06/2008<br>NUMBER: 200808244289<br>JURISDICTION: FL | CATERPILLAR FINANCIAL SERVICES<br>CORPORATION<br>2120 WEST END AVE<br>NASHVILLE, TN 37203-5251 |
| 97 | **AVT EQUIPMENT, LLC**<br>**5115 JOANNE KEARNEY BLVD**<br>**TAMPA, FL 33619-8602** | INITIAL FILING<br>DATE: 04/01/2008<br>NUMBER: 200807999537<br>JURISDICTION: FL | WELLS FARGO EQUIPMENT FINANCE,<br>INC.<br>1540 W FOUNTAINHEAD PKWY<br>TEMPE, AZ 85282-1839 |
| 98 | **AVT EQUIPMENT, LLC**<br>**5115 JOANNE KEARNEY BLVD**<br>**TAMPA, FL 33619-8602** | INITIAL FILING<br>DATE: 03/07/2008<br>NUMBER: 200807810876<br>JURISDICTION: FL | CATERPILLAR FINANCIAL SERVICES<br>CORPORATION<br>2120 WEST END AVE<br>NASHVILLE, TN 37203-5251 |
| 99 | **AVT CONSTRUCTION, INC.**<br>**558 HANOVER ST**<br>**MERIDEN, CT 06451-5307**<br>NANFITO, VINCENT<br>444 ROCKWOOD DR<br>SOUTHINGTON, CT 06489-4662 | INITIAL FILING<br>DATE: 02/27/2008<br>NUMBER: 0002620169<br>JURISDICTION: CT<br>CONTINUATION<br>DATE: 01/03/2013<br>NUMBER: 0002913555<br>AMENDMENT<br>DATE: 01/03/2013<br>NUMBER: 0002913555 | COLONIAL SURETY COMPANY<br>50 CHESTNUT RIDGE RD<br>MONTVALE, NJ 07645-1814 |
| 100 | **AVT EQUIPMENT, LLC**<br>**5115 JOANNE KEARNEY BLVD**<br>**TAMPA, FL 33619-8602** | INITIAL FILING<br>DATE: 01/14/2008<br>NUMBER: 200807413648 | CATERPILLAR FINANCIAL SERVICES<br>CORPORATION<br>2120 WEST END AVE |

| No. | Debtor | Filing | Secured Party |
|-----|--------|--------|---------------|
| | | JURISDICTION: FL | NASHVILLE, TN 37203-5251 |
| 101 | AVT EQUIPMENT LLC<br>5115 JOANNE KEARNEY BLVD<br>TAMPA, FL 33619-8602 | INITIAL FILING<br>DATE: 08/30/2007<br>NUMBER: 200706412425<br>JURISDICTION: FL<br>TERMINATION<br>DATE: 05/06/2008<br>NUMBER: 200808242960 | DEERE & COMPANY<br>6400 NW 86TH ST<br>JOHNSTON, IA 50131-2945 |
| 102 | AVT EQUIPMENT, LLC<br>9625 WES KEARNEY WAY<br>RIVERVIEW, FL 33578-0506 | INITIAL FILING<br>DATE: 07/20/2007<br>NUMBER: 200706090959<br>JURISDICTION: FL<br>TERMINATION<br>DATE: 12/07/2007<br>NUMBER: 200707169052 | FCC EQUIPMENT FINANCING, INC.<br>PO BOX 56347<br>JACKSONVILLE, FL 32241-6347 |
| 103 | AVT EQUIPMENT, LLC<br>9625 WES KEARNEY WAY<br>RIVERVIEW, FL 33578-0506 | INITIAL FILING<br>DATE: 07/13/2007<br>NUMBER: 200706028943<br>JURISDICTION: FL<br>TERMINATION<br>DATE: 08/04/2008<br>NUMBER: 200808876331 | FCC EQUIPMENT FINANCING, INC.<br>PO BOX 56347<br>JACKSONVILLE, FL 32241-6347 |
| 104 | AVT EQUIPMENT LLC<br>5115 JOANNE KEARNEY BLVD<br>TAMPA, FL 33619-8602 | INITIAL FILING<br>DATE: 04/19/2007<br>NUMBER: 200705335699<br>JURISDICTION: FL<br>CONTINUATION<br>DATE: 03/08/2012<br>NUMBER: 201206318633 | CATERPILLAR FINANCIAL SERVICES<br>CORPORATION<br>2120 WEST END AVE<br>NASHVILLE, TN 37203-5251 |
| 105 | AVT EQUIPMENT LLC<br>9625 WES KEARNEY WAY<br>RIVERVIEW, FL 33578-0506 | INITIAL FILING<br>DATE: 04/03/2007<br>NUMBER: 200705209936<br>JURISDICTION: FL | DEERE CREDIT INC<br>6400 NW 86TH ST<br>JOHNSTON, IA 50131-2945 |
| 106 | AVT EQUIPMENT LLC<br>5115 JOANNE KEARNEY BLVD<br>TAMPA, FL 33619-8602 | INITIAL FILING<br>DATE: 04/02/2007<br>NUMBER: 200705193983<br>JURISDICTION: FL<br>AMENDMENT<br>DATE: 04/25/2007<br>NUMBER: 200705380783<br>AMENDMENT<br>DATE: 10/19/2007<br>NUMBER: 200706817867<br>TERMINATION<br>DATE: 08/18/2009<br>NUMBER: 200901057051 | WELLS FARGO EQUIPMENT FINANCE,<br>INC.<br>1540 W FOUNTAINHEAD PKWY<br>TEMPE, AZ 85282-1839<br>THE CIT GROUP/EQUIPMENT FINANC-<br>ING INC<br>PO BOX 27248<br>TEMPE, AZ 85285-7248 |
| | AVT EQUIPMENT, LLC | | |

| No. | Debtor | Filing | Secured Party |
|-----|--------|--------|---------------|
| 107 | **9625 WES KEARNEY WAY RIVERVIEW, FL 33578-0506** | INITIAL FILING DATE: 03/02/2007 NUMBER: 200704942664 JURISDICTION: FL | DEERE & COMPANY 6400 NW 86TH ST JOHNSTON, IA 50131-2945 |
| 108 | **AVT EQUIPMENT, LLC 9625 WES KEARNEY WAY RIVERVIEW, FL 33578-0506** | INITIAL FILING DATE: 03/02/2007 NUMBER: 200704942672 JURISDICTION: FL TERMINATION DATE: 08/27/2009 NUMBER: 200901107563 | DEERE & COMPANY 6400 NW 86TH ST JOHNSTON, IA 50131-2945 |
| 109 | **AVT EQUIPMENT, LLC 5115 JOANNE KEARNEY BLVD TAMPA, FL 33619-8602** | INITIAL FILING DATE: 02/27/2007 NUMBER: 200704913141 JURISDICTION: FL AMENDMENT DATE: 03/07/2007 NUMBER: 200704985878 | CATERPILLAR FINANCIAL SERVICES CORPORATION 2120 WEST END AVE NASHVILLE, TN 37203-5251 |
| 110 | **AVT EQUIPMENT, LLC 9625 WES KEARNEY WAY RIVERVIEW, FL 33578-0506** | INITIAL FILING DATE: 12/29/2006 NUMBER: 200604465864 JURISDICTION: FL | CITICAPITAL COMMERCIAL CORPO- RATION 8201 RIDGEPOINT DR IRVING, TX 75063-3160 |
| 111 | **AVT EQUIPMENT, LLC 9625 WES KEARNEY WAY RIVERVIEW, FL 33578-0506** | INITIAL FILING DATE: 12/29/2006 NUMBER: 200604466429 JURISDICTION: FL | CITICAPITAL COMMERCIAL CORPO- RATION 8201 RIDGEPOINT DR IRVING, TX 75063-3160 |
| 112 | **AVT EQUIPMENT LLC 9625 WES KEARNEY WAY RIVERVIEW, FL 33578-0506** | INITIAL FILING DATE: 10/19/2006 NUMBER: 200603948225 JURISDICTION: FL | DEERE CREDIT INC 6400 NW 86TH ST JOHNSTON, IA 50131-2945 |
| 113 | **AVT EQUIPMENT LLC 9625 WES KEARNEY WAY RIVERVIEW, FL 33578-0506** | INITIAL FILING DATE: 10/18/2006 NUMBER: 200603926272 JURISDICTION: FL TERMINATION DATE: 08/18/2009 NUMBER: 200901057086 | DEERE CREDIT INC 6400 NW 86TH ST JOHNSTON, IA 50131-2945 |
| 114 | **AVT EQUIPMENT, LLC 9625 WES KEARNEY WAY RIVERVIEW, FL 33578-0506** | INITIAL FILING DATE: 05/26/2006 NUMBER: 200602751134 JURISDICTION: FL AMENDMENT DATE: 09/13/2007 NUMBER: 200706530339 TERMINATION DATE: 08/27/2009 | THE CIT GROUP/EQUIPMENT FINANC- ING, INC. PO BOX 27248 TEMPE, AZ 85285-7248 WELLS FARGO EQUIPMENT FINANCE, INC. 1540 W FOUNTAINHEAD PKWY TEMPE, AZ 85282-1839 |

| No. | Debtor | Filing | Secured Party |
|---|---|---|---|
| | | NUMBER: 200901107571 | |
| 115 | **AVT EQUIPMENT LLC**<br>**9625 WES KEARNEY WAY**<br>**RIVERVIEW, FL 33578-0506** | INITIAL FILING<br>DATE: 05/25/2006<br>NUMBER: 200602742712<br>JURISDICTION: FL<br>TERMINATION<br>DATE: 04/04/2008<br>NUMBER: 200808016251 | FCC EQUIPMENT FINANCING INC<br>PO BOX 56347<br>JACKSONVILLE, FL 32241-6347 |
| 116 | **AVT CONSTRUCTION, INC**<br>**558 HANOVER ST**<br>**MERIDEN, CT 06451-5307** | INITIAL FILING<br>DATE: 05/10/2006<br>NUMBER: 0002392660<br>JURISDICTION: CT<br>CONTINUATION<br>DATE: 01/19/2011<br>NUMBER: 0002794687<br>AMENDMENT<br>DATE: 01/19/2011<br>NUMBER: 0002794687<br>AMENDMENT<br>DATE: 01/20/2011<br>NUMBER: 0002794671<br>AMENDMENT<br>DATE: 02/23/2016<br>NUMBER: 0003104109 | TD BANK, N.A. AS SUCCESSOR BY<br>MERGER TO HUDSON UNITED BANK<br>1701 MARLTON PIKE E<br>CHERRY HILL, NJ 08003-2390<br>HUDSON UNITED BANK<br>1000 MACARTHUR BLVD<br>MAHWAH, NJ 07430-2035 |
| 117 | **AVT EQUIPMENT LLC**<br>**9625 WES KEARNEY WAY**<br>**RIVERVIEW, FL 33578-0506** | INITIAL FILING<br>DATE: 04/18/2006<br>NUMBER: 200602410655<br>JURISDICTION: FL<br>CONTINUATION<br>DATE: 12/02/2010<br>NUMBER: 201003663816<br>CONTINUATION<br>DATE: 03/23/2016<br>NUMBER: 201606932630 | LASALLE BANK NATIONAL ASSOCIA-<br>TION<br>135 S LA SALLE ST<br>CHICAGO, IL 60603-4177<br>LASALLE BANK NATIONAL ASSOCIA-<br>TION<br>135 S LA SALLE ST<br>CHICAGO, IL 60603-4177 |
| 118 | **AVT CONSTRUCTION, INC.**<br>**558 HANOVER ST**<br>**MERIDEN, CT 06451-5307**<br>LASTRINA, JOSEPH<br>5 ALLEN ST<br>PORTLAND, CT 06480-1401<br>LAVOIE, DENISE<br>62 SAW MILL DR<br>WALLINGFORD, CT 06492-5037<br>NANFITO, VINCENT<br>558 HANOVER ST<br>MERIDEN, CT 06451-5307 | INITIAL FILING<br>DATE: 04/09/2003<br>NUMBER: 0002195967<br>JURISDICTION: CT<br>AMENDMENT<br>DATE: 12/09/2005<br>NUMBER: 0002366159 | COLONIAL SURETY COMPANY<br>50 CHESTNUT RIDGE RD<br>MONTVALE, NJ 07645-1814 |
| 119 | **AVT FINANCING, INC.**<br>**13336 FM 718** | ORIGINAL FILING<br>NUMBER: 30002239009 | ERNSOC, INC.<br>1910 GILLILAND RD |

| No. | Debtor | Filing | Secured Party |
|-----|--------|--------|---------------|
| | SAGINAW, TX 76179-9139 | DATE: 09/23/2002 JURISDICTION: TX UCC STANDARD DATE: 09/23/2002 NUMBER: 30002239009 | SPRINGTOWN, TX 76082-5203 |
| 120 | A.V.T. REALTY CO., LLC 104 CANTON AVE STATEN ISLAND, NY 10312-2208 A.V.T. REALTY CO., LLC | INITIAL FILING DATE: 03/29/2002 NUMBER: 02073327 JURISDICTION: NY CONTINUATION DATE: 11/27/2006 NUMBER: 200611276142578 CONTINUATION DATE: 11/17/2011 NUMBER: 201111176284148 | SOVEREIGN BANK, SUCCESSOR BY MERGER TO SI BANK & TRUST SI BANK & TRUST 260 CHRISTOPHER LN STATEN ISLAND, NY 10314-1607 |
| 121 | AVT AQUISITION CORPORATION 865 INDUSTRIAL BLVD WACONIA, MN 55387-1045 AVT ACQUISITION CORPORATION AVT AQUISITION CORPORATION APPLIED VACUUM TECHNOLOGY 865 INDUSTRIAL BLVD WACONIA, MN 55387-1045 APPLIED VACUUM TECHNOLOGY 865 INDUSTRIAL BLVD WACONIA, MN 55387-1045 | INITIAL FILING DATE: 06/20/2000 NUMBER: 2237718 JURISDICTION: MN ASSIGNMENT DATE: 11/07/2000 NUMBER: 2272793 TERMINATION DATE: 05/18/2005 NUMBER: 20051656662 | MAZAK FINANCIAL GROUP L.L.C. 1500 CHAQUITA CTR SUITE 23250 CINCINNATI, OH 45202 THE CIT GROUP 900 ASHWOOD PKWY\6TH FLR ATLANTA, GA 30338 |
| 122 | AVT PROPERTIES LLC 2600 FISHER RD COLUMBUS, OH 43204-3564 | INITIAL FILING DATE: 04/17/2000 NUMBER: AP0236825 JURISDICTION: OH | GFC LEASING 2101 W BELTLINE HWY MADISON, WI 53713-2339 |
| 123 | AVT PROPERTIES LLC 2600 FISHER RD COLUMBUS, OH 43204-3564 | INITIAL FILING DATE: 02/15/2000 NUMBER: AP0220608 JURISDICTION: OH | GFC LEASING 2101 W BELTLINE HWY MADISON, WI 53713-2339 |
| 124 | AVT ACQUISITION CORPORATION 4200 REDDING RIDGE DR MINNETONKA, MN 55345-2929 | INITIAL FILING DATE: 02/03/2000 NUMBER: 2198578 JURISDICTION: MN | APPLIED VACUUM TECHNOLOGY, INC. 865 INDUSTRIAL BLVD WACONIA, MN 55387-1045 |
| 125 | AVT ACQUISITION CORP 865 INDUSTRIAL BLVD WACONIA, MN 55387-1045 AVT ACQUISITION CORP. 865 INDUSTRIAL BLVD WACONIA, MN 55387-1045 | INITIAL FILING DATE: 02/03/2000 NUMBER: 2198826 JURISDICTION: MN AMENDMENT DATE: 09/27/2004 NUMBER: 20041339442 | CENTURY BANK NATIONAL ASSOCIATION 11455 VIKING DR EDEN PRAIRIE, MN 55344-7251 M&I MARSHALL & ILSLEY BANK 770 N WATER ST MILWAUKEE, WI 53202-0002 |

| No. | Debtor | Filing | Secured Party |
|-----|--------|--------|---------------|
| | | CONTINUATION<br>DATE: 09/27/2004<br>NUMBER: 20041339440<br>CONTINUATION<br>DATE: 08/10/2009<br>NUMBER: 20091700623<br>TERMINATION<br>DATE: 04/30/2012<br>NUMBER: 20122812809 | CENTURY BANK NA<br>11455 VIKING DR<br>EDEN PRAIRIE, MN 55344-7251 |
| 126 | **AVT PROPERTIES LLC**<br>**2600 FISHER RD**<br>**COLUMBUS, OH 43204-3564** | INITIAL FILING<br>DATE: 01/03/2000<br>NUMBER: AP0207768<br>JURISDICTION: OH | GFC LEASING<br>2101 W BELTLINE HWY<br>MADISON, WI 53713-2339 |
| 127 | BROWN, BILL<br>411 SW 8TH ST<br>DES MOINES, IA 50309-4615<br>DREWSTER PRODUCTIONS<br>411 SW 8TH ST<br>DES MOINES, IA 50309-4615 | INITIAL FILING<br>DATE: 04/26/1995<br>NUMBER: K646692<br>JURISDICTION: IA<br>TERMINATION<br>DATE: 02/13/1997<br>NUMBER: T247308 | **AVT SYSTEMS**<br>**2851 104TH ST STE D**<br>**URBANDALE, IA 50322-3814**<br>AUDIOVISUAL INC<br>2851 104TH ST STE D<br>URBANDALE, IA 50322-3814 |
| 128 | **AVT REALTY CO INC**<br>**522 ARMSTRONG AVE**<br>**STATEN ISLAND, NY 10308-1937**<br>AVT REALTY CO. INC.<br>533 ARMSTRONG AVE<br>STATEN ISLAND, NY 10308-2324<br>A V T REALTY CO INC<br>522 ARMSTRONG AVE<br>STATEN ISLAND, NY 10308-1937 | INITIAL FILING<br>DATE: 06/18/1991<br>NUMBER: 91128037<br>JURISDICTION: NY<br>CONTINUATION<br>DATE: 04/17/1996<br>NUMBER: 96076397<br>CONTINUATION<br>DATE: 02/09/2001<br>NUMBER: 01028262 | NEW YORK BUSINESS DEVELOP-<br>MENT CORP<br>PO BOX 738<br>ALBANY, NY 12201-0738<br>NEW YORK BUSINESS DEVELOP-<br>MENT CORPORATION<br>41 STATE ST<br>ALBANY, NY 12207-2843<br>NEW YORK BUSINESS DEVELOP-<br>MENT CORPORATION<br>41 STATE ST<br>ALBANY, NY 12207-2843 |
| 129 | **AVT REALTY CO INC**<br>**522 ARMSTRONG AVE**<br>**STATEN ISLAND, NY 10308-1937**<br>A V T REALTY CO INC<br>522 ARMSTRONG AVE<br>STATEN ISLAND, NY 10308-1937 | INITIAL FILING<br>DATE: 12/11/1990<br>NUMBER: 90263968<br>JURISDICTION: NY<br>TERMINATION<br>DATE: 06/18/1991<br>NUMBER: 91128035 | GATEWAY STATE BANK<br>1630 RICHMOND RD<br>STATEN ISLAND, NY 10304-2322<br>GATEWAY STATE BANK<br>1630 RICHMOND RD<br>STATEN ISLAND, NY 10304-2322 |
| 130 | **ION AVT INC.**<br>**6241 1/2 FULTON AVE**<br>**VALLEY GLEN, CA 91401-2504** | FINANCING STATEMENT<br>NUMBER: 127334296815<br>DATE: 10/25/2012<br>JURISDICTION: CA | CALVERT WIRE & CABLE CORPORA-<br>TION<br>5091 W 164TH ST<br>CLEVELAND, OH 44142-1502 |
| 131 | **ELECTRICTEK-AVT, INC.**<br>**400 E MINERAL AVE**<br>**LITTLETON, CO 80122-2604**<br>ELECTRITEK-AVT, INC | INITIAL FILING<br>DATE: 04/02/2007<br>NUMBER: 20072033083<br>JURISDICTION: CO | GUARANTY BANK AND TRUST COM-<br>PANY<br>1331 17TH ST<br>DENVER, CO 80202-1566 |

| No. | Debtor | Filing | Secured Party |
|-----|--------|--------|---------------|
| | 400 E MINERAL AVE<br>LITTLETON, CO 80122-2604<br>ELECTRICTEK-AVT, INC | AMENDMENT<br>DATE: 07/27/2007<br>NUMBER: 2007F077533<br>TERMINATION<br>DATE: 02/05/2008<br>NUMBER: 20082012449<br>TERMINATION<br>DATE: 03/21/2008<br>NUMBER: 2008F029605 | |
| 132 | **ELECTRITEK-AVT, INC.**<br>**400 E MINERAL AVE**<br>**LITTLETON, CO 80122-2604** | INITIAL FILING<br>DATE: 01/19/2007<br>NUMBER: 20072006670<br>JURISDICTION: CO<br>TERMINATION<br>DATE: 11/24/2010<br>NUMBER: 20102072269 | ROYNAT MERCHANT CAPITAL, INC.,<br>AS AGENT<br>ROYNAT MERCHANT CAPITAL INC.,<br>AS AGENT<br>PENTON MEDIA BLDG 1300E<br>CLEVELAND, OH 44114 |
| 133 | **ELECTRITEK-AVT, INC.**<br>**400 E MINERAL AVE**<br>**LITTLETON, CO 80122-2604** | INITIAL FILING<br>DATE: 02/06/2004<br>NUMBER: 2004F013182<br>JURISDICTION: CO<br>TERMINATION<br>DATE: 01/23/2007<br>NUMBER: 20072007924<br>TERMINATION<br>DATE: 03/20/2008<br>NUMBER: 2008F029352 | U.S. BANK NATIONAL ASSOCIATION<br>555 SW OAK ST<br>PORTLAND, OR 97204-1752 |
| 134 | **ELECTRITEK-AVT, INC.**<br>**400 E MINERAL AVE**<br>**LITTLETON, CO 80122-2604**<br>ELECTRTEK, INC.<br>400 E MINERAL AVE<br>LITTLETON, CO 80122-2604 | INITIAL FILING<br>DATE: 12/30/2002<br>NUMBER: 20022135446<br>JURISDICTION: CO<br>AMENDMENT<br>DATE: 02/05/2004<br>NUMBER: 2004F012666<br>TERMINATION<br>DATE: 01/23/2007<br>NUMBER: 20072007923<br>AMENDMENT<br>DATE: 07/20/2007<br>NUMBER: 2007F074787<br>TERMINATION<br>DATE: 03/26/2008<br>NUMBER: 2008F030632 | U.S. BANK NATIONAL ASSOCIATION<br>555 SW OAK ST<br>PORTLAND, OR 97204-1752<br>U.S. BANK NATIONAL ASSOCIATION |
| 135 | **DBA AVT INC**<br>**2016 E BROAD ST**<br>**SAVANNAH, GA 31401-8661**<br>VAC, JET<br>2016 E BROAD ST<br>SAVANNAH, GA 31401-8661 | INITIAL FILING<br>DATE: 07/21/1998<br>NUMBER: 02598004932<br>JURISDICTION: GA | NATIONSBANK<br>PO BOX 830632<br>DALLAS, TX 75283-0632 |

| No. | Debtor | Filing | Secured Party |
|-----|--------|--------|---------------|
| 136 | **ELECTRITEK-AVT, INC.**<br>DISPLAYS PLUS INC<br>8100 SOUTHPARK WAY STE A9<br>LITTLETON, CO 80120-4525 | INITIAL FILING<br>DATE: 05/09/1994<br>NUMBER: 19942034549<br>JURISDICTION: CO<br>TERMINATION<br>DATE: 12/20/2006<br>NUMBER: 2006F122770<br>TERMINATION<br>DATE: 12/20/2006<br>NUMBER: 2006F122753 | ELECTRITEK-AVT, INC.<br>UMB COLUMBINE NATIONAL BANK<br>6900 E HAMPDEN AVE<br>DENVER, CO 80224-3010 |
| 137 | **ELECTRITEK-AVT, INC.**<br>INDELCO INC<br>8100 SOUTHPARK WAY STE A9<br>LITTLETON, CO 80120-4525 | INITIAL FILING<br>DATE: 05/09/1994<br>NUMBER: 19942034550<br>JURISDICTION: CO<br>TERMINATION<br>DATE: 12/20/2006<br>NUMBER: 2006F122773<br>TERMINATION<br>DATE: 12/20/2006<br>NUMBER: 2006F122755 | ELECTRITEK-AVT, INC.<br>UMB COLUMBINE NATIONAL BANK<br>6900 E HAMPDEN AVE<br>DENVER, CO 80224-3010 |
| 138 | **AVT EVENT TECHNOLOGIES INC**<br>**1500 W SHURE DR STE 175**<br>**ARLINGTON HEIGHTS, IL 60004-1486** | ORIGINAL FILING<br>NUMBER: 110026013640<br>DATE: 09/02/2011<br>JURISDICTION: TX<br>UCC STANDARD DATE:<br>09/02/2011 NUMBER:<br>110026013640 | CANON FINANCIAL SERVICES<br>158 GAITHER DR STE 200<br>MOUNT LAUREL, NJ 08054-1716 |
| 139 | MARRIOTT HOTELS SERVICES, INC.<br>710 W OLYMPIC BLVD<br>LOS ANGELES, CA 90015-1424<br>MARRIOTT, JW<br>710 W OLYMPIC BLVD<br>LOS ANGELES, CA 90015-1424<br>RITZ CARLTON LOS ANGELES AT LA<br>LIVE<br>710 W OLYMPIC BLVD<br>LOS ANGELES, CA 90015-1424 | FINANCING STATEMENT<br>NUMBER: 107225063117<br>DATE: 03/09/2010<br>JURISDICTION: CA | **AVT EVENT TECHNOLOGIES, INC.**<br>**1500 W SHURE DR STE 175**<br>**ARLINGTON HEIGHTS, IL 60004-1486** |
| 140 | **AVT AUTO SALES**<br>**13336 FM 718**<br>**SAGINAW, TX 76179-9139**<br>AVT AUTO SALES, A CORPORATION<br>13336 FM 718<br>SAGINAW, TX 76179-9139 | ORIGINAL FILING<br>NUMBER: 90025783620<br>DATE: 09/14/2009<br>JURISDICTION: TX<br>UCC STANDARD DATE:<br>09/14/2009 NUMBER:<br>90025783620<br>TERMINATION DATE:<br>03/22/2010 NUMBER:<br>1000081130 | INTERNAL REVENUE SERVICE<br>PO BOX 145595<br>CINCINNATI, OH 45250-5595 |
| 141 | **ULTIMATE AVT, INC.** | ORIGINAL FILING | FINANCIAL PACIFIC LEASING, LLC |

| No. | Debtor | Filing | Secured Party |
|-----|--------|--------|---------------|
| | 17000 DALLAS PKWY STE 219 DALLAS, TX 75248-1943 | NUMBER: 80017308986 DATE: 05/20/2008 JURISDICTION: TX UCC STANDARD DATE: 05/20/2008 NUMBER: 80017308986 | PO BOX 4568 FEDERAL WAY, WA 98063-4568 WELLS FARGO BANK N.A. N9311161 SIXTH AND MARQUETTE MINNEAPOLIS, MN 55479-0001 |
| 142 | ULTIMATE AVT, INC. 17000 DALLAS PKWY STE 219 DALLAS, TX 75248-1943 | ORIGINAL FILING NUMBER: 80017139665 DATE: 05/19/2008 JURISDICTION: TX UCC STANDARD DATE: 05/19/2008 NUMBER: 80017139665 | FINANCIAL PACIFIC LEASING 3455 S 344TH WAY STE 300 FEDERAL WAY, WA 98001-9546 FIVE POINT CAPITAL 10525 VISTA SORRENTO PKWY STE 300 SAN DIEGO, CA 92121-2748 |
| 143 | ULTIAMTE AVT, INC. 17000 DALLAS PKWY STE 219 DALLAS, TX 75248-1943 | ORIGINAL FILING NUMBER: 70032585030 DATE: 09/24/2007 JURISDICTION: TX UCC STANDARD DATE: 09/24/2007 NUMBER: 70032585030 AMENDMENT, MASTER AMENDMENT DATE: 02/08/2011 NUMBER: 1100039163 | SOUTHWEST SECURITIES, FSB 1201 ELM ST STE 3500 DALLAS, TX 75270-2108 SOUTHWEST SECURITIES, FSB 5949 SHERRY LN STE 800 DALLAS, TX 75225-8004 |
| 144 | AVT AUTO SALES INC 13336 FM 718 SAGINAW, TX 76179-9139 | ORIGINAL FILING NUMBER: 60007286746 DATE: 03/06/2006 JURISDICTION: TX UCC STANDARD DATE: 03/06/2006 NUMBER: 60007286746 | NMHG FINANCIAL SERVICES, INC. 10 RIVERVIEW DR DANBURY, CT 06810-6268 |
| 145 | AVT AUTO SALES, INC. 13336 FM 718 SAGINAW, TX 76179-9139 | ORIGINAL FILING NUMBER: 30002239110 DATE: 09/23/2002 JURISDICTION: TX UCC STANDARD DATE: 09/23/2002 NUMBER: 30002239110 | ERNSOC, INC. 1910 GILLILAND RD SPRINGTOWN, TX 76082-5203 |
| 146 | AVT ADVANCED VIDEO TECHNOLO-GIES, INC. 34 SIMARANO DR MARLBOROUGH, MA 01752-3010 | UCC-1 ORIGINAL NUMBER: 200101979470 DATE: 05/02/2001 JURISDICTION: MA NUMBER: 200101979470 AMENDMENT DATE: 05/16/2002 NUMBER: 200211658010 | TEXTRON FINANCIAL CORPORATION 1180 WELSH RD STE 280 NORTH WALES, PA 19454-2053 TEXTRON FINANCIAL CORPORATION 1060 1ST AVE KING OF PRUSSIA, PA 19406-1336 |

| No. | Debtor | Filing | Secured Party |
|-----|--------|--------|---------------|
|  |  | UCC-3 TERMINATION DATE: 10/24/2002 NUMBER: 200215769730 |  |
| 147 | **A.V.T. AUTO SALES**<br>**1336 FM 718**<br>**SAGINAW, TX 76179** | ORIGINAL FILING NUMBER: 9900199978 DATE: 10/01/1999 JURISDICTION: TX UCC STANDARD DATE: 10/01/1999 NUMBER: 9900199978 | EXCEL FINANCIAL CO.<br>5236 80TH ST STE B<br>LUBBOCK, TX 79424-1039 |
| 148 | **ULTIMATE AVT, INC.**<br>**15851 DALLAS PKWY STE 308**<br>**ADDISON, TX 75001-6027** | ORIGINAL FILING NUMBER: 120001715754 JURISDICTION: TX MASTER RECORD (ORIGINAL FILING UCC-1) DATE: 01/17/2012 NUMBER: 120001715754 | FINANCIAL PACIFIC LEASING<br>3455 S 344TH WAY STE 300<br>FEDERAL WAY, WA 98001-9546<br>FIVE POINT CAPITAL<br>10525 VISTA SORRENTO PKWY STE 300<br>SAN DIEGO, CA 92121-2748 |
| 149 | **ULTIMATE AVT, INC.**<br>**15851 DALLAS PKWY STE 308**<br>**ADDISON, TX 75001-6027**<br>SOUND PRODUCTIONS, INC.<br>10480 SHADY TRL STE 104<br>DALLAS, TX 75220-2533 | ORIGINAL FILING NUMBER: 120001717918 JURISDICTION: TX MASTER RECORD (ORIGINAL FILING UCC-1) DATE: 01/17/2012 NUMBER: 120001717918 TERMINATION DATE: 10/03/2014 NUMBER: 1400317301 | WELLS FARGO CAPITAL FINANCE, LLC<br>PO BOX 4568<br>FEDERAL WAY, WA 98063-4568 |
| 150 | **ULTIMATE AVT, INC.**<br>**15851 DALLAS PKWY STE 308**<br>**ADDISON, TX 75001-6027** | ORIGINAL FILING NUMBER: 140013939363 JURISDICTION: TX MASTER RECORD (ORIGINAL FILING UCC-1) DATE: 05/02/2014 NUMBER: 140013939363 | CISCO SYSTEMS CAPITAL CRP<br>1111 OLD EAGLE SCHOOL RD<br>WAYNE, PA 19087-1453 |
| 151 | **ULTIMATE AVT, INC.**<br>**4406 SUNBELT DR**<br>**ADDISON, TX 75001-5129** | ORIGINAL FILING NUMBER: 140031185942 JURISDICTION: TX MASTER RECORD (ORIGINAL FILING UCC-1) DATE: 09/30/2014 NUMBER: 140031185942 | FIRST UNITED BANK AND TRUST<br>PO BOX 130<br>DURANT, OK 74702-0130 |
| 152 | **ULTIMATE AVT, INC.**<br>**4406 SUNBELT DR**<br>**ADDISON, TX 75001-5129** | ORIGINAL FILING NUMBER: 150033662006 JURISDICTION: TX MASTER RECORD (ORIGINAL FILING UCC-1) | FIRST UNITED BANK AND TRUST CO<br>PO BOX 130<br>DURANT, OK 74702-0130 |

| No. | Debtor | Filing | Secured Party |
|---|---|---|---|
| | | DATE: 10/21/2015 NUM-BER: 150033662006 | |
| 153 | **A V T INCORPORATED**<br>**411 W MARTINDALE RD**<br>**SEGUIN, TX 78155-1642**<br>WASHTUB NO 2<br>411 W MARTINDALE RD<br>SEGUIN, TX 78155-1642 | ORIGINAL FILING<br>NUMBER: 8800040198<br>DATE: 02/19/1988<br>JURISDICTION: TX<br>UCC STANDARD DATE:<br>02/19/1988 NUMBER:<br>8800040198 | I R S<br>AUSTIN, TX |

Search:            Public Records: Uniform Commercial Code Filings
Terms:             company(AVT, Inc.)
Date/Time:         Monday, April 04, 2016 5:44 PM
Permissible Use:
                   **DPPA - I have no permissible use**
                   **GLBA - I have no permissible use**

Copyright © 2016 LexisNexis, a division of Reed Elsevier Inc. All Rights Reserved.

# EXHIBIT 3

# EXHIBIT 3

 **Chaffey College**



## Vending Services Agreement

In consideration of the mutual promises and covenants herein contained it is hereby agreed by and between Chaffey College Auxiliary Services (Chaffey) and AVT Inc. (AVT) that:

Chaffey agrees to:

1. Grants AVT the exclusive right to install, operate, and maintain snack, food, ice cream, and hot drink vending on all Chaffey property (5885 Haven Avenue in Rancho Cucamonga, 5897 College Park Avenue in Chino, 16855 Merrill Avenue in Fontana, 13106 Central Avenue in Chino, 13170 Seventh Street in Chino);
2. Not remove AVT equipment from designated locations or deliver possession of the equipment to any other person or company without notifying AVT;
3. Grant AVT reasonable access to all campus locations for the purpose of repairing, stocking, replacing, or otherwise servicing vending equipment;
4. Supply and maintain functioning electrical outlets for all mutually agreed upon vending locations;
5. Provide trash and garbage removal in the vicinity of each vending machine;
6. Partner with AVT to optimize vending locations to maximize service and sales;
7. Guarantee that the minimum number of potential vending locations will not fall below the level of 24 machines unless mutually agreed upon;
8. Work in good faith with campus administration to increase the total potential vending locations within reason and upon request by AVT;
9. Notify AVT of any machine malfunctions that are reported to Chaffey;
10. Work with AVT to relocate or remove "underperforming" machines at their request;

NCV agrees to:

1. Replace all existing vending machines by 9/15/2014 with those of modern design, energy efficient, and a color scheme appropriate for Chaffey's educational environment and as determined by Chaffey;
2. Comply with all applicable laws and health/sanitation standards;
3. Abide by the rules and regulation adopted by the Governing Board of Chaffey College as set forth in Education Code Section 82530 through 82547, inclusive. These rules and regulations, entitled *Use of College Facilities, Policy, Procedures and Fee Schedules*, are available for review upon request, or may be viewed on line at http://www.leginfo.ca.gov/calaw.html;
4. Take responsibility for all applicable taxes, fees, permits, insurance, and licenses;
5. Exempt Chaffey from liability for any damage that may occur while operating within its boundaries, including vandalism and/or theft;
6. Notify and reimburse Chaffey for any loss or damage to Chaffey facilities or equipment during the period of use of such facility or equipment as contained herein;
7. Properly handle all stocking, maintenance, installing, removing, and cleaning of the vending machines and resolve equipment problems within two business day of notification;

1

**Chaffey College**



8. Install additional vending machines at existing or new sites as requested by Chaffey;
9. Under no circumstances remove or relocate a vending machine without the consent of Chaffey;
10. Guarantee that all vended products shall be sold or replaced prior to their expiration/sell by dates;
11. Allow Chaffey to accompany AVT representatives during collections and witness the reconciliation of collected funds;
12. Give Chaffey the right to audit and examine any pertinent books, documents, papers, and records relating to the performance of this agreement;
13. Cover all removal, replacement and relocation costs at the end of the contract period;
14. Make accommodations for the installation of energy saving devices (such as Vendor Misers) at no cost to Chaffey;
15. Not assign or transfer this agreement to any other party without the written consent of Chaffey;
16. Supply, install, and maintain credit card readers on machines as requested by Chaffey at no cost to Chaffey;
17. Equally share in the cost of installing and maintaining campus card readers on machines should Chaffey begin a campus card program with both Chaffey and AVT responsible for 50% of said costs;
18. Provide four petty cash funds maintained at the four campus stores for refunds due to machine malfunction;
19. Remove any vended product that conflict with the goals or mission of Chaffey within 10 business days;
20. Ensure all vending machines are functional at all times, and repair and/or replace damaged vending machines within 48 hours of notice by Chaffey;
21. Abide by all directives of Chaffey Campus Police and management with regard to all activities on Chaffey Property, safety of persons and property and use of AVT vehicles and equipment;
22. Provide monthly commission statements to Chaffey Auxiliary Services in a format approved by Chaffey;
23. Pay guaranteed annual vending commissions of $10,000 due by August 31st of each contract year (due by 10/31/2014 of the first contact year) as an advanced payment toward the agreed commission rate of 20% of gross sales minus sales tax;
24. Pay additional commissions to Chaffey on a monthly basis once the guarantee has been achieved (due by the end of the following month);
25. Pay a signing bonus of $5,000 (due by 10/31/2014);
26. Pay a penalty of 10% for payments more than ten (10) calendar days overdue;
27. Grant Chaffey the option to extend this agreement for up to two additional years under the same terms plus a bonus of $2,000 annually;
28. Indemnify, defend and hold harmless Chaffey, its officers, agents, employees and volunteers from and against any and all claims, demands, losses, defense and other litigation costs, or liability for any kind or nature which Chaffey, its officers,

2

 **Chaffey College**



agents, employees or volunteers may sustain or incur for injury or death of persons, or damage to property as a result of, arising out of, or in any manner connected with NCV's use of any Chaffey facilities, equipment, supplies or services under the terms of this Agreement, except for liability arising out of sole negligence of Chaffey. It is agreed and understood that NCV members, volunteers, guests, employees and contractors are agents of NCV and not Chaffey.

Both parties agree that:

1. This agreement remains in full effect from 8/1/2014-7/31/2019;
2. If, at any time during this agreement or renewal thereof, Chaffey should determine that AVT's services are unsatisfactory, Chaffey shall advise AVT in writing and provide 30 days to resolve the issue. If unsatisfactory conditions have not been resolved to Chaffey's satisfaction, Chaffey may cancel the agreement with an additional 30 days' notice to AVT;
3. This agreement, the proposal submitted by AVT on 5/27/14, and the amended proposal submitted by AVT on 6/26/14, constitute the entire agreement of the parties hereto and all previous communications between the parties whether written or oral with reference to the subject matter of this agreement are canceled and superseded.

In Witness Whereof, the parties to this agreement have hereunto affixed their signatures this __12__ day of __Aug__ 2014.

AVT Inc.                                        Chaffey College Auxiliary Services
341 Bonnie Circle                               5885 Haven Avenue
Corona, CA 92880                                Rancho Cucamonga, CA
760-724-3286                                    909-652-6561
Name: _____                           Name: _____
Title: CEO                                      Title: _____
Authorized Signature: _____            Authorized Signature: _____

3

EXERCISE OF SECOND OPTION
EXTENSION OF VENDING AGREEMENT

THIS EXERCISE OF SECOND OPTION - EXTENSION OF VENDING AGREEMENT is effective as of July 1, 2015 by and between Automated Vending Technologies Inc., a Nevada corporation dba in California as Automated Vending Inc. ("Vendor"), and the City of Santa Ana, a charter city and municipal corporation organized and existing under the Constitution and laws of the State of California ("City").

## RECITALS

A. The parties entered into the "Vending Agreement between the City of Santa Ana and Automated Vending Technologies Inc." (# A-2013-091) dated July 1, 2013 ("Agreement") by which Vendor has provided beverage and/or snack vending machines at various City-owned properties.

B. The initial term of the Agreement was for one year, and the City exercised its option to extend the Agreement for a second year, from July 1, 2014 through June 30, 2015, by prior written agreement, #A-2013-091-01.

C. In accordance with the terms and conditions of the Agreement, the City wishes to exercise a second option to extend the Agreement for an additional year.

## THE PARTIES THEREFORE AGREE:

1. Section 1. TERM, shall be extended by one year, from July 1, 2015 through June 30, 2016.

2. A revised and updated list of vending machines and their locations is attached hereto and incorporated herein as Exhibit A, which shall supersede any prior list.

3. Except as amended above, all terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Second Option - Extension of Vending Agreement, as effective on the date and year first written above.

ATTEST:                                          CITY OF SANTA ANA

_____          _____
MARIA D. HUIZAR                                  DAVID CAVAZOS
Clerk of the Council                             City Manager

APPROVED AS TO FORM:                     VENDOR:
SONIA R. CARVALHO                            Automated Vending Technologies Inc.
City Attorney

By: _____            _____
John M. Funk                                     WAYNE SALDINO
Assistant City Attorney                       President

RECOMMEND FOR APPROVAL:

_____
Gerardo Mouet, Executive Director, Parks, Recreation & Community Services Agency

1

EXHIBIT "3"                                                                      PAGE 88

## EXHIBIT A

### VENDING MACHINES - EXISTING SITES

| PRCSA Park/Facility Sites | Address | Existing Machine | Proposed Number/Type Of Machines |
|---|---|---|---|
| Memorial Park (PUBLIC) | 2102 S. Flower St. | 2 | 1 drink and 1 snack |
| Rosita Park and Salgado Recreation Center (PUBLIC) | 706 N. Newhope St. | 2 | 1 drink and 1 snack |
| Santa Ana Public Library (EMPLOYEE) | 26 Civic Center Plaza | 2 | 1 cold drink and 1 snack |
| Santa Ana Senior Center (SASC) (PUBLIC) | 434 W. 3rd Street | 1 | 1 cold drink/snack combo |
| Southwest Senior Center SWSC) (PUBLIC) | 2201 W. McFadden Ave. | 2 | 1 cold drink and 1 snack |
| | | | |

| Other City Agency Facility Sites | Address | Existing Machine | Proposed Number/Type Of Machines |
|---|---|---|---|
| Santa Ana Regional Transportation Center (SARTC) (PUBLIC) | 1000 East Santa Ana Blvd | 3 | 2 cold drink and 1 snack |
| Santa Ana Police Department, Code 7 Café (EMPLOYEE) | 60 Civic Center Plaza | 3 | 1 cold drink, 1 hot drink, and 1 snack |
| Santa Ana Police Department, 1st Floor (EMPLOYEE) | 60 Civic Center Plaza | 1 | 1 cold drink |
| Santa Ana City Hall (EMPLOYEE) | 20 Civic Center Plaza | 2 | 1 cold drink and 1 snack |
| Santa Ana City Yard, Administrative Building (EMPLOYEE) | 220 S. Daisy Ave. | 2 | 1 cold drink and 1 snack |

A-2013-091



INSURANCE ON FILE
WORK MAY PROCEED
UNTIL INSURANCE EXPIRES
5-31-2014
CLERK OF COUNCIL
DATE: 11-6-13

cx long. Parks-Cucinss, S.

## VENDING AGREEMENT BETWEEN
## THE CITY OF SANTA ANA AND
## AUTOMATED VENDING TECHNOLOGIES, INC.

This Agreement is made and entered into this 1st day of July, 2013, by and
between Automated Vending Technologies Inc., a Nevada corporation dba in California
as Automated Vending Inc. ("Vendor"), and the City of Santa Ana, a charter city and
municipal corporation duly organized and existing under the Constitution and laws of the
state of California ("City").

### RECITALS

A.    On April 11, 2013, the City issued a Request for Proposals (RFP 13-011 PRCSA)
      for a vending company to provide twenty-two (22) beverage and/or snack vending
      machines at various City-owned properties.

B.    The City received responsive proposals from three vending companies. Upon
      review of said proposals and rating through an evaluation committee, the City has
      determined that the Vendor's proposal is the most beneficial to the City.

C.    Vendor offers soft drinks, water, iced tea, juice and snack products for sale in
      Vendor-owned vending machines. Vendor desires to place its vending machines
      at various agreed upon City-owned and operated facilities ("the Premises").

D.    Vendor ensures that no less than fifty percent (50%) of the food and beverages
      provided in all vending machines located on the Premises will be of a healthy
      variety in compliance with the City's policy regarding healthy snacks in vending
      machines at City-owned facilities.

WHEREFORE, in consideration of the mutual and respective promises, and subject to the
terms and conditions hereinafter set forth, the parties hereto do hereby agree as follows:

### 1. TERM

The term of this Agreement shall be for an initial term of one (1) year, commencing on
the date set forth above and expiring on the anniversary date in the year 2014, unless
earlier terminated by either party as provided herein. There shall be the option of
extending the Agreement for five (5) additional one-year terms, exercisable by the
Executive Director of Parks, Recreation and Community Services ("Executive Director").

### 2. EXCLUSIVITY/VENDING RIGHTS

The City hereby grants Vendor the exclusive right to install and maintain their soft drink
and snack vending machines ("vending machines") throughout the Premises for the term
of this Agreement. City agrees to exclusively use Vendor identified soft drink and snack
vending machines on the Premises.

1

EXHIBIT "3"                                                      PAGE 90

## 3. COMPENSATION

Vendor agrees to pay, and City agrees to accept as payment for its granting the exclusive right to install and maintain vending operations on City-owned property, thirty percent (30%) of gross receipts received from sales of all vending machine products as identified in Exhibit A, Commissions (attached hereto and incorporated herein by reference) from the machines installed at the City Yard, the Santa Ana Regional Transportation Center, Library and at the Parks and Recreation Centers. At the Police Facility, City Hall and City Yard administration building, the product will be sold at a lower price with no commission. In addition, Vendor agrees to provide additional products and services as set forth in the Request for Proposal and Vendor's responsive proposal (attached hereto as Exhibit C and incorporated herein by reference).

## 4. RESPONSIBILITY FOR VENDING MACHINES

Vendor will provide vending machines on the Premises as mutually agreed upon between Vendor and the Executive Director throughout the term of this Agreement. All vending machines shall at all times remain the property of Vendor. Vendor will repair and maintain the vending machines and agrees to keep them in good working order and condition at all times. Vendor shall have the exclusive right and obligation to repair, replace, or remove any and all vending machines. City shall not replace, relocate, move or remove any vending machines. Notwithstanding the foregoing, City agrees to use reasonable efforts to keep the vending machines in clean and sanitary condition, wholly free of all advertising at all times. In addition, City agrees to promptly notify Vendor of any need for repair or service, and to fully cooperate with Vendor in effecting such necessary repairs or service. City shall bear no responsibility whatsoever for any vandalism or theft occurring with regard to Vendor's equipment and vending machines. Further, Vendor shall be responsible for the costs of repair or replacement necessitated by vandalism, graffiti or theft. Should vandalism occur to the same vending machine for a second time, City may elect one to either relocate or remove said vending machine. Vendor and the Executive Director shall mutually agree on all locations to relocate vending machines if needed.

## 5. VEND RATES AND COMMISSION

Current vending rates and commission rates shall be as approved in writing from time to time by the Executive Director. Vendor shall maintain all vending machines stocked with at least 50% healthy foods, such as such as baked chips, fruit, pretzels, granola, nuts, bottled water, low fat milk products, sports drinks and natural fruit juice drinks in compliance with the City's policy regarding healthy snacks, healthy eating and active living (City of Santa Ana Resolution No. 2006-053 and Resolution No. 2011-003).

## 6. VENDING MACHINE PLACEMENT

A detailed list reflecting the proposed placement of all vending machines and equipment is set forth in Placement List, (attached hereto as Exhibit B and incorporated herein by

2

reference). Vendor shall provide vending machines at all listed locations. Additional
vending machines may periodically be added to the list subject to prior written approval
of the Executive Director. Should the proposed locations of the vending machines be
found not to be in the best interest of Vendor or the City, both parties must mutually
agree as to whether or not to relocate the vending machines. If the Executive Director
agrees that relocation is necessary, he/she has the authority to exercise discretion as to the
most appropriate new location for placement of said vending machine on behalf of the
City. An updated list evidencing the placement of the vending machines shall be kept by
the Executive Director. A minimum number of twenty-two (22) vending machines shall
be in place, at eleven City approved locations, at all times this Agreement is in effect.

## 7. DEFAULT AND TERMINATION:

This Agreement may be terminated by the non-defaulting party if the other party
materially fails to perform or comply with this Agreement or any provision hereof. The
non-defaulting party may cancel the Agreement by sending a Non-Compliance Notice
describing the non-compliance to the non-complying party. Upon receipt of such Non-
Compliance Notice, the non-complying party shall have thirty (30) days from the date of
such notice to cure any such non-compliance. If such non-compliance is not cured within
the required thirty (30) day period, the party providing the Non-Compliance Notice shall
have the right to cancel this Agreement. The rights of termination referred to herein are
not intended to be exclusive and are in addition to any other rights available to either
party in law or in equity.

## 8. RIGHTS UPON TERMINATION

Upon termination of this Agreement by either party, City shall permit Vendor reasonable
access to the Premises free from any claims of trespass, for the purpose of removing any
vending machines within thirty (30) days from termination of this Agreement. Until such
time as all vending machines are removed, each party's obligations shall continue as set
forth in section 3 and 4. Vendor shall use its best efforts to leave each of the vending
sites within the Premises in the condition in which it existed prior to installation,
excepting reasonable wear and tear.

## 9. ENTIRE AGREEMENT

This Agreement contains the entire understanding and agreement between the parties
hereto regarding the rights and responsibilities pertaining to vending machines on the
Premises and supersedes all other agreements between the parties respecting such. This
Agreement may be amended or modified only by written agreement, signed by each of
the parties.

## 10. INDEMNIFICATION

Vendor shall indemnify, defend, and hold harmless the City of Santa Ana, its officers,
agents, employees, and volunteers from damage to property and for injury to or death of

3

any person and from all claims, demands, actions, liability, or damages of any kind or nature arising out of or in connection with Vendor's use of the Premises, except those which arise out of a dangerous/defective condition of the Premises or due to the sole negligence of the City.

11.    INSURANCE

Prior to undertaking performance of work under this Agreement, Vendor shall maintain and shall require its subcontractors, if any, to obtain and maintain insurance as described below:

a.  Commercial General Liability Insurance. Vendor shall maintain commercial general liability insurance naming the City, its officers, agents, volunteers, and employees as additional insured(s) and shall include, but not be limited to protection against claims arising from bodily and personal injury, including death resulting therefrom and damage to property, resulting from any act or occurrence arising out of Vendor's operations in the performance of this Agreement, including, without limitation, acts involving vehicles. The amounts of insurance shall be not less than the following: single limit coverage applying to bodily and personal injury, including death resulting therefrom, and property damage, in the total amount of $1,000,000 per occurrence. Vendor shall supply City with a fully executed additional insured endorsement in substantially the form attached hereto as Exhibit D upon execution of this Agreement and shall be approved in form by the City Attorney.

b.  Business automobile liability insurance, or equivalent form, with a combined single limit of not less than $1,000,000 per occurrence. Such insurance shall include coverage for owned, hired and non-owned automobiles.

c.  Worker's Compensation Insurance. In accordance with the provisions of Section 3300 of the Labor Code, Vendor, if Vendor has any employees, is required to be insured against liability for worker's compensation or to undertake self-insurance. Prior to commencing the performance of the work under this Agreement, Vendor agrees to obtain and maintain any employer's liability insurance with limits not less than $1,000,000 per accident.

d.  If Vendor is or employs a licensed professional such as an architect or engineer: Professional liability (errors and omissions) insurance, with a combined single limit of not less than $1,000,000 per claim.

e.  The following requirements apply to the insurance to be provided by Vendor pursuant to this section:

(i)  Vendor shall maintain all insurance required above in full force and effect for the entire period covered by this Agreement.

(ii)  Certificates of insurance shall be furnished to the City upon execution of this Agreement and shall be approved in form by the City Attorney.

(iii)  Certificates and policies shall state that the policies shall not be canceled or reduced in coverage or changed in any other material aspect without thirty (30) days prior written notice to the City.

f.  If Vendor fails or refuses to produce or maintain the insurance required by this section or fails or refuses to furnish the City with required proof that insurance has been procured and is in force and paid for, the City shall have the right, at the City's election, to terminate this Agreement.  Such termination shall not affect Vendor's right to be paid for its time and materials expended prior to notification of termination.  Vendor waives the right to receive compensation and agrees to indemnify the City for any work performed prior to approval of insurance by the City.

12.  NOTICE

Any notice or instrument required to be given or delivered to either party to this Agreement may be delivered by personal delivery or by depositing the same in the United States Mail, postage prepaid, addressed to:

If to the City:    Executive Director of Parks, Recreation and Community Services
City of Santa Ana
26 Civic Center Plaza (M-75)
P.O. Box 1988
Santa Ana, California  92702
Telefacsimile (714) 571-4211

If to Vendor:    Automated Vending Technologies, Inc.
c/o Natalie Russell
341 Bonnie Circle, Ste. 102
Corona, CA 92880
Phone:  (951)737-1057
FAX:  (951)737-7646

Any notice of a change of address shall be delivered in the same manner as any other notice provided herein.  Notice by mail shall be effective three (3) days after mailing by the above-described procedure.

13.  MISCELLANEOUS PROVISIONS

a.  Vendor covenants that it presently has no interest, and shall not have any interest, direct or indirect, which would conflict in any manner with the performance of services required hereunder.

b. Vendor certifies that it will not discriminate against any employee or applicant for employment because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, martial status, sex or age, in compliance with Government Code 12900, et seq. Vendor agrees to take affirmative action to insure that applicants are employed, and that employees are treated during employment, without regard to their race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex or age.

c. The invalidity in whole or in part of any provision of this Agreement shall not void or affect the validity of any other provision of this Agreement.

d. This Agreement shall be governed by and construed in accordance with the laws of the State of California, with venue in Orange County.

e. Each undersigned represents and warrants that its signature hereinbelow has the power, Agency and right to bind their respective parties to each of the terms of this Agreement, and shall indemnify Agency fully, including reasonable costs and attorney's fees, for any injuries or damages to Agency in the event that such Agency or power is not, in fact, held by the signatory or is withdrawn.

f. All Exhibits referenced herein and attached hereto shall be incorporated as if fully set forth in the body of this Agreement.

EXHIBIT "3"                                                    PAGE 95

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the date and year first above written.

ATTEST:

_Maria D. Huizar_
MARIA D. HUIZAR
Clerk of the Council

APPROVED AS TO FORM:
Sonia R. Carvalho
City Attorney

By: Lisa Storck
Assistant City Attorney

CITY OF SANTA ANA

**David Cavazos**
**City Manager**

VENDOR:
AUTOMATED VENDING
TECHNOLOGIES, INC.

By: Natalie Russell
President

7
EXHIBIT "3"                    PAGE 96

Addendum # 1
September 12, 2014
Change to Contract #28717
between the Department of Rehabilitation and
AVT, Inc. @ 24%

The following location(s) service area(s) have been ADDED as follows:

Riverside County ACR
38686 El Cerrito Road
Palm Desert, CA 92211

Contact Person:    Jerry Frease
                   760-778-8412
                   Gfrease@asrclkrec.com

Contact Person:    AVT Vending, Inc.
                   951-737-1057, Ext. 321
                   Kim Alexander (Kima.avtinconline.com)

Location/Type:     2nd Floor Breakroom - 1 Cold Beverage and 1 Candy/Snack

All other terms and conditions remain the same.

Contract Administrator  :  Cheryl Gatus
                           Print Name

_____ DATE: 10/2/14
Signature of Contractor

_____ DATE: 10/6/14
Signature of Contract Administrator

1 copy to contract folder. 1 copy to contracts. 1 copy to contractor.

EXHIBIT B

## MAXIMUM SELLING PRICES *

| Product | Size | Maximum Selling Price |
|---|---|---|
| Soda / Juice (less than 10%) / Tea / Seltzer / Water (Unflavored and Unfortified) | 11.5 oz. can and up | $ 1.10 |
| | 16 oz. bottle and up | $ 1.50 |
| Milk, 100% Juice | 1/2 pint and up | $ 1.00 |
| Specialty Drinks (Starbucks, Snapple, Water (Flavored and/or Fortified, etc.) | 9.5 oz. | $ 2.00 |
| Energy Drinks (Red Bull, Rockstar, etc.) | 8 oz. and up | $ 3.00 |
| Candy and Candy Bars | 1-2.5 oz. | $ 1.00 |
| | 2.6 oz. and up | $ 1.25 |
| Healthy Pick (Health Bar, Trail Mix, etc.) | 1.5 oz. and up | $ 1.50 |
| Snacks / Chips | 1 – 2 oz. | $ 1.00 |
| | 2.1 oz. and up | $ 1.50 |
| Pastries (Drake, Hostess, etc.) | 1 oz. and up | $ 1.50 |
| Popcorn, Fresh or Microwave | 3 oz. and up | $ 1.00 |
| Gum / Lifesavers / Mints | 1 oz. and up | $ 1.00 |
| Cookies / crackers | 2 oz. and up | $ 1.00 |
| Hot Coffee / Tea / Chocolate | 8 oz. | $ 0.75 |
| | 12 oz. | $ 1.00 |
| Cold Food (Muffin, Biscuits, Burrito, etc.) | Various | OPEN |

* *Maximum selling price includes Bottle/Can Deposit (CA CRV) and applicable California Sales Tax*

Rev 9/30/2008

Indio to Palm Springs                    Page 3                    28717

## EXHIBIT D
## SPECIAL TERMS AND CONDITIONS

### A) Insurance

Contractor shall supply a Certificate of Insurance, with the appropriate coverage and limits as required. The Certificate of Insurance shall state a limit of liability not less than $1,000,000.00 (one million dollars) per occurrence and $2,000,000.00 (two million dollars) aggregate for bodily injury and property damage liability combined; plus automobile liability of not less than $1,000,000.00 (one million dollars) combined single limit; *plus* $1,000,000.00 (one million) Worker's Compensation Insurance. **The Certificate of Insurance must include**:

1) Commercial General Liability: General Aggregate; Products; Personal and Advertising injury; each occurrence for a minimum of $1,000,000.00 (one million dollars) and aggregate for $2,000,000.00 (two million dollars).
2) Automobile Liability must include any-auto, hired-autos, non-owned autos, and any other auto used in performing services under the contract for a minimum of $1,000,000 combined single limit.
3) Workers' Compensation Insurance and Employers' Liability:
Workers' Compensation Insurance with Employer's Liability for a minimum of $1,000,000.00 (one million dollars), issued by an insurance carrier licensed to underwrite Workers' Compensation Insurance in the State of California.

The Certificate of Insurance (i.e., Accord Certificate) that includes record on the General Liability Insurance Certificate must also include the following endorsements, **word for word**:

1) *The insurer will not cancel the insured's coverage without 30 days prior written notice to the State.*
2) *The State of California, its officers, agents, employees, and servants are included as additional insured, but only insofar as the operations under this Contract are concerned.*

The Contractor agrees that bodily injury liability insurance herein provided shall be in effect at all times during the term of this Contract. In the event said insurance coverage expires at any time, or times, during the term of this Contract, the Contractor agrees to provide at least 30 days prior to said insurance expiration date a new Certificate of Insurance evidencing insurance coverage as provided for herein for not less than the remainder of the term of the Contract or for a period of not less than one (1) year. New Certificates of Insurance are subject to approval by the Department of General Services and the Contractor agrees that no work or services shall be performed prior to receiving Department of General Services' approval. In the event the Contractor fails to keep in effect, at all times, insurance coverage as herein provided, the State may, in addition to any other remedies it may have, terminate this Contract upon occurrence of such event.

The Department of Rehabilitation will not provide for, nor compensate, the Contractor for any insurance premiums or cost for any type or amount of insurance.
Contractor will submit current insurance documents yearly on the anniversary date of the contract. Contract may be canceled at Departmental discretion, if all current insurance forms are

Indio to Palm Springs                    Page 1                    28717

EXHIBIT "3"                                                         PAGE 99

not received within 30 days of contract anniversary date.

B) **Insurance Companies**

Insurance companies issuing any of the policies required by these provisions shall have a rating classification of "B" or better and a financial size category rating of "VII" or better according to the latest edition of the A.M. Best Key Rating Guide. Any other rating classification requires State approval.

All insurance companies issuing any of the policies required by these provisions shall be licensed to do business in the State of California.

Expiration date of Insurance must not expire prior to receipt of renewal. Should lapse of insurance occur, a $1,000 Liquidated Damages as defined in Exhibit E Additional Provisions may apply. Insurance forms must be mailed to:

> Department of Rehabilitation
> Business Enterprises Program (BEP)
> Vending Machine Unit (VMU)
> 721 Capitol Mall, 5th Floor
> Sacramento, CA 95814
> (916) 558-5345 Fax (916) 558-5347
> Email – vmuresponses@dor.ca.gov

C) **Workers' Compensation**

Contractor shall have and maintain, for the term of this Agreement, Workers' Compensation insurance issued by an insurance carrier licensed to underwrite Workers' Compensation insurance in the State of California. If the business is a sole proprietorship, the Contractor has signed and certified the following statement on business letterhead, "*I certify under penalty of perjury under the laws of the State of California that I do not employ any person in any manner as to become subject to the Workers' Compensation laws of California. I further certify that the Department of Rehabilitation will be notified within ninety (90) days of any changes which results in the business becoming subject to the Workers' Compensation laws of California".* Contractor will submit documents yearly on the anniversary date of the contract. Contract may be canceled if current Works' Compensation documents are not received within 30 days of contract anniversary date.

D) **Tax Compliance**

The Contractor is hereby notified that the Department of Rehabilitation is required by Federal and State Tax Codes to report certain payments to individuals. Without this information, the Department of Rehabilitation cannot pay Contractor invoices. The Contractor agrees to abide by these conditions and provide the requested information.

E) **License(s) And Permit(s)**

The Contractor shall be an individual or firm licensed to do business in California and shall obtain at his/her expense all license(s) and permit(s) required by law for accomplishing any work required in connection with this contract. Contractor will submit documents on the anniversary of the contract annually. Contract may be canceled if not received within 30 days of contract

anniversary date.

Contractor's business located within the State of California shall have a business license from the city/county in which the business is headquartered or if the business is a corporation, a copy of the incorporation documents/letter from the Secretary of State's Office shall be on file with the Department of Rehabilitation. Contractor's business outside the State of California, shall have on file with the Department of Rehabilitation a copy of the business license or incorporation papers for your respective State showing that your company is in good standing in that state.

In the event, any license(s) and/or permit(s) expire at any time during the term of this contract, Contractor agrees to provide agency a copy of the renewed license(s) and/or permit(s) within thirty (30) days following the expiration date. In the event the Contractor fails to keep in effect at all times all required license(s) and permit(s), the State may, in addition to any other remedies it may have, terminate this contract upon occurrence of such event.

## F) Right To Terminate

The State reserves the right to terminate this agreement subject to thirty (30) days written notice to the Contractor.

Contractor may submit a written request to terminate this agreement only if the State should substantially fail to perform its responsibilities as provided herein.

However, the agreement can be immediately terminated for cause. The term "for cause" shall mean that the Contractor fails to meet the terms, conditions, and/or responsibilities of the contract. In this instance, the contract termination shall be effective as of the date indicated on the State's notification to the Contractor.

This agreement may be suspended or cancelled without notice, at the option of the Contractor, if the Contractor or State's premises or equipment are destroyed by fire or other catastrophe, or so substantially damaged that it is impractical to continue service, or in the event the Contractor is unable to render service as a result of any action by any governmental authority.

## G) Right to Review Compliance:

Contractor agrees that the awarding agency or its delegates will have the right to review, obtain, and copy all records pertaining to performance of the contract. Contractor agrees to provide the awarding department or its delegates with any relevant information requested and shall permit the awarding agency or its delegates access to its premises, upon reasonable notice, during normal business hours for the purpose of interviewing employees and inspecting and copying such books, records, accounts, and other material that may be relevant to a matter under investigation for the purpose of determining compliance with *PCC § 10115 et seq., GC § 8546.7 and 2 CCR § 1896.60 et seq.* Contractor further agrees to maintain such records for a period of three years after final payment under the contract. Contractor shall comply with the caveats and be aware of the penalties for violations of fraud and for obstruction of investigation as set forth in *PCC § 10115.10.*

## H) Agency Liability:

The Contractor warrants by execution of this Agreement, that no person or selling agency has been employed or retained to solicit or secure this Agreement upon agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or

bona fide established commercial or selling agencies maintained by the Contractor for the purpose of securing business. For breach or violation of this warranty, the State shall, in addition to other remedies provided by law, have the right to annul this Agreement without liability, paying only for the value of the work actually performed, or otherwise recover the full amount of such commission, percentage, brokerage, or contingent fee.

i) Non Eligible Alien – All Sole Proprietor Contracts:
Contractor shall comply with *US Code, Title 8, Section 1621 (a), (b), (c), and (d)*, concerning aliens or immigrants ineligible for State and local public benefits.

EXHIBIT "3"                          PAGE 102

## EXHIBIT E
## ADDITIONAL PROVISIONS

1. **Installation**. After the awarding of the contract, contractor will coordinate a convenient installation schedule. Contractor shall not interrupt any building service without securing prior approval from the Agency contact person(s) and/or building manager.

2. **Signature requirements**. After a Contractor has signed the agreement and is in place, the contractor will be required to sign the agreement renewal within 15 days of the renewal date. Should the signed renewal not be received prior to the 15 day deadline, Contractors will be required to remove their equipment on the 16th day. Should machines not be removed on the 16th day, all machines will be moved at the owners expense.

3. **Placement of Equipment**. At no time is a Contractor authorized to move equipment into the location without returning the agreement and confirmed receipt by Department of Rehabilitation's Contract Administrator. Should contractor move into a location prior to returning agreement, **Liquidated Damages as defined in Exhibit E Additional Provisions** of $100.00 per machine per day will be applied.

4. **Agreement Amendments**. Agreement Amendments must be signed and returned within 15 days of receipt. Should amendment not be received on 16th day, the location will not be added.

5. **Installation Report**. Installation report form is immediately due upon request of the Department of Rehabilitation's Contract Administrator.

6. **Stocking/Restocking Levels**. The Contractor is responsible to ensure that: all products must be fresh when stocking/restocking vending machines/s; stock is rotated and removed according to expired freshness dates on each and every delivery; perishable items must be replaced within ten (10) calendar days; product levels must meet the needs of the Agency. Product choices are at the discretion of the Agency. Product Inventory forms must be completed and submitted if requested by the Agency. Service requests from the respective Agency contact person must be acknowledged by the Contractor within twenty-four (24) hours.

7. **Customer Satisfaction**. Contractor will establish a system, which will identify a procedure for customer satisfaction in the event that refunds or reimbursements from vending sales activity become due to customers. Contractor will ensure that all employees work with professionalism and tact when interacting with Building Managers and patrons of the facility.

8. **Safety**. All equipment will be banded together, bolted down, or held in place in accordance with local safety ordinances.

9. **Clean Site**. Contractor shall keep site clean. Upon completion of the work all surfaces involved in this project shall be clean and removed of any foreign material due to work hereunder. Contractor shall keep all vending machines clean.

10. **Equipment Removal**. Contractor shall remove any and all equipment within a reasonable time, not to exceed ten(10) working days, after written notification of contract expiration. Contractor to be responsible for all costs related to equipment removal. Should equipment not be removed

on the ten (10) working day, all equipment will be considered property of the state.

11. **Repairs & Maintenance**. Repairs and maintenance of vending machines provided by the contractor under the terms of this contract are solely the responsibility of the contractor. All equipment failures will be responded to within eight (8) working hours. All equipment failures will be resolved within twenty-four (24) working hours. All equipment failures not resolved within thirty-two (32) hours without just cause and notification to VMU via email, vmuresponses@dor.ca.gov, can result in termination of contract. Should service repair of a vending machine exceed two (2) working days with written justification and approval of VMU, contractor will pay service repair fees for the repair of the vending machine unit. Should the contractor have a proven history of negligence and refusal to abide by said agreement, contract will be terminated with just cause.

12. **Damages of State and Federal Property**. Any damages by the contractor to portions of buildings, premises, equipment, furniture, material or other property for which the State/Federal is responsible will be repaired or items will be replaced by contractor to the satisfaction of the State/Federal with no expense to the State/Federal. Contractor shall patch, replace and/or finish in kind all surfaces of features displaced, or damaged in performance of work, such as but not limited to acoustical tile, floor covering, and wall areas.

13. **Internal Controls and Record Requirements**. Contractor will maintain adequate records to document and substantiate sales and commission payments reported to the Department of Rehabilitation. Contractor will also ensure that adequate accounting and administrative controls are in place to reasonably assure the accuracy of the information contained in the accounting records. Contractor will support data management services to streamline records, sales, commissions and other pertinent information as it relates to BEP in conjunction with chosen data management service provider.

14. **Reporting Omissions.** Should the Contractor not report all vending machines as agreed to, a Liquidated Damages as defined in Exhibit E Additional Provisions of $50 per day per machine may be applied until a corrected commission payment report is received.

15. **Audit Requirements**. See Exhibit C. In addition, the Department of Rehabilitation Contract Administrator may request copies of records relevant to the sales and commissions reported to the Department of Rehabilitation. Should an audit take place and it is found that said contractor inappropriately filed commission reports an administrative fee will be applied for hours dedicated to audit findings. Fees may be applied in accordance to the State Administrative Manual (SAM).

16. **Audit Appeals**. If audited by the Department of Rehabilitation, the audit report is final thirty (30) days after its mailing to the Contractor unless the Contractor appeals, in writing, the findings and recommendations in the audit. The appeal shall be addressed to the Program Administrator, Business Enterprise Program, Department of Rehabilitation, within thirty (30) days from the date the audit report is mailed and contain the following information:

   - The audit issues being disputed by the contractor;
   - A full statement of the contractor's position on each disputed audit issue;
   - All pertinent facts and reasons supporting the contractor's position; and
   - Any additional documentation to support the contractor's position.

17. The Program Administrator, Business Enterprise Program, Department of Rehabilitation shall respond within forty-five (45) days from receipt of the appeal, provided the Contractor has submitted the necessary information in the appeal. The Program Administrator, Business Enterprise Program, Department of Rehabilitation may require the Contractor to submit additional documentation relevant to any disputed audit findings or recommendation.

18. If the Contractor disputes the decision of the Program Administrator, Business Enterprise Program, Department of Rehabilitation. the contractor may request in writing a second level review by the Deputy Director. Specialized Services Division. The request must be received within thirty (30) days from the date of the Program Administrator, Business Enterprise Program, Department of Rehabilitation decision. The Deputy Director shall consider the appeal and the pertinent information, and arrive at a decision within forty-five (45) days from receipt of the request for a second level review. The decision of the Deputy Director is final.

19. **Subject to Approval**. In addition, the contractor may request an amendment with a written notice to the Department of Rehabilitation, Contract Administrator, forty-five (45) days prior to the requested date of change. Contractor is still legally obligated to provide the services as stated in the original contract until the amendment is effective.

20. **Accounts Receivable/Delinquent Commission Payment**. If a contractor has an account receivable or is delinquent in commission payments, the account must be current with all payments including penalties and have valid vending machine commission statements on file prior to a contract eligibility of amendment to add additional locations or be awarded new contracts.

21. **Installation Requirements**. It is the contractor's responsibility to insure that the types of machines are in accordance with the contract specifications. Certain contracts may have different installation dates for each customer listed, which is stated under Special Conditions. Installation is required within seven (7) working days of those specific dates. The contractor must explain in writing to the Department of Rehabilitation Contract Administrator and to the customers in the contract if there are any delays in installation. Failure to install the machines as stated in the contract within seven (7) working days of the contract effective date may result in termination of the contract, unless there are construction delays.

22. **Location Abandonment.**
    A 45-day notification must be given to:

    Department of Rehabilitation
    Business Enterprises Program (BEP)
    Vending Machine Unit (VMU)
    721 Capitol Mall, 5th Floor
    Sacramento, CA 95814
    (916) 558-5345 Fax (916) 558-5347
    Email – vmuresponses@dor.ca.gov

Should Contractor decide to abandon the location without notification a $1000 Liquidated Damages as defined in Exhibit E Additional Provisions may be applied until such time as State is able to replace Contractor and resume service. Should the Contractor abandon the location leaving the equipment, BEP will make written notification to remove equipment within three (3) days after abandonment. At which time BEP will take ownership of the equipment.

Indio to Palm Springs                    Page 3                    28717

23. **Service Related/Refund Issues**. It is the Contractor's responsibility to ensure that service refund requests are handled within twenty-four (24) hours of notification from the customer. . Note: The customer may have the option of a product replacement or cash refund. If service related/refund issues remain unresolved, the Agency Contact shall contact the Department of Rehabilitation Contract Administrator to evaluate the issue that may result to the Department of Rehabilitation terminating the contract.

24. **Termination for Cause**. Failure to comply with contract terms and conditions is termination for cause and future bids may be rejected for one (1) year.

25. **Liquidated Damages**.
   a. Failure of Contractor to complete the scope of work, including making required reports and commission payments within the time frames and by the dates identified will result in damages being sustained by State. It is and will be extremely difficult and impracticable to determine the actual damage which State will sustain by reason of such delay. Therefore, Contractor shall pay to State, as liquidated damages, the sum of ONE HUNDRED DOLLARS ($100.00), unless otherwise stipulated, for each and every Calendar Day's delay in providing the commission payments and reports required under this Contract beyond the stipulated date or number of days, or any adjustments thereof agreed to by State. State may deduct liquidated damages from funds due or that become due Contractor. Execution of the Contract shall constitute acknowledgment by Contractor that Contractor has ascertained and agrees that State will suffer damages in the amount fixed herein.

   b. Contractor shall not be assessed liquidated damages when the delay is caused by the failure of State or the Building Manager of any location to provide assistance or access to a location or to perform work as indicated in the Contract.

STATE OF CALIFORNIA
**STANDARD AGREEMENT**
STD 213 (Rev 06/03)

*Indio to Palm Springs*

| | |
|---|---|
| AGREEMENT NUMBER | 28717 |
| REGISTRATION NUMBER | |

1. This Agreement is entered into between the State Agency and the Contractor named below:

STATE AGENCY'S NAME

Department of Rehabilitation

CONTRACTOR'S NAME

AVT Inc

*3 yr Antioct*

2. The term of this Agreement is:   08/01/2012   through   07/31/2015   *at*

This contract is a 3-yr revenue contract   *15%*

3. The maximum amount of this Agreement is:   $ 0.00 This contract is a 3-yr revenue contract

4. The parties agree to comply with the terms and conditions of the following exhibits which are by this reference made a part of the Agreement.

| | |
|---|---|
| Exhibit A – Scope of Work | |
| Attachment I | 3 pages |
| Exhibit B – Budget Detail and Payment Provisions | 1 page |
| | 3 pages |
| Exhibit C* – General Terms and Conditions   GTC 610   6/10 | |
| Check mark one item below as Exhibit D: | |
| ☒ Exhibit - D Special Terms and Conditions (Attached hereto as part of this agreement) | 4 pages |
| ☐ Exhibit - D* Special Terms and Conditions | |
| Exhibit E – Additional Provisions | 4 pages |

*Items shown with an Asterisk (\*), are hereby incorporated by reference and made part of this agreement as if attached hereto. These documents can be viewed at www.ols.dgs.ca.gov/Standard+Language*

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto.

| CONTRACTOR | | California Department of General Services Use Only. |
|---|---|---|
| CONTRACTOR'S NAME (if other than an individual, state whether a corporation, partnership, etc.) AVT Inc | | *Contract # 12-0603* |
| BY (Authorized Signature) | DATE SIGNED (Do not type) 8-3-2012 | |
| PRINTED NAME AND TITLE OF PERSON SIGNING James Winsor, CEO | | |
| ADDRESS 341 Bonnie Circle, Suite 102, Corona, CA 92880 | | |
| **STATE OF CALIFORNIA** | | |
| AGENCY NAME Department of Rehabilitation | | |
| BY (Authorized Signature) | DATE SIGNED (Do not type) | ☒ EXEMPT |
| PRINTED NAME AND TITLE OF PERSON SIGNING Simone Dumas, Chief, Contracts and Procurement Section | | |
| ADDRESS 721 Capitol Mall, Sacramento, CA 95814 | | |

## BID/BIDDER CERTIFICATION SHEET
### BID NUMBER # 12-06-03
### VENDING MACHINE CONTRACT
### Indio to Palm Springs

This Bid/Bidder Certification Sheet must be signed and returned along with all the "required attachments" as an entire package with original signatures. The bid must be transmitted in a sealed envelope in accordance with IFB instructions.

Do not return Section C, Bid Requirements and Information. Do not return "Sample Agreement" at the end of this IFB.

---

*Our all inclusive bid is submitted as follows:*

## *Percentage Rate of: 15%*

---

(Contractor will submit one flat bid rate for all machines: example: 15%, 18%, etc.)

- A. All required attachments are included with this certification sheet.
- B. The signature affixed hereon and dated certifies compliance with all the requirements of this bid document. The signature below authorizes the verification of this certification.
- C. An Unsigned Bid/Bidder Certification Sheet May Be Cause For Rejection.

| 1. Company Name **AVT INC** | 2. Telephone # ( 951 ) 737-1057 | 2b. Fax # ( 951 ) 737-7646 |
|---|---|---|
| 3. Address   341 BONNIE CIRCLE, SUITE 102, CORONA, CA 92880 | | |
| 3a.   Email:   kima@avtinconline.com | | |
| Indicate your organization type:  4. ☐ Sole Proprietorship   5. ☐ Partnership | | 6. X  Corporation |
| Indicate the applicable employee and/or corporation number:  7. Federal Employee ID No. (FEIN):   113828743 | 8. California Corporation No.:   C3072929 | |
| 9. Indicate applicable license and/or certification information: | | |
| 10. Bidder's Name (Print)   **James Winsor** | | 11. Title   CEO |
| 12. Signature | | 13. Date   07/09/2012 |

EXHIBIT "3"                              PAGE 108

## SCOPE OF WORK
### Indio to Palm Springs

Contractor agrees to supply all labor, materials, tools, vending machine equipment, products and transportation necessary to perform all services required for the vending machines on behalf of the Department of Rehabilitation's Business Enterprise Program as described herein:

1) **Location(s) and Equipment(s):**

   Locations: See Exhibit A (See A-I) for list of agencies, locations, and equipment.
   **Total: (11) Vending Machines.**

   - All machines should be energy-efficient (i.e., Energy Star-rated) and must accept dollar bills. Being that they are state buildings and not federal, you are not required by law to provide machines that accept dollar coins, but the Department of Rehabilitation strongly encourages retrofitting your machines to accept the dollar coins.
   - Specific product choices are the option of each agency but the Department of Rehabilitation urges the consideration of healthy beverage and snack choices, i.e., items relatively low in saturated fats, total fats and calories.
   - Unless specified, cold beverage machines may dispense cans or bottles and contain carbonated, non-carbonated and water drinks.
   - This contract shall give the option to amend for more time and money in the event that additional services (adding machines or removing machines) must be performed which were wholly unanticipated and not specified in the original written Scope of Work, but which in the opinion of both parties is necessary to the successful accomplishment of the general scope of work outlined, however, an amendment for these additional services to the agreement must be executed prior to any work being authorized by DOR.

2) **Background Checks:**

   The Contractor and all their employees will be subject to a background check. Picture identification is required for entry into the buildings.
   A background check will be performed on the winning contractor and their employees. Upon being accepted as the winning bid and passing the background check, a picture identification must be presented immediately upon request everywhere in the facility. You will not be permitted entrance without a valid I.D.
   **Standard security issues apply and you must have a valid California State ID to gain entrance to these facilities.**

3) **Service Hours:**

   The Contractor must complete all work during business hours, between 8:00 AM – 5:00 PM, Monday through Friday, except for holidays. Service is expected within those timeframes.

4) **Project Representatives**

   During the term of this agreement, will be:

   **DOR Contract Administrator**
   **Department of Rehabilitation**
   Candise Clark, Contract
   Administrator or designee
   Business Enterprises Program
   721 Capitol Mall, 5th Floor
   Sacramento, CA 95814
   (916) 558-5353

   *See Exhibit A, Attachment I for the list of Agency Contacts.*

EXHIBIT "3"                PAGE 109

Note: The Agency Contact shall be responsible to ensure their respective agency-related vend
machine service issues are coordinated and resolved directly with the Contractor. Should issu
need to be addressed at the next highest level, the Agency contact shall contact the Departme
Rehabilitation - Contract Administrator for further assistance.

### 5)   Compliance with SB 441

Vending machines operated or maintained on state property must satisfy the requirement of SB
441 "that at least 35 percent of the food and at least one-third of the beverages offered in the
vending machines meet accepted nutritional guidelines" by January 1, 2011.
The complete text of SB 441 can be accessed at:

http://info.sen.ca.gov/pub/07-08/bill/sen/sb_0401-
0450/sb_441_cfa_20080108_122759_sen_comm.html

### 6)   Vendor Information

Any changes to business information provided on the contract, address, phone number, etc.,
must be submitted in writing within 15 days of changes. Liquidated Damages as defined in
Exhibit E Additional Provisions of $50.00 may be applied if BEP is not notified within 15 days of
changes.

Changes in ownership of the business in any form must be submitted to the Department of
Rehabilitation Business Enterprise Program within 15 days of the business modification. Should
a business make changes to ownership, split the business, or change business name are
expected to be forwarded to Department of Rehabilitation Business Enterprise Program attention:
**Cheryl Gatus**. **Should changes take place without notification to BEP within 15 days a
Liquidated Damages as defined in Exhibit E Additional Provisions of $50.00 may be applied
for everyday there after.**

State of California

Scope of Work

## Exhibit A: Attachment 1, Locations and Equipment

Contract #28717  **Indio to Palm Springs Route**

| Agency | Location | Address | Contact | E-Mail | Phone | Pop | Cold Drink | Candy/ Snack | TOT |
|--------|----------|---------|---------|--------|-------|-----|-----------|--------------|-----|
| CHP | Brk. Rm. | 79650 Varner Rd., Indio, CA 92203 | Sgt. Campbell | jacampbell@ chp.ca.gov | 760-772- 8911 | 80 | 1 | 1 | 2 |
| DDS | Brk. Rm. | 69696 Ramon Rd., Cathedral City, CA 92235 | Ann Larsen | alarsen@ cs.dds.ca.gov | 760-770- 6248 | 145 staff, 60 clients, 15 wkly visitors | 2 | 2 | 4 |
| USPS | Brk. Rm. | 74801 Hovley Lane, East, Palm Desert, CA 92260 | Elizabeth B. Comandant e | elizabeth.b comandante@ usps.gov | 858-674- 0409 | 85 | 1 | 1 | |
| CDC | Brk. Rm. | 79-687 Country Club Dr., #101, Bermuda Dunes, CA 92203 | Beverly Williams | beverly.williams3@cd cr.ca.gov | 909-468- 2300 | 30 staff 1500 parolees | | | |
| Bureau of Indian Affairs | Brk. Rm. | 3700A Tachevan Dr., #201, Palm Springs, CA 92262 | Ollie Beyal | olliebeyal@ bia.gov | 760-416- 2133 x225 | 30 staff + 30 during trng. | 1 | 1 | |
| | | | | | | | | | |
| TOTALS | | | | | | | 6 | 5 | 11 |

28717

STATE OF CALIFORNIA

DEPARTMENT...
REHABILITATI...
BUSINESS ENTERPRIS...
PROGR...

## VENDING MACHINE COMMISSION STATEMENT

Sales Activity Report

DR 486B (Rev. 01/09)

List all machines serviced at each agency.

Submit Completed Report with Payment to:

Department of Rehabilitation
Accounting Services Section
P. O. Box 944222
Sacramento, CA 94244-2220

Vending Machine Company: _____

Period Covered: _____

| Contract Number | Agency Name | Address | City | Loc. (Flr.) | VM No. | VM Type | Meter Start | Meter End | Total Units | Gross Sales | Comm. Rate(%) | Comm. Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | $ |
| | | | | | | | | | | | | $ |
| | | | | | | | | | | | | $ |
| | | | | | | | | | | | | $ |
| | | | | | | | | | | | | $ |
| | | | | | | | | | | | | $ |
| | | | | | | | | | | | | $ |
| | | | | | | | | | | | | $ |
| | | | | | | | | | Page Totals | $ | | $ |

Indio to Palm Springs

28717

Page 4

EXHIBIT "3"                    PAGE 112

# EXHIBIT B

## BUDGET DETAIL AND PAYMENT PROVISIONS

1) **COMMISSION PERCENTAGE RATE:**

The contractor will pay the Commission Percentage Rate of: __15__ %

2) **TRUST FUND ACCOUNT:**

The amount paid to the Business Enterprises Program Vending Machine Trust Fund Account will be a single payment derived from multiplying the commission percentage rate times the gross receipts. Gross receipts are defined as cash collected including sales tax and CRV, less refunds paid.

3) **MONTHLY SALES REPORT:**

Contractor will submit the <u>attached</u> DR486 **Vending Machine Commission Statement** with their monthly payments to reflect all sales for each vending machine. **Contractor will insure that payments are post marked by the 15th of the following month** (e.g., payments for January activity must be post marked by February 15th). Monthly sales reports not post marked by the 15th may result in an assessment of Liquidated Damages as defined in Exhibit E Additional Provisions.

4) **The monthly DR 486B must be included with the following information with each payment:**

   a. Contract number
   b. Name and address of location, including floor
   c. Sales Activity for each machine (by type) in the contract
   d. Commissions paid for each machine
   e. Contact person (name and phone number)
   f. **Beginning and Ending Meter Readings**

5) **The contractor will make payments payable to the Business Enterprises Program, Vending Machine Trust Fund Account and submit them on a monthly basis to:**

<div align="center">

**Department of Rehabilitation**
**Attn: Accounting Section, 721 Capitol Mall, 6th Floor**
**Sacramento, CA 95814**

</div>

6) **DAMAGES FOR NON-COMPLIANCE WITH OFFICIAL DR486B VENDING MACHINE COMMISSION STATEMENT FORM PROVIDED:**

Commission statements received that are not utilizing the official DR486B Vending machine commission statement form that has been provided by the VMU will not be accepted. This will result in a "non-payment" status and will incur Liquidated Damages as defined in Exhibit E Additional Provisions.

7) **DAMAGES FOR NON, PARTIAL OR LATE PAYMENT:**

Any payments post marked after the 15th of the following month may be assessed a Liquidated Damages as defined in Exhibit E Additional Provisions of $50.00 for each machine in the contract. Damages may be applied on a weekly basis until payment is received.

8) **PRICE LIST:**

Contractor will not exceed the prices for the similar items on the attached Price List, rev 9/30/2008, Attachment II.

9) **BUDGET CONTINGENCY CLAUSES:**

It is mutually agreed that if the Budget Act of the current year and/or any subsequent years

covered under this Agreement does not appropriate sufficient funds for the program, this Agreement shall be of no further force and effect. In this event, the State shall have no liability to pay any funds whatsoever to Contractor or to furnish any other considerations under this Agreement and Contractor shall not be obligated to perform any provisions of this Agreement.

If funding for any fiscal year is reduced or deleted by the Budget Act for purposes of this program, the State shall have the option to either: cancel this Agreement with no liability occurring to the State, or offer an Agreement amendment to Contractor to reflect the reduced amount.

## Addendum # 4
### September 12, 2014
### Change to Contract #28716
### between the Department of Rehabilitation and
### AVT, Inc. @ 24%

The following location(s) service area(s) have been ADDED as follows:

**California Highway Patrol**
**47250 I-10 (W/B Commercial Vehicle Scales)**
**Banning, CA 92220**

Contact Person: Keith Loonsfoot
951-572-4050
Kloonsfoot@chp.ca.gov

Contact Person: AVT Vending, Inc.
951-737-1057, Ext. 321
Kim Alexander (Kima.avtinconline.com)

Location/Type: Admin. Bldg., 1st. Floor Lobby - 1 Candy/Snack
Admin. Bldg., 1st Floor Kitchen – 1 Combo or Cold Bev.
Outside Area – 1 Cold Bev.

All other terms and conditions remain the same.

Contract Administrator : Cheryl Gatus
Print Name

Signature of Contractor _____ DATE: 10/2/14

Signature of Contract Administrator _____ DATE: 10/6/14

1 copy to contract folder. 1 copy to contracts. 1 copy to contractor.



DEPARTMENT of
REHABILITATION
Employment, Independence & Equality

Edmund G. Brown Jr., Governor

State of California
Health and Human Services Agency
Department of Rehabilitation
721 Capitol Mall
Sacramento, CA 95814

August 15, 2012

AVT Inc
James Winsor, CEO
341 Bonnie Circle, Suite 102
Corona, CA 92880

Dear Mr. Winsor:

RE: Contract 28716, Riverside to Beaumont

Attached for your records is one fully executed copy of the subject contract
agreement for your records.

You should be advised that in the performance of this agreement you, your agents,
and employees are in an independent capacity and not officers, employees, or
agents of the State of California.

If you have any questions regarding this agreement, please call me at
(916) 558-5691.

Sincerely,

Jeanne Simmons
Contract Analyst

Cc: Contract Administrator

| | AGREEMENT NUMBER |
|---|---|
| | 28716 |
| | REGISTRATION NUMBER |
| | |

1.  This Agreement is entered into between the State Agency and the Contractor named below:

STATE AGENCY'S NAME

Department of Rehabilitation

CONTRACTOR'S NAME

**AVT Inc**

2.  The term of this          08/01/2012          through          07/31/2015
    Agreement is:          This contract is a 3-yr revenue contract

3.  The maximum amount
    of this Agreement is:          $ 0.00 This contract is a 3-yr <u>revenue</u> contract

4.  The parties agree to comply with the terms and conditions of the following exhibits which are by this reference made a part of the Agreement.

| | |
|---|---|
| Exhibit A – Scope of Work | 4 pages |
| Attachment I | 1 page |
| Exhibit B – Budget Detail and Payment Provisions | 3 pages |
| | |
| Exhibit C* – General Terms and Conditions          GTC 610    6/10 | |
| Check mark one item below as Exhibit D: | |
| ☒  Exhibit - D Special Terms and Conditions (Attached hereto as part of this agreement) | 4 pages |
| ☐  Exhibit - D* Special Terms and Conditions | |
| Exhibit E – Additional Provisions | 4 pages |

*Items shown with an Asterisk (\*), are hereby incorporated by reference and made part of this agreement as if attached hereto. These documents can be viewed at www.ols.dgs.ca.gov/Standard+Language*

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto.

| CONTRACTOR | California Department of General Services Use Only |
|---|---|
| CONTRACTOR'S NAME (if other than an individual, state whether a corporation, partnership, etc.)<br>AVT Inc | |
| BY (Authorized Signature)          DATE SIGNED (Do not type)<br>8·3·2012 | |
| PRINTED NAME AND TITLE OF PERSON SIGNING<br>James Winsor, CEO | |
| ADDRESS<br>341 Bonnie Circle, Suite 102, Corona, CA 92880 | |

| STATE OF CALIFORNIA | |
|---|---|
| AGENCY NAME<br>Department of Rehabilitation | |
| BY (Authorized Signature)          DATE SIGNED (Do not type) | ☒ EXEMPT |
| PRINTED NAME AND TITLE OF PERSON SIGNING<br>Sandy Orch Ared Chief, Contracts and Procurement Section | |
| ADDRESS<br>721 Capitol Mall, Sacramento, CA 95814 | |

## SCOPE OF WORK
## Indio to Palm Springs

Contractor agrees to supply all labor, materials, tools, vending machine equipment, products and transportation necessary to perform all services required for the vending machines on behalf of the Department of Rehabilitation's Business Enterprise Program as described herein:

1) **Location(s) and Equipment(s):**
   **Locations: See Exhibit A (See A-I)** for list of agencies, locations, and equipment.
   **Total: (11) Vending Machines.**
   - All machines should be energy-efficient (i.e., Energy Star-rated) and must accept dollar bills. Being that they are state buildings and not federal, you are not required by law to provide machines that accept dollar coins, but the Department of Rehabilitation strongly encourages retrofitting your machines to accept the dollar coins.
   - Specific product choices are the option of each agency but the Department of Rehabilitation urges the consideration of healthy beverage and snack choices, i.e., items relatively low in saturated fats, total fats and calories.
   - Unless specified, cold beverage machines may dispense cans or bottles and contain carbonated, non-carbonated and water drinks.
   - This contract shall give the option to amend for more time and money in the event that additional services (adding machines or removing machines) must be performed which were wholly unanticipated and not specified in the original written Scope of Work, but which in the opinion of both parties is necessary to the successful accomplishment of the general scope of work outlined, however, an amendment for these additional services to the agreement must be executed prior to any work being authorized by DOR.

2) **Background Checks:**
   The Contractor and all their employees will be subject to a background check. Picture identification is required for entry into the buildings.
   A background check will be performed on the winning contractor and their employees. Upon being accepted as the winning bid and passing the background check, a picture identification must be presented immediately upon request everywhere in the facility. You will not be permitted entrance without a valid I.D.
   **Standard security issues apply and you must have a valid California State ID to gain entrance to these facilities.**

3) **Service Hours:**
   The Contractor must complete all work during business hours, between 8:00 AM – 5:00 PM, Monday through Friday, except for holidays. Service is expected within those timeframes.

4) **Project Representatives**
   During the term of this agreement, will be:

   **DOR Contract Administrator**          *See Exhibit A, Attachment I for the*
   **Department of Rehabilitation**          *list of Agency Contacts.*
   Candise Clark, Contract
   Administrator or designee
   Business Enterprises Program
   721 Capitol Mall, 5th Floor
   Sacramento, CA 95814
   (916) 558-5353

EXHIBIT "3"                                                          PAGE 118

Note: The Agency Contact shall be responsible to ensure their respective agency-related vending machine service issues are coordinated and resolved directly with the Contractor. Should issues need to be addressed at the next highest level, the Agency contact shall contact the Department of Rehabilitation - Contract Administrator for further assistance.

## 5)   Compliance with SB 441

Vending machines operated or maintained on state property must satisfy the requirement of SB 441 "that at least 35 percent of the food and at least one-third of the beverages offered in the vending machines meet accepted nutritional guidelines" by January 1, 2011.
The complete text of SB 441 can be accessed at:

http://info.sen.ca.gov/pub/07-08/bill/sen/sb_0401-
0450/sb_441_cfa_20080108_122759_sen_comm.html

## 6)   Vendor Information

Any changes to business information provided on the contract, address, phone number, etc., must be submitted in writing within 15 days of changes. Liquidated Damages as defined in Exhibit E Additional Provisions of $50.00 may be applied if BEP is not notified within 15 days of changes.

Changes in ownership of the business in any form must be submitted to the Department of Rehabilitation Business Enterprise Program within 15 days of the business modification.  Should a business make changes to ownership, split the business, or change business name are expected to be forwarded to Department of Rehabilitation Business Enterprise Program attention: **Cheryl Gatus**.  **Should changes take place without notification to BEP within 15 days a Liquidated Damages as defined in Exhibit E Additional Provisions of $50.00 may be applied for everyday there after.**

**State of California**

**Scope of Work**

**Exhibit A: Attachment 1, Locations and Equipment**

**Contract #28717 **Indio to Palm Springs Route****

| Agency | Location | Address | Contact | E-Mail | Phone | Pop | Cold Drink | Candy/ Snack | TOTAL |
|--------|----------|---------|---------|--------|-------|-----|-----------|-------------|-------|
| CHP | Brk. Rm. | 79650 Varner Rd., Indio, CA 92203 | Sgt. Campbell | jacampbell@ chp.ca gov | 760-772-8911 | 80 | 1 | 1 | 2 |
| DDS | Brk. Rm. | 69696 Ramon Rd, Cathedral City, CA 92235 | Ann Larsen | alarsen@ cs.dds.ca.gov | 760-770-6248 | 145 staff, 60 clients, 15 wkly visitors | 2 | 2 | 4 |
| USPS | Brk. Rm. | 74801 Hovley Lane, East, Palm Desert, CA 92260 | Elizabeth B. Comandante | elizabeth.b. comandante@ usps.gov | 858-674-0409 | 85 | 1 | 1 | |
| CDC | Brk. Rm. | 79-687 Country Club Dr., #101, Bermuda Dunes, CA 92203 | Beverly Williams | beverly.williams3@cd cr.ca.gov | 909-468-2300 | 30 staff 1500 parolees | 1 | | |
| Bureau of Indian Affairs | Brk. Rm. | 3700A Tachevan Dr., #201, Palm Springs, CA 92262 | Ollie Beyal | olliebeyal@ bia.gov | 760-416-2133 x225 | 30 staff + 30 during trng. | 1 | 1 | |
| | | | | | | | | | |
| **TOTALS** | | | | | | | 6 | 5 | 11 |
| | | | | | | | | | |

Indio to Palm Springs                    Page 3                    28717

EXHIBIT "3"                                    PAGE 120

STATE OF CALIFORNIA

DEPARTMENT OF REHABILITATION
BUSINESS ENTERPRISES PROGRAM

## VENDING MACHINE COMMISSION STATEMENT

Sales Activity Report

DR 486B (Rev. 01/09)

Submit Completed Report with Payment to:

Department of Rehabilitation

Accounting Services Section

P. O. Box 944222

Sacramento, CA 94244-2220

List all machines serviced at each agency.

Vending Machine Company: _____

Period Covered: _____

| Contract Number | Agency Name | Address | City | Loc. (Flr.) | VM No. | VM Type | Meter Start | Meter End | Total Units | Gross Sales | Comm. Rate(%) | Comm. Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | $  ' |
| | | | | | | | | | | | | $  ' |
| | | | | | | | | | | | | $  ' |
| | | | | | | | | | | | | $  ' |
| | | | | | | | | | | | | $  ' |
| | | | | | | | | | | | | $  ' |
| | | | | | | | | | | | | $  ' |
| | | | | | | | | | | | | $  ' |
| | | | | | | | | | | | | $  ' |
| | | | | | Page Totals | | | | | $  ' | | $  ' |

Indio to Palm Springs

Page 4

28717

EXHIBIT "3"

PAGE 121

# EXHIBIT B

## BUDGET DETAIL AND PAYMENT PROVISIONS

### 1)   COMMISSION PERCENTAGE RATE:

The contractor will pay the Commission Percentage Rate of:   15   %

### 2)   TRUST FUND ACCOUNT:

The amount paid to the Business Enterprises Program Vending Machine Trust Fund Account will be a single payment derived from multiplying the commission percentage rate times the gross receipts. Gross receipts are defined as cash collected including sales tax and CRV, less refunds paid.

### 3)   MONTHLY SALES REPORT:

Contractor will submit the attached DR486 Vending Machine Commission Statement with their monthly payments to reflect all sales for each vending machine. Contractor will insure that payments are post marked by the 15th of the following month (e.g., payments for January activity must be post marked by February 15th). Monthly sales reports not post marked by the 15th may result in an assessment of Liquidated Damages as defined in Exhibit E Additional Provisions.

### 4)   The monthly DR 486B must be included with the following information with each payment:

a.   Contract number
b.   Name and address of location, including floor
c.   Sales Activity for each machine (by type) in the contract
d.   Commissions paid for each machine
e.   Contact person (name and phone number)
f.   Beginning and Ending Meter Readings

### 5)   The contractor will make payments payable to the Business Enterprises Program, Vending Machine Trust Fund Account and submit them on a monthly basis to:

**Department of Rehabilitation
Attn: Accounting Section, 721 Capitol Mall, 6th Floor
Sacramento, CA 95814**

### 6)   DAMAGES FOR NON-COMPLIANCE WITH OFFICIAL DR486B VENDING MACHINE COMMISSION STATEMENT FORM PROVIDED:

Commission statements received that are not utilizing the official DR486B Vending machine commission statement form that has been provided by the VMU will not be accepted. This will result in a "non-payment" status and will incur Liquidated Damages as defined in Exhibit E Additional Provisions.

### 7)   DAMAGES FOR NON, PARTIAL OR LATE PAYMENT:

Any payments post marked after the 15th of the following month may be assessed a Liquidated Damages as defined in Exhibit E Additional Provisions of $50.00 for each machine in the contract. Damages may be applied on a weekly basis until payment is received.

### 8)   PRICE LIST:

Contractor will not exceed the prices for the similar items on the attached Price List, rev 9/30/2008. Attachment II.

### 9)   BUDGET CONTINGENCY CLAUSES:

It is mutually agreed that if the Budget Act of the current year and/or any subsequent years

covered under this Agreement does not appropriate sufficient funds for the program, this Agreement shall be of no further force and effect. In this event, the State shall have no liability to pay any funds whatsoever to Contractor or to furnish any other considerations under this Agreement and Contractor shall not be obligated to perform any provisions of this Agreement.

If funding for any fiscal year is reduced or deleted by the Budget Act for purposes of this program, the State shall have the option to either: cancel this Agreement with no liability occurring to the State, or offer an Agreement amendment to Contractor to reflect the reduced amount.

EXHIBIT "3"                                                              PAGE 123

## BID/BIDDER CERTIFICATION SHEET
### BID NUMBER # 12-06-03
### VENDING MACHINE CONTRACT
### Indio to Palm Springs

This Bid/Bidder Certification Sheet must be signed and returned along with all the "required attachments" as an entire package with original signatures. The bid must be transmitted in a sealed envelope in accordance with IFB instructions.

Do not return Section C, Bid Requirements and Information. Do not return "Sample Agreement" at the end of this IFB.

---

***Our all inclusive bid is submitted as follows:***

## *Percentage Rate of: 15%*

---

(Contractor will submit one flat bid rate for all machines: example: 15%, 18%, etc.)

- A. All required attachments are included with this certification sheet.
- B. The signature affixed hereon and dated certifies compliance with all the requirements of this bid document. The signature below authorizes the verification of this certification.
- C. An Unsigned Bid/Bidder Certification Sheet May Be Cause For Rejection.

| 1. Company Name<br>AVT INC | 2. Telephone #<br>( 951 ) 737-1057 | 2b. Fax #<br>( 951) 737-7646 |
|---|---|---|
| 3. Address    341 BONNIE CIRCLE, SUITE 102, CORONA, CA 92880 | | |
| 3a.   Email:    kima@avtinconline.com | | |
| Indicate your organization type:<br>4. ☐ Sole Proprietorship      5. ☐ Partnership | | 6. X   Corporation |
| Indicate the applicable employee and/or corporation number:<br>7. Federal Employee ID No. (FEIN):<br>113828743 | 8. California Corporation No.:<br>C3072929 | |
| 9. Indicate applicable license and/or certification information: | | |
| 10. Bidder's Name (Print)      James Winsor | | 11. Title   CEO |
| 12. Signature | | 13. Date    07/09/2012 |

## EXHIBIT B

## MAXIMUM SELLING PRICES *

| Product | Size | Maximum Selling Price | |
|---|---|---|---|
| | | | |
| Soda / Juice (less than 10%) / Tea / Seltzer / Water (Unflavored and Unfortified) | 11.5 oz. can and up | $ | 1.10 |
| | 16 oz. bottle and up | $ | 1.50 |
| Milk, 100% Juice | 1/2 pint and up | $ | 1.00 |
| Specialty Drinks (Starbucks, Snapple, Water (Flavored and/or Fortified, etc.) | 9.5 oz. | $ | 2.00 |
| Energy Drinks (Red Bull, Rockstar, etc.) | 8 oz. and up | $ | 3.00 |
| Candy and Candy Bars | 1-2.5 oz. | $ | 1.00 |
| | 2.6 oz. and up | $ | 1.25 |
| Healthy Pick (Health Bar, Trail Mix, etc.) | 1.5 oz. and up | $ | 1.50 |
| Snacks / Chips | 1 – 2 oz. | $ | 1.00 |
| | 2.1 oz. and up | $ | 1.50 |
| Pastries (Drake, Hostess, etc.) | 1 oz. and up | $ | 1.50 |
| Popcorn, Fresh or Microwave | 3 oz. and up | $ | 1.00 |
| Gum / Lifesavers / Mints | 1 oz. and up | $ | 1.00 |
| Cookies / crackers | 2 oz. and up | $ | 1.00 |
| Hot Coffee / Tea / Chocolate | 8 oz. | $ | 0.75 |
| | 12 oz. | $ | 1.00 |
| Cold Food (Muffin, Biscuits, Burrito, etc.) | Various | OPEN | |

\* *Maximum selling price includes Bottle/Can Deposit (CA CRV) and applicable California Sales Tax*

Rev 9/30/2008

EXHIBIT "3"                                                    PAGE 125

# EXHIBIT D
## SPECIAL TERMS AND CONDITIONS

### A) Insurance

Contractor shall supply a Certificate of Insurance, with the appropriate coverage and limits as required. The Certificate of Insurance shall state a limit of liability not less than $1,000,000.00 (one million dollars) per occurrence and $2,000,000.00 (two million dollars) aggregate for bodily injury and property damage liability combined; **plus** automobile liability of not less than $1,000,000.00 (one million dollars) combined single limit; **plus** $1,000,000.00 (one million) Worker's Compensation Insurance. **The Certificate of Insurance must include:**

1) Commercial General Liability:  General Aggregate; Products; Personal and Advertising Injury; each occurrence for a minimum of $1,000,000.00 (one million dollars) and aggregate for $2,000,000.00 (two million dollars).
2) Automobile Liability must include any-auto, hired-autos, non-owned autos, and any other auto used in performing services under the contract for a minimum of $1,000,000 combined single limit.
3) Workers' Compensation Insurance and Employers' Liability:
Workers' Compensation Insurance with Employer's Liability for a minimum of $1,000,000.00 (one million dollars), issued by an insurance carrier licensed to underwrite Workers' Compensation Insurance in the State of California.

The Certificate of Insurance (i.e.. Accord Certificate) that includes record on the General Liability Insurance Certificate must also include the following endorsements, **word for word**:

1) *The insurer will not cancel the insured's coverage without 30 days prior written notice to the State.*
2) *The State of California, its officers, agents, employees, and servants are included as additional insured, but only insofar as the operations under this Contract are concerned.*

The Contractor agrees that bodily injury liability insurance herein provided shall be in effect at all times during the term of this Contract. In the event said insurance coverage expires at any time, or times, during the term of this Contract, the Contractor agrees to provide at least 30 days prior to said insurance expiration date a new Certificate of Insurance evidencing insurance coverage as provided for herein for not less than the remainder of the term of the Contract or for a period of not less than one (1) year. New Certificates of Insurance are subject to approval by the Department of General Services and the Contractor agrees that no work or services shall be performed prior to receiving Department of General Services' approval. In the event the Contractor fails to keep in effect, at all times, insurance coverage as herein provided, the State may, in addition to any other remedies it may have, terminate this Contract upon occurrence of such event.

The Department of Rehabilitation will not provide for, nor compensate, the Contractor for any insurance premiums or cost for any type or amount of insurance.
Contractor will submit current insurance documents yearly on the anniversary date of the contract. Contract may be canceled at Departmental discretion, if all current insurance forms are

Indio to Palm Springs                              Page 1                                   28717

not received within 30 days of contract anniversary date.

## B) Insurance Companies

Insurance companies issuing any of the policies required by these provisions shall have a rating classification of "B" or better and a financial size category rating of "VII" or better according to the latest edition of the A.M. Best Key Rating Guide. Any other rating classification requires State approval.

All insurance companies issuing any of the policies required by these provisions shall be licensed to do business in the State of California.

Expiration date of Insurance must not expire prior to receipt of renewal. Should lapse of insurance occur, a $1,000 Liquidated Damages as defined in Exhibit E Additional Provisions may apply. Insurance forms must be mailed to:

> **Department of Rehabilitation**
> **Business Enterprises Program (BEP)**
> **Vending Machine Unit (VMU)**
> **721 Capitol Mall, 5th Floor**
> **Sacramento, CA 95814**
> **(916) 558-5345 Fax (916) 558-5347**
> **Email – vmuresponses@dor.ca.gov**

## C) Workers' Compensation

Contractor shall have and maintain, for the term of this Agreement, Workers' Compensation insurance issued by an insurance carrier licensed to underwrite Workers' Compensation insurance in the State of California. If the business is a sole proprietorship, the Contractor has signed and certified the following statement on business letterhead, "*I certify under penalty of perjury*

*under the laws of the State of California that I do not employ any person in any manner as to become subject to the Workers' Compensation laws of California. I further certify that the Department of Rehabilitation will be notified within ninety (90) days of any changes which results in the business becoming subject to the Workers' Compensation laws of California*". Contractor will submit documents yearly on the anniversary date of the contract. Contract may be canceled if current Works' Compensation documents are not received within 30 days of contract anniversary date.

## D) Tax Compliance

The Contractor is hereby notified that the Department of Rehabilitation is required by Federal and State Tax Codes to report certain payments to individuals. Without this information, the Department of Rehabilitation cannot pay Contractor invoices. The Contractor agrees to abide by these conditions and provide the requested information.

## E) License(s) And Permit(s)

The Contractor shall be an individual or firm licensed to do business in California and shall obtain at his/her expense all license(s) and permit(s) required by law for accomplishing any work required in connection with this contract. Contractor will submit documents on the anniversary of the contract annually. Contract may be canceled if not received within 30 days of contract

anniversary date.

Contractor's business located within the State of California shall have a business license from the city/county **in which the business is headquartered** or if the business is a corporation, a copy of the incorporation documents/letter from the Secretary of State's Office shall be on file with the Department of Rehabilitation. Contractor's business outside the State of California, shall have on file with the Department of Rehabilitation a copy of the business license or incorporation papers for your respective State showing that your company is in good standing in that state.

In the event, any license(s) and/or permit(s) expire at any time during the term of this contract, Contractor agrees to provide agency a copy of the renewed license(s) and/or permit(s) within thirty (30) days following the expiration date. In the event the Contractor fails to keep in effect at all times all required license(s) and permit(s), the State may, in addition to any other remedies it may have, terminate this contract upon occurrence of such event.

## F) Right To Terminate
The State reserves the right to terminate this agreement subject to thirty (30) days written notice to the Contractor.

Contractor may submit a written request to terminate this agreement **only if the State** should substantially fail to perform its responsibilities as provided herein.

However, the agreement can be immediately terminated for cause. The term "for cause" shall mean that the Contractor fails to meet the terms, conditions, and/or responsibilities of the contract. In this instance, the contract termination shall be effective as of the date indicated on the State's notification to the Contractor.

This agreement may be suspended or cancelled without notice, at the option of the Contractor, if the Contractor or State's premises or equipment are destroyed by fire or other catastrophe, or so substantially damaged that it is impractical to continue service, or in the event the Contractor is unable to render service as a result of any action by any governmental authority.

## G) Right to Review Compliance:
Contractor agrees that the awarding agency or its delegates will have the right to review, obtain, and copy all records pertaining to performance of the contract. Contractor agrees to provide the awarding department or its delegates with any relevant information requested and shall permit the awarding agency or its delegates access to its premises, upon reasonable notice, during normal business hours for the purpose of interviewing employees and inspecting and copying such books, records, accounts, and other material that may be relevant to a matter under investigation for the purpose of determining compliance with *PCC § 10115 et seq., GC § 8546.7 and 2 CCR § 1896.60 et seq.* Contractor further agrees to maintain such records for a period of three years after final payment under the contract. Contractor shall comply with the caveats and be aware of the penalties for violations of fraud and for obstruction of investigation as set forth in *PCC § 10115.10.*

## H) Agency Liability:
The Contractor warrants by execution of this Agreement, that no person or selling agency has been employed or retained to solicit or secure this Agreement upon agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or

bona fide established commercial or selling agencies maintained by the Contractor for the purpose of securing business. For breach or violation of this warranty, the State shall, in addition to other remedies provided by law, have the right to annul this Agreement without liability, paying only for the value of the work actually performed, or otherwise recover the full amount of such commission, percentage, brokerage, or contingent fee.

I)  **Non Eligible Alien – All Sole Proprietor Contracts:**
Contractor shall comply with *US Code, Title 8, Section 1621 (a), (b), (c), and (d)*, concerning aliens or immigrants ineligible for State and local public benefits.

## EXHIBIT E
## ADDITIONAL PROVISIONS

1. **Installation**. After the awarding of the contract, contractor will coordinate a convenient installation schedule. Contractor shall not interrupt any building service without securing prior approval from the Agency contact person(s) and/or building manager.

2. **Signature requirements**. After a Contractor has signed the agreement and is in place, the contractor will be required to sign the agreement renewal within 15 days of the renewal date. Should the signed renewal not be received prior to the 15 day deadline, Contractors will be required to remove their equipment on the 16th day. Should machines not be removed on the 16th day, all machines will be moved at the owners expense.

3. **Placement of Equipment**. At no time is a Contractor authorized to move equipment into the location without returning the agreement and confirmed receipt by Department of Rehabilitation's Contract Administrator. Should contractor move into a location prior to returning agreement, **Liquidated Damages as defined in Exhibit E Additional Provisions** of $100.00 per machine per day will be applied.

4. **Agreement Amendments**. Agreement Amendments must be signed and returned within 15 days of receipt. Should amendment not be received on 16th day, the location will not be added.

5. **Installation Report**. Installation report form is immediately due upon request of the Department of Rehabilitation's Contract Administrator.

6. **Stocking/Restocking Levels**. The Contractor is responsible to ensure that: all products must be fresh when stocking/restocking vending machines/s; stock is rotated and removed according to expired freshness dates on each and every delivery; perishable items must be replaced within ten (10) calendar days; product levels must meet the needs of the Agency. Product choices are at the discretion of the Agency. Product Inventory forms must be completed and submitted if requested by the Agency. Service requests from the respective Agency contact person must be acknowledged by the Contractor within twenty-four (24) hours.

7. **Customer Satisfaction**. Contractor will establish a system, which will identify a procedure for customer satisfaction in the event that refunds or reimbursements from vending sales activity become due to customers. Contractor will ensure that all employees work with professionalism and tact when interacting with Building Managers and patrons of the facility.

8. **Safety**. All equipment will be banded together, bolted down, or held in place in accordance with local safety ordinances.

9. **Clean Site**. Contractor shall keep site clean. Upon completion of the work all surfaces involved in this project shall be clean and removed of any foreign material due to work hereunder. Contractor shall keep all vending machines clean.

10. **Equipment Removal**. Contractor shall remove any and all equipment within a reasonable time, not to exceed ten(10) working days, after written notification of contract expiration. Contractor to be responsible for all costs related to equipment removal. Should equipment not be removed

on the ten (10) working day, all equipment will be considered property of the state.

11. **Repairs & Maintenance**. Repairs and maintenance of vending machines provided by the contractor under the terms of this contract are solely the responsibility of the contractor. All equipment failures will be responded to within eight (8) working hours. All equipment failures will be resolved within twenty-four (24) working hours. All equipment failures not resolved within thirty-two (32) hours without just cause and notification to VMU via email, vmuresponses@dor.ca.gov, can result in termination of contract. Should service repair of a vending machine exceed two (2) working days with written justification and approval of VMU, contractor will pay service repair fees for the repair of the vending machine unit. Should the contractor have a proven history of negligence and refusal to abide by said agreement, contract will be terminated with just cause.

12. **Damages of State and Federal Property**. Any damages by the contractor to portions of buildings, premises, equipment, furniture, material or other property for which the State/Federal is responsible will be repaired or items will be replaced by contractor to the satisfaction of the State/Federal with no expense to the State/Federal. Contractor shall patch, replace and/or finish in kind all surfaces of features displaced, or damaged in performance of work, such as but not limited to acoustical tile, floor covering, and wall areas.

13. **Internal Controls and Record Requirements**. Contractor will maintain adequate records to document and substantiate sales and commission payments reported to the Department of Rehabilitation. Contractor will also ensure that adequate accounting and administrative controls are in place to reasonably assure the accuracy of the information contained in the accounting records. Contractor will support data management services to streamline records, sales, commissions and other pertinent information as it relates to BEP in conjunction with chosen data management service provider.

14. **Reporting Omissions.** Should the Contractor not report all vending machines as agreed to, a Liquidated Damages as defined in Exhibit E Additional Provisions of $50 per day per machine may be applied until a corrected commission payment report is received.

15. **Audit Requirements**. See Exhibit C. In addition, the Department of Rehabilitation Contract Administrator may request copies of records relevant to the sales and commissions reported to the Department of Rehabilitation. Should an audit take place and it is found that said contractor inappropriately filed commission reports an administrative fee will be applied for hours dedicated to audit findings. Fees may be applied in accordance to the State Administrative Manual (SAM).

16. **Audit Appeals**. If audited by the Department of Rehabilitation, the audit report is final thirty (30) days after its mailing to the Contractor unless the Contractor appeals, in writing, the findings and recommendations in the audit. The appeal shall be addressed to the Program Administrator, Business Enterprise Program, Department of Rehabilitation, within thirty (30) days from the date the audit report is mailed and contain the following information:

- The audit issues being disputed by the contractor;
- A full statement of the contractor's position on each disputed audit issue;
- All pertinent facts and reasons supporting the contractor's position; and
- Any additional documentation to support the contractor's position.

17. The Program Administrator, Business Enterprise Program, Department of Rehabilitation shall respond within forty-five (45) days from receipt of the appeal, provided the Contractor has submitted the necessary information in the appeal. The Program Administrator, Business Enterprise Program, Department of Rehabilitation may require the Contractor to submit additional documentation relevant to any disputed audit findings or recommendation.

18. If the Contractor disputes the decision of the Program Administrator, Business Enterprise Program, Department of Rehabilitation, the contractor may request in writing a second level review by the Deputy Director, Specialized Services Division. The request must be received within thirty (30) days from the date of the Program Administrator, Business Enterprise Program, Department of Rehabilitation decision. The Deputy Director shall consider the appeal and the pertinent information, and arrive at a decision within forty-five (45) days from receipt of the request for a second level review. The decision of the Deputy Director is final.

19. **Subject to Approval**. In addition, the contractor may request an amendment with a written notice to the Department of Rehabilitation, Contract Administrator, forty-five (45) days prior to the requested date of change. Contractor is still legally obligated to provide the services as stated in the original contract until the amendment is effective.

20. **Accounts Receivable/Delinquent Commission Payment**. If a contractor has an account receivable or is delinquent in commission payments, the account must be current with all payments including penalties and have valid vending machine commission statements on file prior to a contract eligibility of amendment to add additional locations or be awarded new contracts.

21. **Installation Requirements**. It is the contractor's responsibility to insure that the types of machines are in accordance with the contract specifications. Certain contracts may have different installation dates for each customer listed, which is stated under Special Conditions. Installation is required within seven (7) working days of those specific dates. The contractor must explain in writing to the Department of Rehabilitation Contract Administrator and to the customers in the contract if there are any delays in installation. Failure to install the machines as stated in the contract within seven (7) working days of the contract effective date may result in termination of the contract, unless there are construction delays.

22. **Location Abandonment.**
A 45-day notification must be given to:

Department of Rehabilitation
Business Enterprises Program (BEP)
Vending Machine Unit (VMU)
721 Capitol Mall, 5th Floor
Sacramento, CA 95814
(916) 558-5345 Fax (916) 558-5347
Email – vmuresponses@dor.ca.gov

Should Contractor decide to abandon the location without notification a $1000 Liquidated Damages as defined in Exhibit E Additional Provisions may be applied until such time as State is able to replace Contractor and resume service. Should the Contractor abandon the location leaving the equipment, BEP will make written notification to remove equipment within three (3) days after abandonment. At which time BEP will take ownership of the equipment.

23. **Service Related/Refund Issues**. It is the Contractor's responsibility to ensure that service refund requests are handled within twenty-four (24) hours of notification from the customer. . Note: The customer may have the option of a product replacement or cash refund. If service related/refund issues remain unresolved, the Agency Contact shall contact the Department of Rehabilitation Contract Administrator to evaluate the issue that may result to the Department of Rehabilitation terminating the contract.

24. **Termination for Cause**. Failure to comply with contract terms and conditions is termination for cause and future bids may be rejected for one (1) year.

25. **Liquidated Damages**.

  a. Failure of Contractor to complete the scope of work, including making required reports and commission payments within the time frames and by the dates identified will result in damages being sustained by State. It is and will be extremely difficult and impracticable to determine the actual damage which State will sustain by reason of such delay. Therefore, Contractor shall pay to State, as liquidated damages, the sum of ONE HUNDRED DOLLARS ($100.00), unless otherwise stipulated, for each and every Calendar Day's delay in providing the commission payments and reports required under this Contract beyond the stipulated date or number of days, or any adjustments thereof agreed to by State. State may deduct liquidated damages from funds due or that become due Contractor. Execution of the Contract shall constitute acknowledgment by Contractor that Contractor has ascertained and agrees that State will suffer damages in the amount fixed herein.

  b. Contractor shall not be assessed liquidated damages when the delay is caused by the failure of State or the Building Manager of any location to provide assistance or access to a location or to perform work as indicated in the Contract.

Contractor will submit current insurance documents yearly on the anniversary date of the contract. Contract may be canceled at Departmental discretion, if all current insurance forms are not received within 30 days of contract anniversary date.

B) Insurance Companies

Insurance companies issuing any of the policies required by these provisions shall have a rating classification of "B" or better and a financial size category rating of "VII" or better according to the latest edition of the A.M. Best Key Rating Guide. Any other rating classification requires State approval.

All insurance companies issuing any of the policies required by these provisions shall be licensed to do business in the State of California.

Expiration date of Insurance must not expire prior to receipt of renewal. Should lapse of insurance occur, a $1,000 Liquidated Damages as defined in Exhibit E Additional Provisions may apply.  Insurance forms must be mailed to:

> **Department of Rehabilitation**
> **Business Enterprises Program (BEP)**
> **Vending Machine Unit (VMU)**
> **721 Capitol Mall, 5th Floor**
> **Sacramento, CA 95814**
> **(916) 558-5345 Fax (916) 558-5347**
> **Email – vmuresponses@dor.ca.gov**

## C)  Workers' Compensation

Contractor shall have and maintain, for the term of this Agreement, Workers' Compensation insurance issued by an insurance carrier licensed to underwrite Workers' Compensation insurance in the State of California. If the business is a sole proprietorship, the Contractor has signed and certified the following statement on business letterhead, *"I certify under penalty of perjury*

*under the laws of the State of California that I do not employ any person in any manner as to become subject to the Workers' Compensation laws of California. I further certify that the Department of Rehabilitation will be notified within ninety (90) days of any changes which results in the business becoming subject to the Workers' Compensation laws of California"*. Contractor will submit documents yearly on the anniversary date of the contract. Contract may be canceled if current Works' Compensation documents are not received within 30 days of contract anniversary date.

## D)  Tax Compliance

The Contractor is hereby notified that the Department of Rehabilitation is required by Federal and State Tax Codes to report certain payments to individuals. Without this information, the Department of Rehabilitation cannot pay Contractor invoices. The Contractor agrees to abide by these conditions and provide the requested information.

## E)  License(s) And Permit(s)

The Contractor shall be an individual or firm licensed to do business in California and shall obtain at his/her expense all license(s) and permit(s) required by law for accomplishing any

work required in connection with this contract. Contractor will submit documents on the anniversary of the contract annually. Contract may be canceled if not received within 30 days of contract anniversary date.

Contractor's business located within the State of California shall have a business license from the city/county in which the business is headquartered or if the business is a corporation, a copy of the incorporation documents/letter from the Secretary of State's Office shall be on file with the Department of Rehabilitation. Contractor's business outside the State of California, shall have on file with the Department of Rehabilitation a copy of the business license or incorporation papers for your respective State showing that your company is in good standing in that state.

In the event, any license(s) and/or permit(s) expire at any time during the term of this contract, Contractor agrees to provide agency a copy of the renewed license(s) and/or permit(s) within thirty (30) days following the expiration date. In the event the Contractor fails to keep in effect at all times all required license(s) and permit(s), the State may, in addition to any other remedies it may have, terminate this contract upon occurrence of such event.

## F) Right To Terminate
The State reserves the right to terminate this agreement subject to thirty (30) days written notice to the Contractor.

Contractor may submit a written request to terminate this agreement only if the State should substantially fail to perform its responsibilities as provided herein.

However, the agreement can be immediately terminated for cause. The term "for cause" shall mean that the Contractor fails to meet the terms, conditions, and/or responsibilities of the contract. In this instance, the contract termination shall be effective as of the date indicated on the State's notification to the Contractor.

This agreement may be suspended or cancelled without notice, at the option of the Contractor, if the Contractor or State's premises or equipment are destroyed by fire or other catastrophe, or so substantially damaged that it is impractical to continue service, or in the event the Contractor is unable to render service as a result of any action by any governmental authority.

## G) Right to Review Compliance:
Contractor agrees that the awarding agency or its delegates will have the right to review, obtain, and copy all records pertaining to performance of the contract. Contractor agrees to provide the awarding department or its delegates with any relevant information requested and shall permit the awarding agency or its delegates access to its premises, upon reasonable notice, during normal business hours for the purpose of interviewing employees and inspecting and copying such books, records, accounts, and other material that may be relevant to a matter under investigation for the purpose of determining compliance with PCC § 10115 et seq., GC § 8546.7 and 2 CCR § 1896.60 et seq. Contractor further agrees to maintain such records for a period of three years after final payment under the contract. Contractor shall comply with the caveats and be aware of the penalties for violations of fraud and for obstruction of investigation as set forth in PCC § 10115.10.

Riverside to Beaumont                          Page 3                                    28716

H) Agency Liability:

The Contractor warrants by execution of this Agreement, that no person or selling agency has been employed or retained to solicit or secure this Agreement upon agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Contractor for the purpose of securing business. For breach or violation of this warranty, the State shall, in addition to other remedies provided by law, have the right to annul this Agreement without liability, paying only for the value of the work actually performed, or otherwise recover the full amount of such commission, percentage, brokerage, or contingent fee.

I) Non Eligible Alien – All Sole Proprietor Contracts:

Contractor shall comply with *US Code, Title 8, Section 1621 (a), (b), (c), and (d)*, concerning aliens or immigrants ineligible for State and local public benefits.

## EXHIBIT E
## ADDITIONAL PROVISIONS

1. **Installation**. After the awarding of the contract, contractor will coordinate a convenient installation schedule. Contractor shall not interrupt any building service without securing prior approval from the Agency contact person(s) and/or building manager.

2. **Signature requirements**. After a Contractor has signed the agreement and is in place, the contractor will be required to sign the agreement renewal within 15 days of the renewal date. Should the signed renewal not be received prior to the 15 day deadline, Contractors will be required to remove their equipment on the 16th day. Should machines not be removed on the 16th day, all machines will be moved at the owners expense.

3. **Placement of Equipment**. At no time is a Contractor authorized to move equipment into the location without returning the agreement and confirmed receipt by Department of Rehabilitation's Contract Administrator. Should contractor move into a location prior to returning agreement, **Liquidated Damages as defined in Exhibit E Additional Provisions** of $100.00 per machine per day will be applied.

4. **Agreement Amendments**. Agreement Amendments must be signed and returned within 15 days of receipt. Should amendment not be received on 16th day, the location will not be added.

5. **Installation Report**. Installation report form is immediately due upon request of the Department of Rehabilitation's Contract Administrator.

6. **Stocking/Restocking Levels**. The Contractor is responsible to ensure that: all products must be fresh when stocking/restocking vending machines/s; stock is rotated and removed according to expired freshness dates on each and every delivery; perishable items must be replaced within ten (10) calendar days; product levels must meet the needs of the Agency. Product choices are at the discretion of the Agency. Product Inventory forms must be completed and submitted if requested by the Agency. Service requests from the respective Agency contact person must be acknowledged by the Contractor within twenty-four (24) hours.

7. **Customer Satisfaction**. Contractor will establish a system, which will identify a procedure for customer satisfaction in the event that refunds or reimbursements from vending sales activity become due to customers. Contractor will ensure that all employees work with professionalism and tact when interacting with Building Managers and patrons of the facility.

8. **Safety**. All equipment will be banded together, bolted down, or held in place in accordance with local safety ordinances.

9. **Clean Site**. Contractor shall keep site clean. Upon completion of the work all surfaces involved in this project shall be clean and removed of any foreign material due to work hereunder. Contractor shall keep all vending machines clean.

10. **Equipment Removal**. Contractor shall remove any and all equipment within a reasonable time, not to exceed ten(10) working days, after written notification of contract expiration. Contractor

to be responsible for all costs related to equipment removal. Should equipment not be removed on the ten (10) working day, all equipment will be considered property of the state.

11. **Repairs & Maintenance**. Repairs and maintenance of vending machines provided by the contractor under the terms of this contract are solely the responsibility of the contractor. All equipment failures will be responded to within eight (8) working hours. All equipment failures will be resolved within twenty-four (24) working hours. All equipment failures not resolved within thirty-two (32) hours without just cause and notification to VMU via email, vmuresponses@dor.ca.gov, can result in termination of contract. Should service repair of a vending machine exceed two (2) working days with written justification and approval of VMU, contractor will pay service repair fees for the repair of the vending machine unit. Should the contractor have a proven history of negligence and refusal to abide by said agreement, contract will be terminated with just cause.

12. **Damages of State and Federal Property**. Any damages by the contractor to portions of buildings, premises, equipment, furniture, material or other property for which the State/Federal is responsible will be repaired or items will be replaced by contractor to the satisfaction of the State/Federal with no expense to the State/Federal. Contractor shall patch, replace and/or finish in kind all surfaces of features displaced, or damaged in performance of work, such as but not limited to acoustical tile, floor covering, and wall areas.

13. **Internal Controls and Record Requirements**. Contractor will maintain adequate records to document and substantiate sales and commission payments reported to the Department of Rehabilitation. Contractor will also ensure that adequate accounting and administrative controls are in place to reasonably assure the accuracy of the information contained in the accounting records. Contractor will support data management services to streamline records, sales, commissions and other pertinent information as it relates to BEP in conjunction with chosen data management service provider.

14. **Reporting Omissions.** Should the Contractor not report all vending machines as agreed to, a Liquidated Damages as defined in Exhibit E Additional Provisions of $50 per day per machine may be applied until a corrected commission payment report is received.

15. **Audit Requirements**. See Exhibit C. In addition, the Department of Rehabilitation Contract Administrator may request copies of records relevant to the sales and commissions reported to the Department of Rehabilitation. Should an audit take place and it is found that said contractor inappropriately filed commission reports an administrative fee will be applied for hours dedicated to audit findings. Fees may be applied in accordance to the State Administrative Manual (SAM).

16. **Audit Appeals**. If audited by the Department of Rehabilitation, the audit report is final thirty (30) days after its mailing to the Contractor unless the Contractor appeals, in writing, the findings and recommendations in the audit. The appeal shall be addressed to the Program Administrator, Business Enterprise Program, Department of Rehabilitation, within thirty (30) days from the date the audit report is mailed and contain the following information:

   - The audit issues being disputed by the contractor;
   - A full statement of the contractor's position on each disputed audit issue;
   - All pertinent facts and reasons supporting the contractor's position; and

- ○ Any additional documentation to support the contractor's position.

17. The Program Administrator, Business Enterprise Program, Department of Rehabilitation shall respond within forty-five (45) days from receipt of the appeal, provided the Contractor has submitted the necessary information in the appeal. The Program Administrator, Business Enterprise Program, Department of Rehabilitation may require the Contractor to submit additional documentation relevant to any disputed audit findings or recommendation.

18. If the Contractor disputes the decision of the Program Administrator, Business Enterprise Program, Department of Rehabilitation, the contractor may request in writing a second level review by the Deputy Director, Specialized Services Division. The request must be received within thirty (30) days from the date of the Program Administrator, Business Enterprise Program, Department of Rehabilitation decision. The Deputy Director shall consider the appeal and the pertinent information, and arrive at a decision within forty-five (45) days from receipt of the request for a second level review. The decision of the Deputy Director is final.

19. **Subject to Approval**. In addition, the contractor may request an amendment with a written notice to the Department of Rehabilitation, Contract Administrator, forty-five (45) days prior to the requested date of change. Contractor is still legally obligated to provide the services as stated in the original contract until the amendment is effective.

20. **Accounts Receivable/Delinquent Commission Payment**. If a contractor has an account receivable or is delinquent in commission payments, the account must be current with all payments including penalties and have valid vending machine commission statements on file prior to a contract eligibility of amendment to add additional locations or be awarded new contracts.

21. **Installation Requirements**. It is the contractor's responsibility to insure that the types of machines are in accordance with the contract specifications. Certain contracts may have different installation dates for each customer listed, which is stated under Special Conditions. Installation is required within seven (7) working days of those specific dates. The contractor must explain in writing to the Department of Rehabilitation Contract Administrator and to the customers in the contract if there are any delays in installation. Failure to install the machines as stated in the contract within seven (7) working days of the contract effective date may result in termination of the contract, unless there are construction delays.

22. **Location Abandonment**.
A 45-day notification must be given to:

Department of Rehabilitation
Business Enterprises Program (BEP)
Vending Machine Unit (VMU)
721 Capitol Mall, 5th Floor
Sacramento, CA 95814
(916) 558-5345 Fax (916) 558-5347
Email – vmuresponses@dor.ca.gov

Should Contractor decide to abandon the location without notification a $1000 Liquidated Damages as defined in Exhibit E Additional Provisions may be applied until such time as State is able to replace Contractor and resume service. Should the Contractor abandon the location

leaving the equipment, BEP will make written notification to remove equipment within three (3) days after abandonment. At which time BEP will take ownership of the equipment.

23. **Service Related/Refund issues**. It is the Contractor's responsibility to ensure that service refund requests are handled within twenty-four (24) hours of notification from the customer. . Note: The customer may have the option of a product replacement or cash refund. If service related/refund issues remain unresolved, the Agency Contact shall contact the Department of Rehabilitation Contract Administrator to evaluate the issue that may result in the Department of Rehabilitation terminating the contract.

24. **Termination for Cause**. Failure to comply with contract terms and conditions is termination for cause and future bids may be rejected for one (1) year.

25. **Liquidated Damages**.

    a. Failure of Contractor to complete the scope of work, including making required reports and commission payments within the time frames and by the dates identified will result in damages being sustained by State. It is and will be extremely difficult and impracticable to determine the actual damage which State will sustain by reason of such delay. Therefore, Contractor shall pay to State, as liquidated damages, the sum of ONE HUNDRED DOLLARS ($100.00), unless otherwise stipulated, for each and every Calendar Day's delay in providing the commission payments and reports required under this Contract beyond the stipulated date or number of days, or any adjustments thereof agreed to by State. State may deduct liquidated damages from funds due or that become due Contractor. Execution of the Contract shall constitute acknowledgment by Contractor that Contractor has ascertained and agrees that State will suffer damages in the amount fixed herein.

    b. Contractor shall not be assessed liquidated damages when the delay is caused by the failure of State or the Building Manager of any location to provide assistance or access to a location or to perform work as indicated in the Contract.

D O R

DEPARTMENT of
REHABILITATION

Employment, Independence & Equality

*Edmund G. Brown Jr., Governor*



State of California
Health and Human Services Agency
Department of Rehabilitation
721 Capitol Mall
Sacramento, CA  95814

July 30, 2012

AVT Inc
James Winsor, CEO
341 Bonnie Circle, Suite 102
Corona, CA 92880

Dear Mr. Winsor:

Thank you for your recent bid for the Department of Rehabilitation's Invitation for Bid (IFB)
**#12-06-02, Riverside to Beaumont**. The Department is pleased to inform you that your bid was
responsible and reasonable with a percentage rate of: **18%**

The Department will award a contract to your company. Attached please find (5) five Standard
Agreement (Std.213) and your copy of Contract 28717 (you do not need to return the contract).
Please sign with original signatures all (5) five copies of the STD 213 form and return by mail
directly to:

Department of Rehabilitation
Contracts and Procurement Section
Jeanne Simmons, Contract Analyst
721 Capitol Mall, 6th Floor
Sacramento, California 95814

Failure to return (5) signed copies of the Std.213's by August 7, 2012, could be cause for rejection
of the contract. This Agreement cannot be considered binding on either party until approved by
appropriate authorized State Agencies. No services should be provided prior to approval.

Expeditious handling of this Agreement is appreciated.

Should you have any questions please contact me at jsimmons@dor.ca.gov or
(916) 558-5691.

Sincerely,

*Jeanne Simmons*

Jeanne Simmons
Contract Analyst

Enclosures
cc: Contract Administrator

## EXHIBIT B

## MAXIMUM SELLING PRICES *

| Product | Size | Maximum Selling Price |
|---|---|---|
| Soda / Juice (less than 10%) / Tea / Seltzer / Water (Unflavored and Unfortified) | 11.5 oz. can and up | $ 1.10 |
| | 16 oz. bottle and up | $ 1.50 |
| Milk, 100% Juice | 1/2 pint and up | $ 1.00 |
| Specialty Drinks (Starbucks, Snapple, Water (Flavored and/or Fortified, etc.) | 9.5 oz. | $ 2.00 |
| Energy Drinks (Red Bull, Rockstar, etc.) | 8 oz. and up | $ 3.00 |
| Candy and Candy Bars | 1-2.5 oz. | $ 1.00 |
| | 2.6 oz. and up | $ 1.25 |
| Healthy Pick (Health Bar, Trail Mix, etc.) | 1.5 oz. and up | $ 1.50 |
| Snacks / Chips | 1 – 2 oz. | $ 1.00 |
| | 2.1 oz. and up | $ 1.50 |
| Pastries (Drake, Hostess, etc.) | 1 oz. and up | $ 1.50 |
| Popcorn, Fresh or Microwave | 3 oz. and up | $ 1.00 |
| Gum / Lifesavers / Mints | 1 oz. and up | $ 1.00 |
| Cookies / crackers | 2 oz. and up | $ 1.00 |
| Hot Coffee / Tea / Chocolate | 8 oz. | $ 0.75 |
| | 12 oz. | $ 1.00 |
| Cold Food (Muffin, Biscuits, Burrito, etc.) | Various | OPEN |

\* Maximum selling price includes Bottle/Can Deposit (CA CRV) and
applicable California Sales Tax

Rev 9/30/2008

## EXHIBIT D
### SPECIAL TERMS AND CONDITIONS

### A) Insurance

Contractor shall supply a Certificate of Insurance, with the appropriate coverage and limits as required. The Certificate of Insurance shall state a limit of liability not less than $1,000,000.00 (one million dollars) per occurrence and $2,000,000.00 (two million dollars) aggregate for bodily injury and property damage liability combined; **plus** automobile liability of not less than $1,000,000.00 (one million dollars) combined single limit; **plus** $1,000,000.00 (one million) Worker's Compensation Insurance. The **Certificate of Insurance must include**:

1) Commercial General Liability:  General Aggregate; Products; Personal and Advertising Injury; each occurrence for a minimum of $1,000,000.00 (one million dollars) and aggregate for $2,000,000.00 (two million dollars).
2) Automobile Liability must include any-auto, hired-autos, non-owned autos, and any other auto used in performing services under the contract for a minimum of $1,000,000 combined single limit.
3) Workers' Compensation Insurance and Employers' Liability:
   Workers' Compensation Insurance with Employer's Liability for a minimum of $1,000,000.00 (one million dollars), issued by an insurance carrier licensed to underwrite Workers' Compensation Insurance in the State of California.

The Certificate of Insurance (i.e., Accord Certificate) that includes record on the General Liability Insurance Certificate must also include the following endorsements, **word for word**:

1) *The insurer will not cancel the insured's coverage without 30 days prior written notice to the State.*
2) *The State of California, its officers, agents, employees, and servants are included as additional insured, but only insofar as the operations under this Contract are concerned.*

The Contractor agrees that bodily injury liability insurance herein provided shall be in effect at all times during the term of this Contract. In the event said insurance coverage expires at any time, or times, during the term of this Contract, the Contractor agrees to provide at least 30 days prior to said insurance expiration date a new Certificate of Insurance evidencing insurance coverage as provided for herein for not less than the remainder of the term of the Contract or for a period of not less than one (1) year. New Certificates of Insurance are subject to approval by the Department of General Services and the Contractor agrees that no work or services shall be performed prior to receiving Department of General Services' approval. In the event the Contractor fails to keep in effect, at all times, insurance coverage as herein provided, the State may, in addition to any other remedies it may have, terminate this Contract upon occurrence of such event.

The Department of Rehabilitation will not provide for, nor compensate, the Contractor for any insurance premiums or cost for any type or amount of insurance.

Addendum # 1

## October 19, 2012

### Change to Contract #28716
between the Department of Rehabilitation and
AVT Inc. @ 16.1%.

The following location(s) service area(s) has been removed as follows:

**Dept. of Public Social Services**
**22690 Cactus Avenue, 2nd floor #224**
**Moreno Valley, CA 92553**

Contact person: **Lorean Williamson**
**951-358-7452**
**lorwilli@riversidedss.org**

Population: **30 +**

Location/Type:   **2nd floor, room 224 — (1) soda**
**(1) snack**

All other terms and conditions remain the same.

Contract Administrator:   Candise Clark
Print Name

Signature of Contractor

DATE: /0 -/9-/2

Signature of Contract Administrator

DATE: _____

*riverside e*

*to*

## EXHIBIT B

## BUDGET DETAIL AND PAYMENT PROVISIONS

*Beaumont*

### 1) COMMISSION PERCENTAGE RATE:

The contractor will pay the Commission Percentage Rate of: 18%

### 2) TRUST FUND ACCOUNT:

The amount paid to the Business Enterprises Program Vending Machine Trust Fund Account will be a single payment derived from multiplying the commission percentage rate times the gross receipts. Gross receipts are defined as cash collected including sales tax and CRV, less refunds paid.

### 3) MONTHLY SALES REPORT:

Contractor will submit the attached DR486 Vending Machine Commission Statement with their monthly payments to reflect all sales for each vending machine. Contractor will insure that payments are post marked by the 15th of the following month (e.g., payments for January activity must be post marked by February 15th). Monthly sales reports not post marked by the 15th may result in an assessment of Liquidated Damages as defined in Exhibit E Additional Provisions.

### 4) The monthly DR 486B must be included with the following information with each payment:

a.  Contract number
b.  Name and address of location, including floor
c.  Sales Activity for each machine (by type) in the contract
d.  Commissions paid for each machine
e.  Contact person (name and phone number)
f.  **Beginning and Ending Meter Readings**

### 5) The contractor will make payments payable to the Business Enterprises Program, Vending Machine Trust Fund Account and submit them on a monthly basis to:

**Department of Rehabilitation
Attn: Accounting Section, 721 Capitol Mall, 6th Floor
Sacramento, CA 95814**

### 6) DAMAGES FOR NON-COMPLIANCE WITH OFFICIAL DR486B VENDING MACHINE COMMISSION STATEMENT FORM PROVIDED:

Commission statements received that are not utilizing the official DR486B Vending machine commission statement form that has been provided by the VMU will not be accepted. This will result in a "non-payment" status and will incur Liquidated Damages as defined in Exhibit E Additional Provisions.

### 7) DAMAGES FOR NON, PARTIAL OR LATE PAYMENT:

Any payments post marked after the 15th of the following month may be assessed a Liquidated Damages as defined in Exhibit E Additional Provisions of $50.00 for each machine in the contract.

Damages may be applied on a weekly basis until payment is received.

8)  PRICE LIST:

Contractor will not exceed the prices for the similar items on the attached Price List, rev 9/30/2008, Attachment II.

9)  BUDGET CONTINGENCY CLAUSE:

It is mutually agreed that if the Budget Act of the current year and/or any subsequent years covered under this Agreement does not appropriate sufficient funds for the program, this Agreement shall be of no further force and effect. In this event, the State shall have no liability to pay any funds whatsoever to Contractor or to furnish any other considerations under this Agreement and Contractor shall not be obligated to perform any provisions of this Agreement.

If funding for any fiscal year is reduced or deleted by the Budget Act for purposes of this program, the State shall have the option to either: cancel this Agreement with no liability occurring to the State, or offer an Agreement amendment to Contractor to reflect the reduced amount.

EXHIBIT A

## SCOPE OF WORK
### Riverside to Beaumont

Contractor agrees to supply all labor, materials, tools, vending machine equipment, products and transportation necessary to perform all services required for the vending machines on behalf of the Department of Rehabilitation's Business Enterprise Program as described herein:

1) **Location(s) and Equipment(s):**
   Locations: See Exhibit A (See A-I) for list of agencies, locations, and equipment.
   **Total: (10) Vending Machines.**
   - All machines should be energy-efficient (i.e., Energy Star-rated) and must accept dollar bills. Being that they are state buildings and not federal, you are not required by law to provide machines that accept dollar coins, but the Department of Rehabilitation strongly encourages retrofitting your machines to accept the dollar coins.
   - Specific product choices are the option of each agency but the Department of Rehabilitation urges the consideration of healthy beverage and snack choices, i.e., items relatively low in saturated fats, total fats and calories.
   - Unless specified, cold beverage machines may dispense cans or bottles and contain carbonated, non-carbonated and water drinks.
   - This contract shall give the option to amend for more time and money in the event that additional services (adding machines or removing machines) must be performed which were wholly unanticipated and not specified in the original written Scope of Work, but which in the opinion of both parties is necessary to the successful accomplishment of the general scope of work outlined, however, an amendment for these additional services to the agreement must be executed prior to any work being authorized by DOR.

2) **Background Checks:**
   The Contractor and all their employees will be subject to a background check. Picture identification is required for entry into the buildings.
   A background check will be performed on the winning contractor and their employees. Upon being accepted as the winning bid and passing the background check, a picture identification must be presented immediately upon request everywhere in the facility. You will not be permitted entrance without a valid I.D.
   **Standard security issues apply and you must have a valid California State ID to gain entrance to these facilities.**

3) **Service Hours:**
   The Contractor must complete all work during business hours, between 8:00 AM – 5:00 PM, Monday through Friday, except for holidays. Service is expected within those timeframes.

4) **Project Representatives**
   During the term of this agreement, will be:

   DOR Contract Administrator
   Department of Rehabilitation
   Candise Clark, Contract
   Administrator or designee
   Business Enterprises Program
   721 Capitol Mall, 5th Floor
   Sacramento, CA 95814
   (916) 558-5353

   *See Exhibit A, Attachment I for the list of Agency Contacts.*

Riverside to Beaumont

28716
PAGE 147

Note: The Agency Contact shall be responsible to ensure their respective agency-related vending machine service issues are coordinated and resolved directly with the Contractor. Should issues need to be addressed at the next highest level, the Agency contact shall contact the Department of Rehabilitation - Contract Administrator for further assistance.

### 5)   Compliance with SB 441

Vending machines operated or maintained on state property must satisfy the requirement of SB 441 "that at least 35 percent of the food and at least one-third of the beverages offered in the vending machines meet accepted nutritional guidelines" by January 1, 2011.
The complete text of SB 441 can be accessed at:

http://info.sen.ca.gov/pub/07-08/bill/sen/sb_0401-
0450/sb_441_cfa_20080108_122759_sen_comm.html

### 6)   Vendor Information

Any changes to business information provided on the contract, address, phone number, etc., must be submitted in writing within 15 days of changes. Liquidated Damages as defined in Exhibit E Additional Provisions of $50.00 may be applied if BEP is not notified within 15 days of changes.

Changes in ownership of the business in any form must be submitted to the Department of Rehabilitation Business Enterprise Program within 15 days of the business modification. Should a business make changes to ownership, split the business, or change business name are expected to be forwarded to Department of Rehabilitation Business Enterprise Program attention: **Cheryl Gatus**. **Should changes take place without notification to BEP within 15 days a Liquidated Damages as defined in Exhibit E Additional Provisions of $50.00 may be applied for everyday there after.**

Riverside to Beaumont                    Page 2                             25716

## Exhibit A: Attachment 1, Locations and Equipment

### Contract # 28716  **Riverside to Beaumont Route**

| | Agency | Flr | Location | Address | Contact | E-Mail | Phone | Pop | Hot Drink | Cold Drink | Candy/ Snack | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | DOR - Inland Empire Dist. Office | | Brk. Rm. | 3130 Chicago Ave., Riverside, CA 92507 | Betty Carbullido | betty.a.carbullido@dor.ca.gov | 951-782-4471 | 55 | | 1 | 1 | 2 |
| 2 | Riverside County Probation Dept. | | Brk. Rm. | 1201 Research Park Dr., Ste. 100 Riverside, CA 92507 | Carol Weatherspoon Melinda Arellano | cweather@rcprob.us maarella@rcprob.us | 951-955-2872 951-955-2953 | 31 staff + 40 during wkly trng. | 1 | 1 | 1 | 3 |
| 3 | Dept. of Public Social Services | 2nd | Rm 224 | 22690 Cactus Ave. Moreno Valley, CA 92553 | Lorean Williamson Gail Evens | lorwilli@riversidedpss.org gaevans@riversidedss.org | 951-358-7452 951-358-5240 F 951-413-5601 951-413-5660 F | 30 FT + 100 during wkly trng. | | 1 | 1 | 2 |
| 4 | CHP | | Brk. Rm. | 195 Highlands Spring Ave., Beaumont, CA 92223 | Jeanne Bryan Baker | bbaker@chp.ca.gov | 951-769-2000 | 65 | | 2 | 1 | 3 |
| | TOTALS | | Total Vending Machines - 10 | | | | | | 1 | 5 | 4 | 10 |

EXHIBIT B

## MAXIMUM SELLING PRICES *

| Product | Size | Maximum Selling Price |
|---|---|---|
| Soda / Juice (less than 10%) / Tea / Seltzer / Water (Unflavored and Unfortified) | 11.5 oz. can and up | $ 1.10 |
| | 16 oz. bottle and up | $ 1.50 |
| Milk, 100% Juice | 1/2 pint and up | $ 1.00 |
| Specialty Drinks (Starbucks, Snapple, Water (Flavored and/or Fortified, etc.) | 9.5 oz. | $ 2.00 |
| Energy Drinks (Red Bull, Rockstar, etc.) | 8 oz. and up | $ 3.00 |
| Candy and Candy Bars | 1-2.5 oz. | $ 1.00 |
| | 2.6 oz. and up | $ 1.25 |
| Healthy Pick (Health Bar, Trail Mix, etc.) | 1.5 oz. and up | $ 1.50 |
| Snacks / Chips | 1 – 2 oz. | $ 1.00 |
| | 2.1 oz. and up | $ 1.50 |
| Pastries (Drake, Hostess, etc.) | 1 oz. and up | $ 1.50 |
| Popcorn, Fresh or Microwave | 3 oz. and up | $ 1.00 |
| Gum / Lifesavers / Mints | 1 oz. and up | $ 1.00 |
| Cookies / crackers | 2 oz. and up | $ 1.00 |
| Hot Coffee / Tea / Chocolate | 8 oz. | $ 0.75 |
| | 12 oz. | $ 1.00 |
| Cold Food (Muffin, Biscuits, Burrito, etc.) | Various | OPEN |

* Maximum selling price includes Bottle/Can Deposit (CA CRV) and
 applicable California Sales Tax

Rev 9/30/2008

AGREEMENT

6/03

| | |
|---|---|
| AGREEMENT NUMBER | 28 16 |
| REGISTRATION NUMBER | |

1. This Agreement is entered into between the State Agency and the Contractor named below:

STATE AGENCY'S NAME

Department of Rehabilitation

CONTRACTOR'S NAME

AVT Inc

*Commission Rate – 18%*

*3 yr Contract*

2. The term of this Agreement is:   08/01/2012   through   07/31/2015
This contract is a 3-yr revenue contract

3. The maximum amount of this Agreement is:   $ 0.00 This contract is a 3-yr revenue contract

4. The parties agree to comply with the terms and conditions of the following exhibits which are by this reference made a part of the Agreement.

| | |
|---|---|
| Exhibit A – Scope of Work | 4 pages |
| Attachment I | 1 page |
| Exhibit B – Budget Detail and Payment Provisions | 3 pages |
| | |
| Exhibit C* – General Terms and Conditions   GTC 610  6/10 | |
| Check mark one item below as Exhibit D: | |
| ☒ Exhibit - D Special Terms and Conditions (Attached hereto as part of this agreement) | 4 pages |
| ☐ Exhibit - D* Special Terms and Conditions | |
| Exhibit E – Additional Provisions | 4 pages |

*Items shown with an Asterisk (\*), are hereby incorporated by reference and made part of this agreement as if attached hereto. These documents can be viewed at www.ols.dgs.ca.gov/Standard+Language*

**IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto.**

| CONTRACTOR | | California Department of General Services Use Only |
|---|---|---|
| CONTRACTOR'S NAME (if other than an individual, state whether a corporation, partnership, etc.)<br>AVT Inc | | |
| BY (Authorized Signature) | DATE SIGNED(Do not type)<br>8-3-2012 | |
| PRINTED NAME AND TITLE OF PERSON SIGNING<br>James Winsor, CEO | | |
| ADDRESS<br>341 Bonnie Circle, Suite 102, Corona, CA 92880 | | |
| STATE OF CALIFORNIA | | |
| AGENCY NAME<br>Department of Rehabilitation | | |
| BY (Authorized Signature) | DATE SIGNED(Do not type) | ☒ EXEMPT |
| PRINTED NAME AND TITLE OF PERSON SIGNING<br>Simone Dumas, Chief, Contracts and Procurement Section | | |
| ADDRESS<br>721 Capitol Mall, Sacramento, CA 95814 | | |

ATTACHMENT #1

## BID/BIDDER CERTIFICATION SHEET
### BID NUMBER # 12-06-02
### VENDING MACHINE CONTRACT
### Riverside to Beaumont

This Bid/Bidder Certification Sheet must be signed and returned along with all the "required attachments" as an entire package with original signatures. The bid must be transmitted in a sealed envelope in accordance with IFB instructions.

Do not return Section C, Bid Requirements and Information. Do not return "Sample Agreement" at the end of this IFB.

---

*Our all inclusive bid is submitted as follows:*

## *Percentage Rate of: 18%*

---

(Contractor will submit one flat bid rate for all machines: example: 15%, 18%, etc.)

A. All required attachments are included with this certification sheet.
B. The signature affixed hereon and dated certifies compliance with all the requirements of this bid document. The signature below authorizes the verification of this certification.
C. An Unsigned Bid/Bidder Certification Sheet May Be Cause For Rejection.

| 1. Company Name<br>AVT INC | 2. Telephone #<br>( 951 ) 737-1057 | 2b. Fax #<br>( 951) 737-7646 |
|---|---|---|
| 3. Address    341 BONNIE CIRCLE, SUITE 102, CORONA, CA 92880 | | |
| 3a.  Email:    kima@avtinconline.com | | |
| Indicate your organization type:<br>4. ☐ Sole Proprietorship           5. ☐ Partnership | | 6. X  Corporation |
| Indicate the applicable employee and/or corporation number:<br>7. Federal Employee ID No. (FEIN):<br><br>113828743 | 8. California Corporation No.:<br><br>C3072929 | |
| 9. Indicate applicable license and/or certification information: | | |
| 10. Bidder's Name (Print)        James Winsor | | 11. Title  CEO |
| 12. Signature        James Winsor | | 13. Date      07/09/2012 |

EXHIBIT "3"

EXHIBIT "3"
SAMPLE "EXHIBIT 3"

## A) Insurance

Contractor shall supply a Certificate of Insurance with the appropriate coverage and at limits as required. The Certificate of Insurance shall state a limit of liability not less than $1,000,000.00 (one million dollars) per occurrence and $2,000,000.00 (two million dollars) aggregate for bodily injury and property damage liability combined; plus automobile liability of not less than $1,000,000.00 (one million dollars) combined single limit; plus $1,000,000.00 (one million) Worker's Compensation Insurance. The Certificate of Insurance must include:

1) Commercial General Liability: General Aggregate; Products; Personal and Advertising Injury; each occurrence for a minimum of $1,000,000.00 (one million dollars) and aggregate for $2,000,000.00 (two million dollars).

2) Automobile Liability must include any-auto, hired-autos, non-owned autos, and any other auto used in performing services under the contract for a minimum of $1,000,000 combined single limit.

3) Workers' Compensation Insurance and Employers' Liability:
Workers' Compensation Insurance with Employer's Liability for a minimum of $1,000,000.00 (one million dollars), issued by an insurance carrier licensed to underwrite Workers' Compensation Insurance in the State of California.

The Certificate of Insurance (i.e., Accord Certificate) that includes record on the General Liability Insurance Certificate must also include the following endorsements, **word for word**:

1) *The insurer will not cancel the insured's coverage without 30 days prior written notice to the State.*
2) *The State of California, its officers, agents, employees, and servants are included as additional insured, but only insofar as the operations under this Contract are concerned.*

The Contractor agrees that bodily injury liability insurance herein provided shall be in effect at all times during the term of this Contract. In the event said insurance coverage expires at any time, or times, during the term of this Contract, the Contractor agrees to provide at least 30 days prior to said insurance expiration date a new Certificate of Insurance evidencing insurance coverage as provided for herein for not less than the remainder of the term of the Contract or for a period of not less than one (1) year. New Certificates of Insurance are subject to approval by the Department of General Services and the Contractor agrees that no work or services shall be performed prior to receiving Department of General Services' approval. In the event the Contractor fails to keep in effect, at all times, insurance coverage as herein provided, the State may, in addition to any other remedies it may have, terminate this Contract upon occurrence of such event.

## JOFEMAR / AVT -MUTUAL BUSINESS AGREEMENT

THIS AGREEMENT (the "Agreement") is made and entered as of June 21, 2011, by and between, Jofemar USA, INC, a Florida corporation ("Jofemar") and AVT, Inc., a Nevada corporation ("AVT").

NOW THEREFORE, in consideration of the mutual covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the parties agree as follows:

1.    Parties and Relationship.

    (a).    Jofemar has designed, manufactured and marketed certain vending systems and components (the "Jofemar Systems").

    (b).    AVT specializes in the integration of value added hardware and software technology into vending systems.

    (c).    AVT and Jofemar desire to enter into an agreement to work together to integrate AVT software technology into the Jofemar vending systems and have further agreed to develop new products and have expressed the desire to share in such development costs.

2.    Exclusivity and Revenue Sharing.

    (a)    Effective upon the execution of this Agreement Jofemar hereby grants AVT exclusive rights to offer, provide and Integration and/or Enhancements to any Jofemar system that is sold in the United States. "Integration" or "Enhancements" is defined as any Jofemar system that utilizes a PC or Jofemar "Tools" protocol

Notwithstanding the afore mentioned, AVT hereby acknowledges that prior to enter into this agreement Jofemar has sold the "Tools" to the companies mentioned in Annex 1 of the present agreement. Therefore, Jofemar will not be responsible for any use or development made by those companies and those actions will not represent any violation of the exclusivity granted herein.

Without prejudice to the aforementioned, the exclusivity mentioned herein shall be conditioned to the fulfillment by AVT of its obligations regarding the 'minimum volume of orders" establishes in the following in paragraph 3 of this agreement.

    (b)    As consideration for the exclusivity provided for in this section, on all Jofemar system sold by AVT which utilize a PC and subscribe to AVT's VMS subscription service, AVT will split on a 50/50 basis, all profit received by AVT from the VMS subscription service.

**AVT will provide Jofemar a monthly statement with the sales.**

Mutual Business Agreement
Jofemar / AVT

Page 1

3.    Minimum Volume of Orders

(a) AVT undertakes to purchase annually from Jofemar at least 500 (125 quarterly) Machines according to the terms and conditions set forth within the present Agreement.

(b) If AVT fails with the fulfillment of the obligation outlined in this agreement, herein, Jofemar will be entitled either (i) to terminate the present agreement, or (ii) to remove the exclusivity granted, or (iii) to negotiate the fulfillment of the agreement, with the relevant indemnity of damage or loss in each case.

(c) The prices are those established within Annex 2 of the present Agreement and shall be annually negotiated by the parties. AVT will pay for shipping costs.

(d) Payments will be made by AVT as follows: 50% with the purchase order and 50% within thirty days after receiving the products.

4. Term, Termination.

(a)    This Agreement shall be for an initial 24 month term shall automatically renew for two (2) additional two (2) year terms unless cancelled by either party with 60 days prior written notice.

(b)    This Agreement may be terminated by either party if any party defaults in the performance of any material term or condition of this Agreement and such default continues unremedied for a period of thirty (30) days after the delivery of written notice thereof by the terminating party to the other party or upon any other termination event contained in this Agreement.    Regardless of termination, the provision of paragraphs numbers 5 and 6 shall remain in full force and effect.

5.    Warranty and Indemnity.

(a)    Jofemar hereby provides for a period of 12 months from the date of AVT's receipt of any Jofemar system, a warranty from all manufacturing defects.

(b)    Jofemar shall be responsible for ensuring that the Vision standard models of Jofemar systems provided under this Agreement and its assembly, comply with UL/ETL safety standards and guidelines whenever the CV Systems is fit to apply or it is necessary and mandatory by the relevant government agency. Therefore, AVT will be responsible for obtaining any other certifications that would be necessary for the validity of the modifications entered by it into the Machines. Jofemar undertakes to collaborate with AVT at AVT's expense in all the procedures that where necessary regarding the obtaining of the certifications and will provide

Mutual Business Agreement
Jofemar / AVT

Page 2

AVT with the documentation needed in order to obtain such certifications.

(c)    AVT shall defend, indemnify and hold harmless Jofemar from all costs, judgments and attorneys' fees arising from any claim that any materials supplied by AVT under this Agreement infringes any third party patents, patent rights, copyrights or trade secrets. Jofemar shall promptly notify AVT in writing of the initiation of any such claims, give AVT sole control of any defense or settlement, and provide AVT reasonable information and assistance in resolving such claim, provided, further AVT may not settle any such claim without the prior written consent of Jofemar (which shall not be unreasonable withheld). The preceding indemnity shall not apply, however, to any claims arising from the use by Jofemar of any materials, components or manufacturing processes not expressly specified by AVT.    AVT's indemnification obligation contained herein, shall remain in full force and effect until the date 12 months after the shipment of each Jofemar systems.

(d)    Jofemar shall defend, indemnify and hold harmless AVT from all costs, judgments and attorneys' fees arising from any claim arising from or in connection with the Jofemar systems supplied by Jofemar, including, without limitation, with respect to the manufacture, packing, or packaging.    AVT shall promptly notify Jofemar in writing of the initiation of any such claims, give Jofemar sole control of any defense or settlement, and provide Jofemar reasonable information and assistance in resolving such claim, provided, further Jofemar may not settle any such claim without the prior written consent of AVT (which shall not be unreasonable withheld).    Jofemar's indemnification obligation contained herein, shall remain in full force and effect until the date 12 months after the shipment of each Jofemar system.

6.    Confidentiality.    All written information and data exchanged between the parties under this Agreement shall be deemed to be Confidential Information. The party that receives such Confidential Information agrees not to disclose it directly or indirectly to any third party, or to use it for any purpose other than as required under this Agreement, without the prior written consent of the disclosing party.    Notwithstanding the foregoing, if Jofemar deems that this Agreement is required to be filed with the Securities and Exchange Commission (the "SEC") or described in Jofemar's filings under the Securities Exchange Act of 1934 or the Securities Act of 1933, pursuant to the rules and regulations promulgated thereunder, AVT consents the filing or description of the Agreement with the SEC so long as pricing and other trade secrets are redacted from the filing and such filing is approved by AVT which shall not be unreasonably withheld.

7.    Intellectual and Industrial Property Rights.

(a) Each Party will remain as sole owner of their respective background intellectual and industrial Property associated to the object of the present Agreement and the signing of this Agreement may not grant to the Parties more rights or obligations that the ones expressly set in this Agreement, and specially, this Agreement may not involve the granting of any license in order to exploit any intellectual property right.

Mutual Business Agreement
Jofemar / AVT

Page 3

(b) The parties guarantee that the results and intellectual and industrial property rights which have been created by the parties, its affiliated companies or its subcontractors in connection with the performance of this agreement do not infringe third party's intellectual property rights. Parties shall hold each other, its agents, successors and assignees, harmless against all third party claims in connection with the actual or alleged infringement by Parties of intellectual property rights belonging to a third party and directed to the work and products delivered by Parties during the performance of this agreement. Parties agree to bear the full cost of all consequences, including any financial convictions as well as settlement made in connection with the actual or alleged infringement, attorney's fees and any other legal fees that may be incurred by Parties as a consequence thereof.

(c) If AVT creates intellectual and industrial property rights, using Jofemar Systems, which are eligible for statutory protection, AVT is obliged to give Jofemar notice thereof without undue delay. Jofemar shall be obliged to declare within a period of two months after having received notice thereof, whether Jofemar intends to file the patent application or utility model application and share its ownership and costs with AVT 50% each of them or not. If Jofemar decides to file such applications together with AVT, both parties must take all necessary measures to ensure such actions.

8.   No Assignment. This Agreement shall be binding upon the parties and their respective successors and assigns, provided that neither party may assign this Agreement without the written consent of the other party.

9.   Notices.   All notices hereunder shall be sufficiently given for all purposes hereunder if in writing and delivered personally, sent by document, overnight delivery service to the appropriate address or number set forth below.

Notice to AVT shall be addressed to:

Notices to Jofemar shall be addressed to:

James Winsor
AVT, Inc.
341 Bonnie Circle, Suite 102
Corona, CA 92880

Jose F Iribarren
Jofemar USA INC.
2200 NW 102 Ave, unit 3
Doral, Fl 33172

or at such other address and to the attention of such other person as either party may designate by written notice to the other.

10.   Governing Law.   This Agreement shall be construed and interpreted in accordance

Mutual Business Agreement
Jofemar / AVT

Page 4

with the laws of the State of California, United States of America. Any claim, dispute or controversy arising out of, or relating to any section of this Agreement or the making, performance, or interpretation of the rights and obligations explicitly set forth in this Agreement shall be settled on an expedited basis by binding arbitration in the County of Orange, California, USA, before a single arbitrator mutually agreeable to the parties, and if no agreement is reached, before a single arbitrator from the American Arbitration Association selected in accordance with its rules then in effect, which arbitration shall be conducted in accordance with such rules, and judgment on the arbitration award may be entered in any court having jurisdiction over the subject matter of controversy. AVT and Jofemar hereby consent to the jurisdiction and venue of County of Orange, California, USA

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

Jofemar

By: _JOSE F. IRIBARREN_
Its: _CEO_

AVT, Inc.

By: _James Winser_
Its: _CEO_

Mutual Business Agreement
Jofemar / AVT

Page 5

ANNEX I

**Existing "Tools" Customers**

1. QUIDMED
2. VEND-RITE
3. H.M.B./UPSTATE
4. CHILDREN EYE CENTER

Mutual Business Agreement
Jofemar / AVT

Page 6

ANNEX 2

Standard Pricing



**Jofemar** USA

CONFIDNTIAL AVT, Inc.

| | W/out P Sys. | With P Sys. | |
|---|---|---|---|
| **AVT PRICES** | | | |
| *With elevator delivery* | | | |
| VISION MENU | 3497 | 3697 | *with cooling unit and healthy timer syst. |
| COMBO PLUS II | 3392 | 3592 | *with cooling unit |
| QUENCHER | 3322 | 3522 | *with cooling unit |
| MULTISELLER PLUS | 3147 | 3347 | *optional cooling unit |
| VISION ES PLUS | 3509 | n/a | *with cooling unit |
| VISION ES PLUS | 3147 | n/a | *optional cooling unit |
| KEY PAD/DISPLAY KIT FOR TOOLS | 180 | n/a | |
| VISION MULTIPLUS | 3392 | 3592 | *with cooling unit |
| VISION MULTIPLUS | 3147 | 3347 | *optional cooling unit |
| *Without elevator delivery* | | | |
| MULTISELLER | 2797 | 2997 | *optional cooling unit |
| MULTISELLER ES | 2517 | n/a | *optional cooling unit |
| SNACK PLUS | 2797 | 2997 | *optional cooling unit |
| EASY COMBO | 3007 | 3207 | *with cooling unit |
| EASY LUNCH | 3217 | 3417 | *with cooling unit and healthy timer syst. |
| *Hot Drinks* | | | |
| G-500 Real Espresso (whole bean) | 2902 | 3102 | |
| G-250 Real Espresso (whole bean) | 2700 | 2900 | |
| S-500 Freeze Dry | 2587 | 2787 | |
| *Frozen food/ice cream With elevator delivery* | | | |
| ICE PLUS MIDI by container only | 4162 | 4362 | *Cooling unit and healthy |
| ICE PLUS | 4680 | 4880 | |
| *Tobacco/Multiproduct* | | | |
| ARGOS 15 | 2083 | 2263 | |
| ARGOS 21 | 2372 | 2572 | |
| GOYA 5 | 1250 | 1450 | |
| GOYA 16 | 2035 | 2235 | |
| GOYA 22 | 2650 | 2850 | |
| GOYA 32 | 2850 | 3050 | |
| RSU 28 | 1862 | n/a | |
| RSU 51 | 2660 | n/a | |
| RSU 87 | 3010 | n/a | |
| KIOS 24 | 795 | n/a | |
| REMOTE CONTROL RSU | 280 | n/a | |
| *Payment Systems* | | | |
| BT-10 Bill reader | 242 | n/a | *Our payment systems |
| J-2000 5 tubes coinmech | 287 | n/a | can be configured for |
| CRONOS Time & Pulse timer | 291 | n/a | almost any currency, |
| J-130 Cashless reader | 217 | n/a | price may vary. |

Mutual Business Agreement
Jofemar / AVT

Page 7



## MASTER VENDING AGREEMENT

THIS MASTER VENDING AGREEMENT (this "Agreement") is made and entered into as of June 18, 2014, by and between AVT Inc., a Nevada corporation, with an address at 341 Bonnie Circle, Suite 102, Corona, CA 92880 ("AVT") and Fitness International, LLC, a California limited liability company, with an address at 3161Michelson Drive, Suite 600, Irvine, CA 92612 ("LA Fitness").

### RECITALS

A.    AVT and LA Fitness previously entered into that certain Location and Placement Agreement, dated as of March 15, 2014 (the "Previous Agreement").

B.    AVT and LA Fitness desire that this Agreement supersede and replace the Previous Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, subject to the terms and conditions set forth herein, hereby agree as follows:

1.    Grant of Right to Place Vending Machines and Owner Responsibility. Subject to the terms and conditions herein, LA Fitness hereby grants to AVT a non-exclusive right:

(a)    to install, operate, supply and service automatic vending equipment for the dispensing of beverages, snack foods and retail products ("Vending Machines") in spaces to be designated by LA Fitness (the "Spaces") within the LA Fitness facilities (each, a "Facility" and collectively, the "Facilities") set forth on Schedule A hereto; provided that LA Fitness may add Facilities to Schedule A at any time during the Term if: (i) LA Fitness provides forty-five (45) days' notice to AVT, or sixty (60) days' notice to AVT for Facilities located east of the Mississippi river or in Canada, and (ii) the number of Facilities added to Schedule A does not exceed twenty (20) locations in any calendar month; and

(b)    to enter the Facilities during normal business hours and without undue disruption to, or interference with, the normal operation of the Facilities, as is reasonably required for the production, maintenance, preservation, and continued operation of the Vending Machines.

2.    Term. The term of this Agreement shall be June 6, 2014 to June 5, 2017 (the "Initial Term"). Upon expiration of the Term this Agreement shall automatically renew for a one (1) year period (each such period, a "Renewal Term" and together with the Initial Term, the "Term"); provided that either party may terminate this Agreement upon thirty (30) days written notice prior to the expiration of the Initial Term or any Renewal Term.

3.    Equipment. AVT will place the Vending Machines in the Spaces provided at each Facility, and LA Fitness shall provide AVT with a 110 Volt power source(s) in compliance with applicable building codes per each Vending Machine placed. Subject to prior approval by LA Fitness, which may be withheld is LA Fitness' sole discretion, AVT shall have the right to install or contract to install dedicated internet connection for the Vending Machines at the sole cost and expense of AVT. The number and type of Vending Machines permitted at each Facility shall be set forth on Schedule A.

Page 1

EXHIBIT "3"          PAGE 161

4.    Receipts and Revenue Sharing.

    a.    Subject to the following provision, all receipts from the Vending Machines shall belong to AVT. AVT shall be responsible for all direct costs of operations. In consideration of LA Fitness providing the Spaces and entering into this Agreement, AVT agrees to pay to LA Fitness, on a monthly basis, an amount equal to fifty percent (50%) of Profits (as defined below) resulting from the sale of items dispensed by the Vending Machines at the Facilities during the Term (such amount, the "LAF Share"). The LAF Share shall be paid to LA Fitness as follows: by the 15th of each month, AVT shall (a) pay to LA Fitness, by wire transfer of funds to an account identified by LA Fitness, the LAF Share for the immediately preceding month, and (b) provide to LA Fitness, with respect to such immediately preceding month, a written accounting of the total amount of monies collected, the specific costs deducted therefrom, and the resulting Profits. For the purposes of this Agreement, "Profits" means the difference between (a) the total amounts of money collected from purchases of items dispensed by the Vending Machines less (b) AVT's wholesale costs of such items sold, and the resulting Profits.

    b.    AVT shall keep complete, accurate books of account and records with respect to the Profits and the LAF Share, and shall retain such books and records and reasonable supporting documentation for at least three (3) years from the end of the period to which they are applicable. LA Fitness may at any reasonable time during normal business hours, upon ten (10) days' prior notice to AVT, cause an examination or complete audit to be made of such books, records and other materials pertaining to the Profits and LAF Share for all or any part of the three (3) year period immediately preceding the giving of such notice. AVT shall make such books and records available to LA Fitness for examination and audit as permitted herein. Any such examination or audit shall be conducted in a manner so as to minimize interference with AVT's business operations. If such audit discloses any underpayment by AVT of the LAF Share, AVT shall pay to LA Fitness the amount of such underpayment within fifteen (15) days following AVT's receipt of such audit, unless AVT disputes the findings of such audit, in which case the parties shall work in good faith to resolve the dispute. If such audit is not disputed, and discloses any overpayment by AVT of the LAF Share, LA Fitness shall pay the amount of such overpayment to AVT together with delivery to Landlord of such audit. If such audit is not disputed, and discloses an underpayment by AVT of the LAF Share for a particular calendar year by five percent (5%) or more, AVT shall pay to LA Fitness within fifteen (15) days after demand, LA Fitness' reasonable cost in conducting such audit (as evidenced by invoices or other reasonable supporting documents delivered to AVT).

5.    Service. AVT shall service the Vending Machines as required to ensure that they are regularly replenished with items for sale and kept in a presentable manner. LA Fitness shall not open, service, repair, collect money from, stock, access inventory in, or otherwise service or operate the Vending Machines.

6.    Club Closures. In the event LA Fitness ceases to conduct business at any of the Facilities set forth on Schedule A, LA Fitness shall remove such Facilities from Schedule A and AVT shall promptly remove the Vending Machines at its sole cost and expense.

7.    License and Permits. AVT represents and warrants that all Vending Machines have been certified by the National Automatic Merchandising Association. AVT will comply with all applicable laws, including all federal, state and local licenses and permits required or applicable with respect to its business and the operation of the Vending Machines at the Premises.

Page 2

8.    Insurance and Indemnification. AVT agrees to obtain and maintain (and shall cause contractors and subcontractors to obtain and maintain), at its sole expense, the following insurance coverage during the entire term of this Agreement:

> a. Comprehensive General Liability Insurance in an amount of not less than One Million Dollars ($1,000,000) per occurrence and in the aggregate of not less than Two Million Dollars ($2,000,000), or in such greater amounts as determined by LA Fitness.
>
> b. Professional Product Liability Insurance in an amount of not less than One Million Dollars ($1,000,000) per occurrence and in the aggregate of not less than Two Million Dollars ($2,000,000), or in such greater amounts as determined by LA Fitness.
>
> c. Statutory Worker's Compensation Insurance and Employers' Liability Insurance in an amount not less than One Million Dollars ($1,000,000) and in no case less than the fullest extent required by federal, state and/or local law.
>
> d. Comprehensive Automobile Liability Insurance for any owned, non-owned, hired or borrowed automobile used in the performance of AVT's obligations under this Agreement in an amount not less than One Million Dollars ($1,000,000) for each accident and in the aggregate combined for bodily injury and property damage.
>
> e. AVT shall name Fitness International, LLC, its subsidiaries, employees, agents, representatives, managers, officers and affiliates as "Additional Insured" on the General Liability and Auto Liability policies (a) and (c) described above.
>
> f. AVT shall deliver to LA Fitness satisfactory evidence of the described insurance coverage on a certificate of insurance within seven (7) days of the execution of this Agreement. AVT will provide thirty (30) days written notice of any cancellation, non-renewal, termination, material change or reduction in coverage.
>
> g. The stipulated limits of coverage above shall not be construed as a limitation of any potential liability to LA Fitness and failure to request evidence of this insurance shall in no way be construed as a waiver of AVT's obligation to provide the insurance coverage specified.
>
> h. AVT's insurance as outlined above shall be primary and non-contributory coverage.

9.    AVT Indemnity. AVT shall indemnify and hold harmless LA Fitness and its subsidiaries, employees, agents, representatives, managers, officers and affiliates (the "Indemnified Parties") from and against any and all claims for damage to the person or property of anyone or any entity arising from AVT's use of the Spaces and Facilities, or from the conduct of AVT's business or from any activity, work or things done, permitted or suffered by AVT in or about the Facilities or elsewhere and shall further indemnify and hold harmless the Indemnified Parties from and against any and all claims, costs and expenses arising from any breach or default in the performance of any obligation on AVT's part to be performed under the terms of this Agreement, or arising from any act or omission (including any negligent act or omission) of AVT, or any of AVT's agents, representatives, contractors, employees or invitees and from and against all costs, attorneys' fees, expenses and liabilities incurred by the Indemnified Parties as a result of any such use, conduct, activity, work, things done, permitted or suffered, breach, default, act or omission or negligence,

Page 3

including but not limited to the defense or pursuit of any claim or any action or proceeding involved therein; and in case any action or proceeding be brought against an Indemnified Party by reason of any such matter, AVT upon such notice from LA Fitness shall defend the same at AVT's expense by counsel satisfactory to LA Fitness and LA Fitness shall cooperate with AVT in such defense. An Indemnified Party need not have first paid any such claim in order to be so indemnified. AVT, as a material part of the consideration to LA Fitness, hereby assumes all risk of damage to property of AVT or injury to persons in, upon or about the Facilities arising from any cause (including the negligence of an Indemnified Party) and AVT hereby waives all claims in respect thereof against LA Fitness.

10.    LA Fitness Indemnity.  LA Fitness shall indemnify and hold harmless AVT and its subsidiaries, employees, agents, representatives, managers, officers and affiliates (the "AVT Indemnified Parties") from and against any and all claims for damage to the person or property of anyone or any entity arising from LA Fitness' negligence or intentional misconduct in or about the Facilities or elsewhere and shall further indemnify and hold harmless the AVT Indemnified Parties from and against any and all claims, costs and expenses arising from any breach or default in the performance of any obligation on LA Fitness' part to be performed under the terms of this Agreement, or arising from any negligent act or omission or intentional misconduct of LA Fitness, or any of LA Fitness' agents, representatives, contractors, employees or invitees and from and against all costs, attorneys' fees, expenses and liabilities incurred by the AVT Indemnified Parties as a result of any such negligent act or omission or intentional misconduct, including but not limited to the defense or pursuit of any claim or any action or proceeding involved therein; and in case any action or proceeding be brought against an AVT Indemnified Party by reason of any such matter, LA Fitness upon such notice from AVT shall defend the same at LA Fitness' expense by counsel satisfactory to AVT and AVT shall cooperate with LA Fitness in such defense. An AVT Indemnified Party need not have first paid any such claim in order to be so indemnified.

11.    Exemption of LA Fitness from Liability.  All property kept, stored or maintained in the Facilities by AVT shall be so kept, stored or maintained at the sole risk of AVT. AVT hereby agrees that LA Fitness shall not be liable for injury to AVT's business or any loss of income there from or for loss of or damage to the goods, merchandise, products or other property of AVT, AVT's employees, agents, representatives, contractors or any other person in or about the Spaces or the Facilities, except to the extent that said loss or damage is caused by the negligence or intentional misconduct of LA Fitness. Nor shall LA Fitness be liable for injury to the person of AVT, AVT's employees, agents, representatives, invitees, customers or contractors, whether such damage or injury is caused by or results from theft, fire, steam, electricity, gas, water or rain, or from the breakage, leakage, obstruction or other defects of pipes, sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures, or from any other cause, whether said damage or injury results from conditions arising upon the Spaces or upon other portions of the Facilities, or from other sources or places, or from new construction or the repair, alteration or improvement of any part of the Spaces or Facilities or of the equipment, fixtures or appurtenances applicable thereto, and regardless of whether the cause of such damage or injury or the means of repairing the same is inaccessible, except to the extent such damage or injury is caused by the negligence or intentional misconduct of LA Fitness. Further, LA Fitness shall not be liable for any damages arising from any act or omission of LA Fitness or any LA Fitness employee, agent, customer, guest, or invitee or any other vendor, occupant or user of the Spaces or the Facilities, nor from the failure of LA Fitness to enforce the provisions of any other agreement of any other vendor, occupant or user of the Facilities, except to the extent that said liability results from the negligence or intentional misconduct of LA Fitness.

12.    Media and Advertising Rights.  AVT may only display Educational Merchandising Platform ("EMP") on video screens on the Vending Machines where the EMP displays information regarding the beverages, snack foods and retail products within the Vending Machines. AVT may not display any third-party advertisements. LA Fitness shall approve in writing within two (2) business days

Page 4

EXHIBIT "3"                                    PAGE 164

all media and advertising placed on the Vending Machines at the Facilities. Said approval may not be withheld in bad faith.

13.     Termination.

a.  In addition to the termination rights set forth in Section 2, this Agreement may be terminated by either party upon material breach by the other party and after a thirty (30) day cure period with a subsequent thirty (30) day written notice.

b.  Either party may terminate this Agreement immediately in the event of the other party's (a) insolvency, receivership, or voluntary or involuntary bankruptcy or institution of proceedings therefore; (b) assignment for the benefit of creditors a substantial part of that party's property; or (c) a substantial part of the other party's property becoming subject to any levy seizure, assignment, or sale for or by any creditor or governmental agency without being released or satisfied within thirty (30) days thereafter.

c.  Upon termination of this Agreement for any reason, AVT shall promptly remove the Vending Machines from the Facilities at its sole cost and expense.

14.     Claims. In the event that any dispute, claim, or controversy of any kind or nature relating to this Agreement arises between the parties, the parties agree to meet and make a good faith effort to resolve the dispute. If the dispute is not resolved within thirty (30) days after the parties first met to discuss it, and either party wishes to further pursue resolution of the dispute, then that party shall submit such dispute to arbitration to be decided by a single neutral arbitrator in accordance with the Arbitration Rules of the American Arbitration Association. The award rendered by the arbitrator shall be final, and judgment may be entered upon it in accordance with applicable law of the State of California. The governing law shall be that of the State of California. Venue shall be the County of Orange, State of California.

15.     Customer Support. AVT will be responsible for providing any service, customer support or help to ensure that AVT's performance under this Agreement is satisfactory. All servicing of the Vending Machines, including restocking of sale items, will be done by AVT at any reasonable time during normal business hours.

16.     Products and Pricing. All products of any kind or nature, including without limitation, food, beverage retail products, must be pre-approved in writing by LA Fitness. AVT will remove any product from the Vending Machines upon the written request of LA Fitness. Schedule B presents the names and retail prices of the food and beverage products, which have been pre-approved by LA Fitness to be offered through the Vending Machines. Prices may be subject to change due to changes in the cost of food and beverage product and/or the consumer price index. No additional products may be sold without LA Fitness' prior written approval.

17.     Intellectual Property. Neither party shall make use of any of the other party's intellectual property or logos without the prior written consent of that party, and all use of such trademarks shall inure to the benefit of the trademark owner.

18.     Confidentiality. The terms of this Agreement are acknowledged by the parties hereto be strictly confidential and the parties agree that they will not share the contents hereof with any third party, except as may be explicitly required for the performance of this Agreement, without the express written consent of the non-disclosing party excluding disclosure required by law, government order or request. AVT shall not issue a press release or make any statements, whether public or private, or create any

Page 5

advertisements, whether oral, printed or electronic, regarding AVT's relationship with LA Fitness or this Agreement without the prior written approval of LA Fitness.

19.    Notice. All notices hereunder by either party to the other party shall be in writing, delivered personally, by certified or registered mail, return receipt requested, or by overnight courier, and shall be deemed to have been duly given when delivered personally or when deposited in the United States mail, postage prepaid, addressed as follows:

| If to LA Fitness: | Fitness International, LLC<br>3161 Michelson Drive, Suite 600<br>Irvine, CA 92612<br>Attention: General Counsel |
|---|---|
| If to AVT: | AVT, Inc.<br>341 Bonnie Circle, Suite 102<br>Corona, CA 92880<br>Attention: Shannon Illingworth |

20.    Assignment. Neither party will assign, transfer or pledge this Agreement or any interest therein, in whole or in part, or delegate performance thereof, in whole or in part, without the prior written consent of the other party; provided, however, that either party may assign this Agreement in connection with its reorganization or the sale of all or substantially all of its assets.

*[Signature Page Follows.]*

Page 6

IN WITNESS WHEREOF, the parties have executed this Agreement, effective as of the date first set forth above.

AVT INC.
a Nevada Corporation

By:

Name: Kim Alexander

Its: VP of Operations

Date: 6-9, 2014

FITNESS INTERNATIONAL, LLC
a California limited liability company

By:

Name: Kathryn S. Polson

Its: Chief Financial Officer

Date: 6/8, 2014

By:

Name: Timothy Holmes

Its: Vice President of Finance

Date: [6-8], 2014

[Signature Page to Master Vending Agreement]

EXHIBIT "3"                    PAGE 167

## AMENDMENT NO. 1 TO MASTER VENDING AGREEMENT

THIS AMENDMENT NO. 1, executed as of February 27, 2015 ("**Amendment No. 1**"), to Master Vending Agreement dated as of June 18, 2014 (the "**Agreement**"), by and among Fitness International, LLC, a California limited liability company ("**Company**") and AVT Inc., a Nevada corporation ( "**AVT**"). Capitalized terms used but not otherwise defined in this Amendment No. 1 shall have the respective meanings ascribed to them in the Agreement, which will remain in full force and effect as amended hereby.

## RECITALS

WHEREAS, the parties entered into the Agreement whereby AVT was granted the non-exclusive right to install, operate, supply and service the Vending Machines.

WHEREAS, the parties hereto desire to make such amendments to the Agreement as are set forth in this Amendment No. 1.

## AGREEMENT

NOW THEREFORE, in consideration of the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1. **Amendments to the Agreement**.

    **1.1**   **Section 2** of the Agreement shall be amended by deleting and replacing "June 5, 2017" with "June 5, 2019".

    **1.2**   **Section 4(a)** of the Agreement shall be deleted in its entirety and replaced with the following:

    "Subject to the following provision, all receipts from the Vending Machines shall belong to AVT. AVT shall be responsible for all direct costs of operations. In consideration of LA Fitness providing the Spaces and entering into this Agreement, AVT agrees to pay to LA Fitness, on a monthly basis, and amount equal to the sum of: (i) fifty percent (50%) of Profits (as defined below) resulting from the sale of items dispensed by the Machines at the Facilities located in California during the Term plus (ii) thirty-five percent (35%) of Profits resulting from the sale of items dispensed by the Vending Machines at the Facilities located outside of California during the Term (such amount, the "LAF Share"). The LAF Share shall be paid to LA Fitness as follows: by the 15th of each month, AVT shall (a) pay to LA Fitness, by wire transfer of funds to an account identified by LA Fitness, the LAF Share for the immediately preceding month, a written accounting of the total amount of monies collected, the

specific costs deducted therefrom, and the resulting Profits. For the purposes of this Agreement, "Profits" means the difference between (a) the total amounts of money collected from purchases of items dispensed by the Vending Machines less (b) AVT's wholesale costs of such items sold."

1.3    The penultimate sentence in **Section 4(b)** of the Agreement shall be deleted in its entirety and replaced with the following:

"If such audit is not disputed, and discloses any overpayment by AVT of the LAF Share, LA Fitness shall pay the amount of such overpayment to AVT together with delivery to AVT of such audit."

2.    **Other Provisions.**  Except as expressly modified by this Amendment No. 1, all of the provisions of the Agreement are equally applicable to this Amendment No. 1.

3.    **Effect of Amendment No. 1.**

3.1    **No Other Amendments.**  Except as specifically amended by this Amendment No. 1, the Agreement will remain in full force and effect and is hereby ratified and confirmed.

3.2    **No Waivers.**  The execution, delivery and performance of this Amendment No. 1 will not, except as expressly provided herein, constitute a waiver of any provision of, or operate as a waiver of any right, power or remedy of the parties under, the Agreement or any other document relating to the Agreement.

3.3    **References.**  On and after the effective date hereof, each reference in the Agreement to "this Agreement," "hereunder," "hereof," "herein" or words of like import referring to the Agreement, and each reference in any other document relating to the "Agreement," "thereunder," "thereof," or words of like import referring to the Agreement, means and references the Agreement as amended hereby.

4.    **Electronic or Facsimile Signature.**  The parties agree that a .pdf copy or facsimile copy of this Agreement bearing authorized signatures may be treated as an original.

[Signature Page Follows.]

-2-

IN WITNESS WHEREOF, the Parties have caused this Amendment No. 1 to be executed and delivered by their duly authorized representatives, under seal or otherwise, as of the date first above written.

FITNESS INTERNATIONAL, LLC

By: _____
Kathryn S. Polson
Chief Financial Officer

By: _____
Robert A. Wilson
Senior Vice President

AVT INC.

By: _____
Kim Alexander
VP Operations

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 18101 Von Karman Avenue, Suite 1200, Irvine, CA 92612

A true and correct copy of the foregoing document entitled (*specify*): **NOTICE OF MOTION AND MOTION FOR ORDER: (1) APPROVING THE SALE OF THE ESTATE'S ASSETS FREE AND CLEAR OF LIENS AND OTHER INTERESTS PURSUANT TO 11 U.S.C. §363 (b) & (f); (2) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ESTATE'S INTEREST IN CERTAIN EXECUTORY CONTRACTS PURSUANT TO 11 U.S.C. §365; (3) FINDING PURCHASER IS A GOOD FAITH PURCHASER; AND (4) WAIVING 14-DAY STAYS OF FRBP 6004(h) AND 6006(d); MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF WAYNE SALVINO AND SUSAN GOODDELL GOLDMAN IN SUPPORT**   will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) April 19, 2016, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

⊠      Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) April 19, 2016, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Armory Consulting Co.
3943 Irvine Blvd., #253
Irvine, CA 92602

Levene Neale Bender Yoo & Brill LLP
10250 Constellation Blvd., Ste. 1700
Los Angeles, CA 90067

⊠      Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) April 19, 2016, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

- Honorable Mark Wallace, USBC, 411 West Fourth Street, Santa Ana, CA 92701

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 19, 2016   Susan C. Stein | /s/Susan C. Stein |
|---|---|
| *Date*                *Printed Name* | *Signature* |

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- **Kyra E Andrassy**    kandrassy@swelawfirm.com,
  csheets@swelawfirm.com;gcruz@swelawfirm.com;hdavis@swelawfirm.com
- **Carla M Blanc**    carla.margolis.blanc@sce.com, carla.margolis.blanc@sce.com
- **Philip Bonoli**    philip.bonoli@leclairryan.com
- **Gregory G Brown**    mhiguchi@bc-llp.com, preno@bc-llp.com
- **Jack Cullen**    jc@foster.com, sandra.lonon@foster.com
- **Glen Dresser**    gombd@aol.com
- **Marc C Forsythe**    kmurphy@goeforlaw.com, mforsythe@goeforlaw.com;goeforecf@gmail.com
- **John-Patrick M Fritz**    jpf@lnbyb.com, JPF.LNBYB@ecf.inforuptcy.com
- **Everett L Green**    everett.l.green@usdoj.gov
- **Ivan L Kallick**    ikallick@manatt.com, ihernandez@manatt.com
- **Eve H Karasik**    ehk@lnbyb.com
- **Gary E Klausner**    gek@lnbyb.com
- **Jeffrey S Kwong**    jsk@lnbyb.com, jsk@ecf.inforuptcy.com
- **Sandra W Lavigna**    lavignas@sec.gov
- **William Malcolm**    bill@mclaw.org
- **Charity J Miller**    cmiller@goeforlaw.com, kmurphy@goeforlaw.com
- **Randall P Mroczynski**    randym@cookseylaw.com
- **Ronak Patel**    rpatel@co.riverside.ca.us, mdominguez@co.riverside.ca.us
- **Paul R Rosenbaum**    paul@prrlawyers.com
- **Evan D Smiley**    esmiley@swelawfirm.com,
  gcruz@swelawfirm.com;csheets@swelawfirm.com;hdavis@swelawfirm.com
- **United States Trustee (RS)**    ustpregion16.rs.ecf@usdoj.gov
- **Edward T Weber**    ed@eweberlegal.com
- **Latonia Williams**    lwilliams@goodwin.com, bankruptcy@goodwin.com
- **Kimberly S Winick**    kwinick@clarktrev.com

**SERVED BY UNITED STATES MAIL**:

SEE ATTACHED

## Contracts

Chafey College
5885 Haven Avenue
Rancho Cucamonga, CA

Marriott International, Inc.
c/o Agent for Service of Process
Corporate Creations Network, Inc.
1430 Truxtun Ave., 5th Floor
Bakersfield, CA 93301

RSA Buying Group
85 Cold Spring Road
Suite 101
Syosset, NY 11791

Worth, Inc.
c/o Agent for Service of Process
Jon Illingworth
630 W Main Street
Tustin, CA 92780

Blue Rhino a division of
Ferrellgas, LP
c/o Agent for Service of Process
The Corporation Trust Company
Corporation Trust Center 1209 Orange St
Wilmington, DE 19801

Francisco Izawa
24872 Vista Magnifica
Laguna Niguel, CA 92677

Exec. Director of Parks, Recreation &
Community Services
City of Santa Ana
PO 1988
Santa Ana, CA 92702

Department of Rehab #28716
State of CA – Health & Human Svc Agency
Dept. of Rehabilitation
721 Capitol Mall
Sacramento, CA 95814

Worth Management, Inc.
c/o Agent for Service of Process
Nevada Business Center, LLC
701 S Carson St #200
Carson City, NV 89701

LA Fitness
Fitness International, LLC
a/o Agent for Service of Process
CT Corporation System
818 West Seventh Street, 2nd Fl
Los Angeles, CA 90017

LA Fitness Agreement II
Fitness International, LLC
c/o Agent for Service of Process
CT Corporation System
818 West Seventh Street, 2nd Fl
Los Angeles, CA 90017

Vending Software Design
1802 North Carson Street
Suite 212
Carson City, NV 89701-1230

**Marine Corps Community Services
(MCCS)
Headquarters
United States Marine Corps
NAF Business & Support Division (MR)
Quantico, VA 22134**

Worth, Inc.
c/o Agent for Service of Process
Agency Services of Nevada
Attn Kelly L Turner, Esq.
245 E Liberty St #200
Reno, NV 89501

Vending Software Design
c/o Agent for Service of Process
Lorne DeJong
19744 Beach Blvd., #131
Huntington, CA 92648

Frescos Mexican Grill
c/o Agent for Service of Process
Francisco Izawa
24872 Vista Magnifica
Laguna Niguel, CA 92677

Worth Consulting
2320 White Oak Lane
Corona, CA 92882

Preferred Wireless Technologies, Inc.
c/o Agent for Service of Process
Richard Ackerman
27247 Madison Ave #104
Temecula, CA 92590

Prim Westgate, LCC
c/o Agent for Service of Process
CT Corporation System
818 West Seventh Street, 2nd Fl
Los Angeles, CA 90017

RSA, Inc.
85 Cold Spring Road #101
Syosset, NY 11971

Rug Doctor, Inc.
4701 Old Shepard Place
Plano TX 75093

Rug Doctor, Inc.
c/o Agent for Service of Process
National Registered Agents, Inc.
818 W Seventh Street #930
Los Angeles, CA 90017

State Board of Equalization
Account Info Group, MIC: 29
PO Box 942879
Sacramento, CA 94279-0029

Sprint Solutions, Inc.
c/o Agent for Service of Process
Corporation Service Co dba CSC-Lawyers
Incorporating Service
2710 Gateway Oaks Dr., #150N
Sacramento, CA95833

Verizon Wireless
Attn Area General Counsel
15505 San Canyon Avenue
Irvine, CA 92618

Verizon Wireless
Legal & External Affairs Dept.
Attn HQ Legal-B2B Contract Admin
One Verizon Way, VC52S401
Basking Ridge, NJ 07920-1097